ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General
MATTHEW T. STRUHAR (SBN 293973)
*matthew.struhar@doj.ca.gov*
Deputy Attorneys General
  1300 I Street
  Sacramento CA 95814
  Tel: (916)210-7246
*Attorneys for Defendant*
*Armando Quintero, in his official capacity as*
*Director of the California Department of Parks and*
*Recreation*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Sable Offshore Corp. and Pacific Pipeline Company,**<br><br>Plaintiffs,<br><br>v.<br><br>**Armando Quintero, in his official capacity as Director of the California Department of Parks and Recreation,**<br><br>Defendant. | Case No. 2:26-cv-02739-SVW-SSC<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFS' COMPLAINT FOR DECLARATORY RELIEF**<br><br>**(Fed. R. Civ. P. 12(b)(6).)**<br><br>Date:          June 29, 2026<br>Time:          1:30 p.m.<br>Courtroom:  10A<br>Judge:         Hon. Stephen V. Wilson<br>Trial Date:   Not Set<br>Action Filed: March 13, 2026<br>Complaint Served: March 26, 2026<br><br>Filed/Concurrently Lodged With: Notice of Motion and Motion to Dismiss; Request for Judicial Notice; Declaration of Matthew T. Struhar ISO Motion to Dismiss; [Proposed] Order Granting Motion to Dismiss |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

SUMMARY OF THE FACTS ..............................................................................2

    I.    State Parks Owns Gaviota State Park, and, Without an Easement, Sable's Pipeline Runs Across the Park ...........................2

    II.    The Refugio Oil Spill .................................................................3

    III.    State Parks Issues Annual Right-of-Way Permits, But It Ultimately Denies Sable's Request for an Easement .........................3

    IV.    The Department of Energy Purportedly Orders Sable to Prioritize and Allocate Pipeline Transportation Services Under the Defense Production Act ...........................................................4

PROCEDURAL HISTORY ...................................................................................5

STANDARD OF REVIEW ...................................................................................5

ARGUMENT .........................................................................................................6

    I.    The Pipeline Safety Act Does Not Confer Sable with Easement Rights, Nor Does It Generally Preempt State Actions Affecting Pipelines ....................................................................................6

        A.    The PSA Does Not Affect the Rights of Property Owners, Including Public Agencies, to Decline to Grant or Renew Easements .................................................................7

        B.    State Parks' Actions Do Not Constitute Impermissible Pipeline Safety Regulation Under the Pipeline Safety Act ........8

    II.    Sable's Defense Production Act Claims Fail ....................................11

        A.    The Defense Production Act Does Not Confer the Federal Government with Requisition Authority, and Any Such Authority Would Be Unconstitutional ....................................11

        B.    The Defense Production Act Does Not Displace State Trespass Law, Nor Does It Immunize Contractors for Intentional Tort Liability .........................................................12

            1.    The Defense Production Act Preempts Certain State Law Antitrust and Contract Claims, Not Sable's Intentional Tort Claim of Trespass ...............................13

            2.    The Defense Production Act's Immunity Provision Does Not Shield Sable from Liability for Intentional Torts Like Trespass ...................................14

    III.    The Consent Decree Does Not Preclude State Parks from Bringing Trespass Claims and Otherwise Enforcing Its Property Rights Against Sable ...................................................................16

    IV.    Amendment Cannot Save the Complaint ........................................17

CONCLUSION ...................................................................................................17

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*
 556 U.S. 662 (2009) ................................................................................8, 11

*Bad River Band of Lake Superior of Chippewa Indians of Bad River
 Reservation v. Enbridge Energy Co., Inc.*
 626 F.Supp.3d 1030 (W.D. Wis. 2022)............................................................7, 8

*Bell Atl. Corp. v. Twombly*
 550 U.S. 544 (2007) ................................................................................5, 11

*California v. PHMSA*
 No. 26-508 (9th Cir. filed Jan. 28, 2026) ...........................................................6

*Eminence Capital, LLC v. Aspeon, Inc.*
 316 F.3d 1048 (9th Cir. 2003)........................................................................17

*Enbridge Energy, LP v. Whitmer*
 813 F.Supp.3d 777 (W.D. Mich. 2025)................................................................9

*Hercules Inc. v. United States*
 24 F.3d 188 (Fed. Cir. 1994).....................................................................13, 15

*In re Agent Orange Prod. Liab. Litig.*
 597 F.Supp. 740 (E.D.N.Y. 1984)....................................................................14

*Medtronic, Inc. v. Lohr*
 518 U.S. 470 (1996) ...........................................................................9, 14, 16

*New York v. United States*
 505 U.S. 144 (1992) ...................................................................................12

*Olympic Pipe Line Co. v. City Seattle*
 437 F.3d 872 (9th Cir. 2006)...........................................................................7

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*
 494 F.3d 788 (9th Cir. 2007)...........................................................................6

*Pocket Protectors v. City of Sacramento*
 124 Cal.App.4th 903 (2004)..........................................................................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Portland Pipe Line Corp. v. City of S. Portland*
288 F.Supp.3d 321 (D. Maine 2017)......................................................................9

*Printz v. United States*
521 U.S. 898 (1997) ...........................................................................................12

*Save the Hill Group v. City of Livermore*
76 Cal.App.5th 1092 (2022)...............................................................................10

*SFPP, L.P. v. Union Pac. R.R. Co.*
No. SACV 05-1015, 2006 WL 8448721 (C.D. Cal. Mar. 20, 2006) ...................8

*Sprewell v. Golden State Warriors*
266 F.3d 979 (9th Cir. 2001)................................................................................6

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*
608 F.3d 200 (5th Cir. 2010) ...............................................................................9

*United States, et al. v. Plains All American Pipeline, et al.*
No. 2:20-cv-02415 (C.D. Cal. filed Mar. 13, 2020)......................................6, 16

*United States v. California*
921 F.3d 865 (9th Cir. 2019) .............................................................................12

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995).................................................................13, 14, 15

*United States v. Youssef*
547 F.3d 1090 (9th Cir. 2008).............................................................................14

*Wash. Gas Light Co. v. Prince George's Cnty. Council*
711 F.3d 412 (4th Cir. 2013) ..........................................................................9, 10

STATUTES

49 U.S.C.
§ 60102(a)(1) ......................................................................................................6
§ 60104(c)........................................................................................................6, 8

**TABLE OF AUTHORITIES**
**(continued)**

Page

50 U.S.C.
    § 4511 ....................................................................................................................4
    § 4511(a)............................................................................................................13
    § 4511(c)............................................................................................................13
    § 4511(c)(1).......................................................................................................13
    § 4511(c)(2)(A)(i)..............................................................................................13
    § 4557 ...............................................................................................................14
    § 4558(j) ............................................................................................................14
    § 4577 .................................................................................................................5

Cal. Civ. Code
    § 659 ...................................................................................................................2
    § 829 ...................................................................................................................2

Cal. Pub. Res. Code
    § 5001(b)..............................................................................................................2
    § 5003 ...............................................................................................................10
    § 5006(a)..............................................................................................................2
    § 21060.5 ..........................................................................................................10
    § 21081(a)(1).....................................................................................................10

DPA (Defense Production Act)
    § 101 ........................................................................................................4, 13, 15
    § 101(a)..............................................................................................................13
    § 101(c)........................................................................................................13, 15
    § 707 ...................................................................................................5, 14, 15, 16

67 Stat. 129, Public Law 83-95 .......................................................................................11

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution ..............................................................................................................1

**COURT RULES**

Rule 12(b)(6)......................................................................................................................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

Alexandra G. Neenan, Cong. Rsch. Serv., R43767, The Defense
    Production Act of 1950: History, Authorities, and Considerations
    for Congress at 2 (updated Oct. 6, 2023),
    https://www.congress.gov/crs-product/R43767. ...............................................11

Executive Order 13603 § 201 ........................................................................................4

PSA (Pipeline Safety Act) ...........................................................................................1

**INTRODUCTION**

Federal law does not give Sable Offshore Corporation and the Pacific Pipeline ("Sable") Company *carte blanche* to requisition the property of the California Department of Parks and Recreation ("State Parks"). Nor may it, as the U.S. Constitution precludes the federal government and its agents from commandeering state facilities. Despite this, Sable claims that two federal statutes—the Pipeline Safety Act and the Defense Production Act—entitle Sable to flow oil through a state-owned park without the state's permission. They also claim that a Consent Decree, which is about pipeline safety, functions to grant them property rights. Even assuming the truth of all material allegations in Sable's complaint, those statutes do not have that effect, and the Consent Decree cannot be interpreted as Sable alleges. Thus, State Parks respectfully requests that the Court dismiss Sable's Complaint for Declaratory Relief (the "Complaint") without leave to amend.

The Pipeline Safety Act (the "PSA") prohibits states from imposing safety standards on interstate pipelines. The Complaint, however, includes no facts that would allow this Court to reasonably infer that State Parks is regulating pipeline safety. Sable has accordingly failed to state a claim under the PSA.

Likewise, the Defense Production Act (the "DPA") does not and cannot allow Sable to transfer oil through state-owned lands without the consent of State Parks. The DPA does not confer requisition authority to the President, the executive branch, or to private companies subject to orders under the DPA. Even if Congress had included express requisition authority in the DPA, commandeering state facilities, which is precisely what Sable claims the DPA entitles them to do, would be prohibited by the U.S. Constitution.

The DPA, in any event, does not preempt state trespass laws. And although the DPA's immunity provision offers contractors protections from breach of contract claims arising from the execution of DPA orders, that immunity is narrow and does

1

not shield private parties from liability for intentional torts based on trespass. For these reasons, Sable's DPA claims fail as a matter of law.

Finally, the Consent Decree, on its plain terms, does not obviate the need for a valid easement to flow oil, nor does it preclude State Parks from pursuing intentional tort claims like trespass. Sable accordingly cannot rely on the Consent Decree to support its claim for declaratory relief.

For those reasons, and for the reasons explained herein, Defendant Armando Quintero, in his official capacity as Director of State Parks, respectfully requests that the Court grant his motion to dismiss without leave to amend.

## SUMMARY OF THE FACTS

**I.    STATE PARKS OWNS GAVIOTA STATE PARK, AND, WITHOUT AN EASEMENT, SABLE'S PIPELINE RUNS ACROSS THE PARK**

State Parks operates California's state park system. Cal. Pub. Res. Code § 5001(b). California law provides that State Parks has title to the lands that comprise the state park system. *See id*. § 5006(a). The state park system includes Gaviota State Park (the "Park"). As the owner of the Park, State Parks has the right to the surface of the land at the Park and "everything permanently situated beneath or above it." Cal. Civ. Code § 829; *see also* Cal. Civ. Code § 659.

Line CA-325 is a hazardous liquid transportation pipeline that runs from the Gaviota Pump Station in Santa Barbara County to the Pentland Delivery Point in Kern County. ECF 1, ¶ 21. In 1987, State Parks granted an easement to the Celeron Pipeline Company ("Celeron") to "conduct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across" the Park. Request for Judicial Notice ("RJN"), Ex. 1, at 7; *see* ECF 1, ¶ 2. The pipeline referenced in the easement is Line CA-325. ECF 1, ¶ 2. The easement was only for thirty years, and it expired on July 27, 2016. RJN, Ex. 1, at 7. It has not been renewed. *See*, RJN, Ex. 2; *see also* ECF 1, ¶ 2 (admitting that the easement was "time-limited").

2

## II. THE REFUGIO OIL SPILL

On May 19, 2015, a portion of Line CA-325 ruptured and discharged approximately 120,000 gallons of heavy crude-oil in Santa Barbara County. *See* ECF 1, ¶ 3. The operator, Sable's predecessor, was ordered to stop flowing through both Lines CA-324 and CA-325. *Id.*

Significant damage occurred to State Parks' property, and State Parks and other state agencies expended significant costs cleaning up the spill. Litigation ensued, which culminated in a consent decree among Plains, the United States, and several California agencies, including State Parks in the role of a "Trustee Agency." *Id.*, Ex. B (the "Consent Decree"). The Consent Decree provides for Trustee Agencies to recover damages and penalties. *Id.* The Consent Decree also provides specific pipeline safety restrictions on the restart of the pipelines. *Id.* The conditions in the Consent Decree do not contain all the legal conditions that a pipeline operator would need to comply with to restart the pipelines; Sable's predecessor remained "responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein." *Id.* ¶ 78.

## III. STATE PARKS ISSUES ANNUAL RIGHT-OF-WAY PERMITS, BUT IT ULTIMATELY DENIES SABLE'S REQUEST FOR AN EASEMENT

Since 2016, State Parks has issued annual Right of Entry ("ROE") permits to Sable's predecessors-in-interest or companies affiliated with Sable that have allowed them access to the Park to perform minimal maintenance on the pipeline. *See* ECF 1, ¶ 36. The most recent ROE permit was issued on July 25, 2025, and it expires on July 26, 2026. RJN, Ex. 3, at 60. It provides that "[a]ctivities related to any new or future projects, *including restarting Line 325* or constructing a new pipeline, *are not included in the Project and are not covered by this Right of Entry.* Instead, the parties are negotiating separate agreements regarding Permittee's

3

activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart." *Id*. at 59 (emphasis added). The Annual Permit also provides that (1) State Parks "grants to [PPC] permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in [PPC] any interest" in Gaviota State Park; (2) PPC is permitted to enter the Park "for the purpose of pipeline maintenance and access for existing Line 325 that is *currently subject to closure orders*." *Id*. (emphasis added). The most recent ROE makes clear that it does not permit Sable to restart the flow of oil. *Id*.

Sable formally requested a new easement, and State Parks has acted consistently with its legal obligations to prudently manage the property and make appropriate decisions about a new encumbrance. *See* RJN, Ex. 2. As of March 13, 2026, State Parks had not granted Sable an easement, and the Complaint includes no allegation that Sable had an easement. *See* ECF 1, ¶ 42.[1] According to Sable, State Parks' reasons are pretextual. *Id*., ¶ 43.

## IV. THE DEPARTMENT OF ENERGY PURPORTEDLY ORDERS SABLE TO PRIORITIZE AND ALLOCATE PIPELINE TRANSPORTATION SERVICES UNDER THE DEFENSE PRODUCTION ACT

On March 13, 2026, the Secretary of Energy issued an order pursuant to Executive Order 13603 section 201, which purported to delegate authority to the Energy Department to issue orders pursuant to sections 101(a) and 101(c) of the DPA. ECF 1, Ex. A (the "Wright Order").[2] The Wright Order directs Sable "to prioritize and allocate pipeline transportation services for hydrocarbons" through various pipelines, including "transportation service activities at the onshore

---

[1] Following the filing of this action, State Parks formally denied Sable's request for a new easement on March 14, 2026. RJN, Ex. 2. Two days later, Sable announced that it had resumed flowing oil through the pipeline. *Id*., Ex. 4. Unlike other cases pending in this Court involving Sable and California (*see, e.g., Cal. Dept. of Parks and Rec. v. Sable Offshore Corp., et al.*, 2:26-cv-02946-SVW-SSC; *United States, et al. v. Plains All-American Pipeline L.P., et al.*, Case No. 2:20-cv-02415-SVW-SSC), this case focuses on State Parks' actions before Sable began flowing oil through the pipeline.

[2] Section 101 of the DPA is codified under 50 U.S.C. § 4511.

facilities in Las Flores Canyon, California, to the Pentland Sation terminal in Pentland California." Wright Order at 3. The Wright Order further requires Plaintiff to "commence performance under contracts or orders for services" for such transportation activities and to prioritize the performance of those contracts. *Id.*

## PROCEDURAL HISTORY

Sable filed its Complaint for Declaratory Relief (the "Complaint") on March 13, 2026, the same day the Secretary of Energy issued the Wright Order. ECF 1.[3] The Complaint includes two causes of action, both for declaratory relief. The first charges State Parks with engaging in unlawful state regulation, which Sable contends is preempted by the PSA, the DPA, and the Consent Decree. *Id.*, ¶¶ 44-52. Sable accordingly seeks a declaratory judgment that the PSA, the DPA, and the Consent Decree "preempt and bar any attempts by Defendant to regulate, direct, oversee, inspect, control, or otherwise interfere with the operation, maintenance, construction, restart, staffing, or testing of" Line CA-325. *Id.*, ¶ 48.

The second claims that section 707 of the DPA immunizes Sable from any cause of action that State Parks might bring to enforce its property rights. *Id.*, ¶¶ 49-52.[4] Sable seeks a declaratory judgment to this effect. *Id.* at 15.

## STANDARD OF REVIEW

Rule 12(b)(6) requires a court to examine whether the plaintiff has alleged sufficient facts to state a *plausible* claim on which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007) (emphasis added). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action" is insufficient. *Id.* at 555. In evaluating a motion to dismiss under Rule

---

[3] Sable claims that State Parks asserted "that Sable may not flow oil unless it complies with additional environmental analysis" despite the Wright Order. That timing, however, left State Parks without an opportunity to assess the effect of the Wright Order (issued March 13), because the Complaint was filed that same day . ECF 1, ¶ 39.

[4] Section 707 of the DPA is codified under 50 U.S.C. § 4577.

12(b)(6), a court assumes all material allegations in the complaint are true, but "need not accept conclusory allegations of law or unwarranted inferences." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007). A court also need not accept as true allegations contradicted by facts subject to judicial notice. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## ARGUMENT

### I. THE PIPELINE SAFETY ACT DOES NOT CONFER SABLE WITH EASEMENT RIGHTS, NOR DOES IT GENERALLY PREEMPT STATE ACTIONS AFFECTING PIPELINES

California is disputing in several pending lawsuits Sable's assertions that the pipeline is interstate.[5] But even if the pipeline were interstate, the PSA does not give Sable the rights that it asserts. Congress enacted the PSA to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1). The PSA expressly preempts "safety standards for interstate pipeline facilities or interstate pipeline transportation." *Id*. § 60104(c). So, on its plain terms, this preemption provision only applies to state-imposed *safety standards*, and it only preempts those safety standards with respect to interstate pipeline facilities or transportation. *Id*.

The PSA does not preempt State Parks' negotiation of an easement, even if that negotiation is time-consuming and perceived as cumbersome. First, State Parks, as a property owner, is not required to extend an easement to a pipeline operator. Second, State Parks is not enforcing safety standards, and Sable makes no allegation to that effect in any event. For each of those reasons, the PSA's preemption provision has no application here, and the Court should accordingly dismiss Sable's PSA claim.

---

[5] *See California v. PHMSA*, No. 26-508 (9th Cir. filed Jan. 28, 2026) ECF 1.1 at 2 (Petition for Review), ECF 23.1 at 34-54 (Petitioners' Opening Brief), *United States, et al. v. Plains All American Pipeline, et al.*, No. 2:20-cv-02415 (C.D. Cal. filed Mar. 13, 2020) ECF 43 at 17-18, 24-25, ECF 43-1 at 66-73.

### A. The PSA Does Not Affect the Rights of Property Owners, Including Public Agencies, to Decline to Grant or Renew Easements

Sable alleges that State Parks is imposing pipeline safety standards in the form of easement conditions demanded by State Parks in easement negotiations. *See* ECF 1, ¶¶ 39-43. The PSA, however, only narrowly preempts state agencies from enacting and enforcing safety standards against interstate pipeline facilities and transportation when those state agencies act in a regulatory capacity. *Olympic Pipe Line Co. v. City Seattle*, 437 F.3d 872, 881 (9th Cir. 2006). The PSA does not compel state agencies *as property owners* to affirmatively confer easement rights to pipeline operators. There are many permissible reasons for a state or other sovereign entity not to grant an easement. *See, e.g., Bad River Band of Lake Superior of Chippewa Indians of Bad River Reservation v. Enbridge Energy Co., Inc.*, 626 F.Supp.3d 1030, 1049 (W.D. Wis. 2022). No legal authority, including the PSA, requires a sovereign entity or any landowner to grant or renew an easement. *See id*. For that reason, the PSA simply does not speak to how State Parks is treating Sable.

That understanding of the PSA is consistent with controlling Ninth Circuit precedent. *Cf. Olympic*, 437 F.3d at 881. In *Olympic*, the Ninth Circuit held that the PSA preempted two locally imposed safety standards on an interstate pipeline that ran beneath Seattle. *Id*. at 880. The first prohibited the operator from making repairs to the pipeline system except under the supervision and with the approval of the local transportation director. *Id*. at 879 n. 20. The second required the operator to conduct weekly inspections. *Id*. The Ninth Circuit held that Seattle's application of these contractual provisions to the pipeline constituted impermissible safety regulation. *Id*. at 879-80.

But nothing in *Olympic* stands for the proposition that a government agency must grant or renew an easement—or that a pipeline operator may transport hazardous liquid in the absence of a property right. *Olympic* simply held that the

7

PSA will preempt state and locally imposed safety standards, even if those standards are adopted as part of a contract with a pipeline operator, so long as the state or local agency is acting in a regulatory capacity. It did not hold that the PSA functions as some sort of shortcut to eminent domain without following constitutional requirements, affirmatively compelling state and local agencies to confer easement rights to pipeline operators.

Such a holding would be inconsistent with the plain text of the PSA, which enjoins the *adoption* or *enforcement* of safety standards. *See* 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."). In other words, the statute merely *prohibits* state agencies from undertaking certain actions. It does not *mandate* the performance of particular actions, including the granting of an easement. *See Bad River Band*, 626 F.Supp.3d at 1049; *see also SFPP, L.P. v. Union Pac. R.R. Co.*, No. SACV 05-1015, 2006 WL 8448721, at \*3 (C.D. Cal. Mar. 20, 2006). For that reason, Sable's PSA claims fail as a matter of law.

**B. State Parks' Actions Do Not Constitute Impermissible Pipeline Safety Regulation Under the Pipeline Safety Act**

Regardless, Sable has not pled sufficient facts demonstrating that State Parks has impermissibly regulated pipeline safety. According to Sable, State Parks has requested further environmental review in order to inform its decision-making on whether to grant an easement. ECF 1, ¶¶ 39-43. That does not, on its own, constitute the adoption or enforcement of safety standards for purposes of the PSA. *See* 49 U.S.C. § 60104(c). Indeed, Sable fails to identify a single pipeline safety standard that State Parks has imposed. For that reason, Sable has failed to put forth sufficient factual content that would allow this Court to reasonably infer that the PSA preempts State Parks' alleged activities. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

The PSA preempts the field of pipeline safety, and, as a result, state and local agencies generally may not impose safety standards on interstate pipelines. *See Wash. Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 420 (4th Cir. 2013); *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010). But the preemptive effect of the PSA extends only to standards that regulate interstate pipeline *safety*, and it does not affect the power of states and localities to otherwise regulate pipelines. *Portland Pipe Line Corp. v. City of S. Portland*, 288 F.Supp.3d 321, 430 (D. Maine 2017); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state law causes of action.")[6]

None of the alleged actions undertaken by State Parks qualify as pipeline safety regulation. Sable cites a variety of processes that they were required to comply with, including "extensive environmental analysis and review." ECF 1, ¶ 42. They imply that the processes took too long and functioned to block Sable from restarting oil production. *Id*. But Sable makes no effort to explain how State Parks' environmental review requirements constitute safety standards for purpose of the PSA. State Parks took these steps in furtherance of its mission to "administer,

---

[6] Sable may argue that the PSA cases cited here all involved the siting of new facilities. *See Enbridge Energy, LP v. Whitmer*, 813 F.Supp.3d 777, 803 (W.D. Mich. 2025), appeal docketed, No. 26-1021 (6th Cir. Jan. 8, 2026). But not all, if any, of these cases hinged on that status. Both *Grand Prairie* and *Washington Gas* held that the PSA's preemption provision did not apply for the simple reason that the regulations at issue did not directly affect pipeline safety. *See, e.g., Grand Prairie*, 608 F.3d at 212 (holding that if a "requirement is not a safety standard in letter, purpose, or effect, it may remain in force"). The district court in *Whitmer* appeared to misapprehend *Grand Prairie* and *Washington Gas* by finding that they relied on the PSA's exception for "location or routing" decisions when they in fact held that the PSA did not preempt the safety standards at issue in the first instance. *Whitmer*, 813 F.Supp.3d at 803 (citing cases); *see Wash. Gas*, 711 F.3d at 421 ("In light of these goals, it is clear that the County Zoning Plans are primarily local land use regulations as opposed to safety regulations.").

protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public." Cal. Pub. Res. Code § 5003.

Those actions do not constitute pipeline safety regulation. Rather, these actions furthered State Parks' mission to maximize the public's use and enjoyment of the Park for recreational purposes. *See Wash. Gas*, 711 F.3d at 420-21. To regulate a particular use of land because it is incompatible with its primary use does not constitute pipeline safety regulation at all. *Id.*

Additionally, requiring environmental review of the effects of granting a long-term easement on one's own property does not constitute pipeline safety regulation. Environmental review is a process that informs an agency's decision-making with respect to competing uses of its property. It allows public agencies to identify and, if feasible, mitigate or avoid adverse environmental impacts of certain projects. Under CEQA, potential environmental impacts are not limited to safety risks, but they include impacts to the public's aesthetic enjoyment of nearby surroundings. *See Pocket Protectors v. City of Sacramento*, 124 Cal.App.4th 903, 937 (2004). CEQA requires California public agencies to consider feasible measures to mitigate those impacts and project alternatives—including foregoing projects altogether— that might reduce or avoid those impacts. *See* Cal. Pub. Res. Code § 21081(a)(1); *see also Save the Hill Group v. City of Livermore*, 76 Cal.App.5th 1092, 1104 (2022) (discussing need to consider no-project alternative). So, while the PSA might preclude State Parks from adopting safety standards as mitigation measures, it does not preempt State Parks' extensive review of (or ultimate denial of) the easement application for the purpose of avoiding potential environmental impacts unrelated to pipeline safety. Environmental impacts include potential effects to air quality, biological resources, noise, aesthetic conditions, and cultural resources, none of which fall within the PSA's field of preemption. *See, e.g.,* Cal. Pub. Res. Code § 21060.5 ("'Environment' means the physical conditions which exist within

10

the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.").

For that reason, Sable fails to state a plausible claim that the PSA preempts State Parks' actions. *See Twombly*, 550 U.S. at 569-70. The Complaint includes no facts at all that explain how State Parks' alleged demand for "environmental analysis and review" constitutes an impermissible pipeline safety standard. ECF 1, ¶ 42. Indeed, Sable fails to identify a single pipeline safety standard sought or actually imposed by State Parks at all.[7] The Court should dismiss Sable's PSA claim.

## II.   SABLE'S DEFENSE PRODUCTION ACT CLAIMS FAIL

### A.   The Defense Production Act Does Not Confer the Federal Government with Requisition Authority, and Any Such Authority Would Be Unconstitutional

Sable's DPA claim rests on the premise that federal contractors may requisition property in order to comply with a DPA order. That is false. Congress intentionally disempowered the President—and, by extension, private parties subject to DPA orders—from requisitioning others' property under the operative version of the DPA.

When Congress first enacted the DPA, it included the power to "requisition" facilities or materials. *See* RJN, Ex. 5, at 77.[8] In the 1950 version of the DPA, the requisition provision was in Title II. But Congress gave Title II an expiration date, and Congress allowed Title II to lapse on April 30, 1953. P.L. 83-95, 67 Stat. 129. P.L. 83-95 (terminating Titles II and VI, effective June 30, 1953, and Titles IV and V, effective April 30, 1953). Since then, the DPA has never authorized the federal government and its contractors to requisition property.

---

[7] The Complaint alleges that State Parks' environmental review requirements are pretextual, but the Complaint includes no factual content to support this conclusory allegation. *See Iqbal*, 556 U.S. at 681 (conclusory allegations "are not entitled to be assumed to be true").

[8] Alexandra G. Neenan, Cong. Rsch. Serv., R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767.

Yet Sable claims that the DPA entitles it to make use of the Park, notwithstanding State Parks' lack of consent. Neither the DPA nor the Wright Order have that effect. Nothing in the Wright Order specifically directs Sable to transfer oil through the Park (indeed, the Park is not mentioned at all). And if it did—if the federal government, in effect, ordered State Parks to dedicate an interest in state land to Sable— then that would make the Wright Order unconstitutional under the Supreme Court's anti-commandeering doctrine. *See Printz v. United States*, 521 U.S. 898, 925 (1997) (holding that the federal government cannot compel a state "to implement, by legislation or executive action, federal regulatory programs"). The anti-commandeering doctrine precludes the federal government—or in this case, a private company acting at the behest of the federal government—from conscripting a state to provide its facilities for federal use. *Id.*; *cf. New York v. United States*, 505 U.S. 144, 177 (1992) (Congress could not force State to "take title" to previously private property).

States have the sovereign prerogative to opt out of federal programs, even if doing so would frustrate the federal scheme in question. *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019). That means that federal preemption cannot invalidate a state agency's refusal to participate in a federal program, including through the dedication of property or state facilities, because California has "the right of refusal." *Id*.

For those reasons, the DPA does not, and constitutionally cannot, confer Sable with the authority to requisition the Park. If Sable wants to use the Park to facilitate the transportation of oil, then it will need permission from Parks Department, not the federal government.

**B.    The Defense Production Act Does Not Displace State Trespass Law, Nor Does It Immunize Contractors for Intentional Tort Liability**

Sable asserts two preemption theories under the DPA. First, they claim that the DPA, via the Wright Order, precludes State Parks from applying state trespass law

12

to Line CA-325. ECF 1, ¶ 52. Second, they claim that the DPA immunizes Sable from trespass liability. Neither theory has merit.

### 1. The Defense Production Act Preempts Certain State Law Antitrust and Contract Claims, Not Sable's Intentional Tort Claim of Trespass

The DPA does not provide Sable with *carte blanche* to transport crude oil through the Park without State Parks' authorization. *See Hercules Inc. v. United States*, 24 F.3d 188, 202-204 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996); *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 811-812 (8th Cir. 1995). Section 101(a) empowers the President to direct private parties to prioritize the performance of government contractors necessary to serve the national defense over other civilian contracts. *Hercules*, 24 F.3d at 203 (discussing 50 U.S.C. § 4511(a)). Section 101(c) empowers the President to require the allocation and prioritization concerning "materials, equipment, and services in order to maximize domestic energy supplies…." 50 U.S.C. § 4511(c). Both provisions concern prioritization and allocation of contracts and materials, which involve satisfying certain uses above others. *See id*. § 4511(a), (c); *Hercules*, 24 F.3d at 203 (noting that section 101 is titled "Priority in contracts and orders").

Neither section 101(a) nor section 101(c), however, authorizes the President or anyone else in the executive branch to compel the *production* or *transportation* of energy sources in places where those activities are not otherwise permitted under state or local law. Indeed, section 101(c) treats energy exploration, production, refining, and transportation differently from the allocation and prioritization of contracts concerning "materials, equipment, and services" for those activities. 50 U.S.C. § 4511(c)(1), (2)(A)(i). Under section 101(c), the President may—if he makes certain findings—compel the allocation of "materials … essential to maintain or expand exploration, production, refining, [or] transportation[.]" *Id*. § 4511(c)(2)(A)(i). But the statute does not expressly confer the President or anyone else in the executive branch with the authority to order the exploration, production,

refining, or transportation of energy resources in places where those activities are not otherwise permitted. Tellingly, the Wright Order includes no express provision to that effect.

Nor does the DPA generally preclude state authorities from enforcing state laws or protecting their property rights against private companies. Instead, specific provisions of the DPA confer private parties with defenses against certain types of claims. *See, e.g.,* 50 U.S.C. § 4558(j) (creating a narrow immunity to federal and state antitrust claims under specified circumstances). That Congress saw fit to include narrow preemptive language in one provision of the DPA shows that Congress did not intend for the DPA orders to possess general preemptive effect. *See United States v. Youssef*, 547 F.3d 1090, 1095 (9th Cir. 2008) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). At most, the DPA may preempt state law claims like breach of contract that fall within the scope of the risks inherent in complying with the DPA. *See Vertac*, 46 F.3d at 812; *see also In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 844-45 (E.D.N.Y. 1984). For the DPA to preempt state law trespass claims, or to effect an involuntary forfeiture of a property interest, would mean the DPA includes the very requisition power that Congress revoked. Nothing in the DPA requires the Court to read such an expansive preemptive scope into the DPA. *See Medtronic*, 518 U.S. at 485 ("Congress does not cavalierly pre-empt state law causes of action.").

### 2. The Defense Production Act's Immunity Provision Does Not Shield Sable from Liability for Intentional Torts Like Trespass

Sable also seeks a declaration that section 707, the DPA's immunity provision, shields it from liability for trespass for its unauthorized use of the Park. *See* 50 U.S.C. § 4557. It does not. Section 707 provides that "[n]o person shall be held

14

liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to" the DPA. *Id*. Federal courts have narrowly construed section 707 "as providing a defense for a DPA contractor against a suit by a non-government customer in the event that the DPA contractor is forced to breach another contract to fulfill the government's requirements." *Hercules*, 24 F.3d at 203.

In *Hercules*, for instance, the Federal Circuit considered section 707 in conjunction with section 101, holding that scope of immunity under section 707 is limited to the scope of the risk created from compliance with section 101. *Id*. That risk included "the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA contract," but it did not "include the risk that the product produced under the DPA contract will be inherently unsafe to users." *Id*. Thus, "the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization." *Id*. at 204.

Likewise, in *Vertac*, the Eight Circuit held that section 707 does not shield private parties for liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). *Vertac*, 46 F.3d at 812. There, the United States argued that to read section 707 as shielding private parties from CERCLA liability "would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *Id*.

That logic applies here, and with equal force to DPA orders issued under section 101(c). Section 707's liability shield extends only to the risk of breaching a contract due to the allocation of materials or prioritization of contracts, not to the risk of violating the property rights of third parties or the land use regulations of state and local governments. To hold otherwise would give the executive branch the authority to shield *any* person subject to a DPA order—say, for instance, a refinery

15

operator ordered to produce on land owned by someone else and using outdated refinery methods that pose health risks to workers and neighboring residents—from state tort liability or state regulation. The Court should not read section 707 so broadly. *See Medtronic*, 518 U.S. at 485.

### III. THE CONSENT DECREE DOES NOT PRECLUDE STATE PARKS FROM BRINGING TRESPASS CLAIMS AND OTHERWISE ENFORCING ITS PROPERTY RIGHTS AGAINST SABLE

Finally, Sable claims that the Consent Decree requires State Parks to provide Sable with an easement or right-of-way to flow oil through the Park. But the Complaint points to no language in the Consent Decree that has that effect.

The Consent Decree did not grant the pipeline operator (then, Plains) an easement to flow oil through Gaviota State Park, nor does it have the preemptive effect advanced by Sable. Consent Decree, ¶ 74 ("This Consent Decree shall not be construed to limit the rights of [applicable agencies] to obtain … injunctive relief" except regarding topics explicitly addressed in the Consent Decree.). The Consent Decree provides specific pipeline safety restrictions on the restart of the pipelines, but it in no way purports to contain *all* the legal conditions that a pipeline operator would need to comply with to restart the pipelines. *Id*. Sable's predecessor remained "responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein." *Id*., ¶ 78.

It is irrelevant that the Consent Decree outlined considerations attendant to constructing a replacement pipeline. ECF 1, ¶¶ 26-28 (suggesting that in explaining the role of new rights-of-way for potential construction of a relocated pipeline, the Consent Decree promised no rights-of-way need to be obtained were the original pipeline restarted). Such discussion in the Consent Decree does not, as Sable claims, confer a right to automatically restart the pipeline once the pipeline safety

16

requirements were deemed satisfied, or estop State Parks from enforcing its property rights. *See id.*, ¶ 47.

Sable also implies that, under the Consent Decree, State Parks was provided "significant compensation" that operates to bar and estop State Parks from demanding any conditions including a negotiated easement. *Ibid*. This suggestion is squarely undermined by the plain text of the Consent Decree that clearly spells out that the damages and penalties provided for State Parks were to directly compensate it for clean-up costs and natural resources damages. At bottom, the Consent Decree does not independently confer easement rights to Sable, nor does it excuse any trespass committed by Sable.

## IV. AMENDMENT CANNOT SAVE THE COMPLAINT

State Parks recognizes that there is a presumption in favor of granting plaintiffs leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Id*.

Here, Sable's claims all fail as a matter of law. As Sable frames it, their case "arises from the collision of federal and state law." ECF 1, ¶ 1. But State Parks has explained, the federal laws cited in their Complaint do not affect—and, under the Constitution, they cannot affect—the actions State Parks has taken to steward its property and protect its property rights.

## CONCLUSION

Defendant respectfully requests that the Court grant this motion without leave to amend.

17

Dated:  May 26, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General


*/s/ Matthew T. Struhar*
MATTHEW T. STRUHAR
Deputy Attorney General
*Attorneys for Defendant Armando Quintero*

SA2026301402
USDC Central (2 Party).docx

18

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Defendant Armando Quintero certifies that this brief contains 5,748 words, which complies with the word limit of L.R. 11-6.1.

Dated:  May 26, 2026                          Respectfully submitted,

ROB BONTA
Attorney General of California


/s/ Matthew T. Struhar
MATTHEW T. STRUHAR
Deputy Attorney General
*Attorneys for Defendant Armando Quintero*