ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General
MATTHEW T. STRUHAR (SBN 293973)
matthew.struhar@doj.ca.gov
Deputy Attorneys General
  1300 I Street
  Sacramento CA 95814
  Tel: (916)210-7246
Attorneys for Defendant
Armando Quintero, in his official capacity as
Director of the California Department of
Parks and Recreation

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Sable Offshore Corp. and Pacific Pipeline Company,**<br><br>Plaintiffs,<br><br>v.<br><br>**Armando Quintero, in his official capacity as Director of the California Department of Parks and Recreation,**<br><br>Defendant. | Case No. 2:26-cv-02739-SVW-SSC<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**<br><br>**(Fed. R. Evid. 201.)**<br><br>Date:        June 29, 2026<br>Time:        1:30 p.m.<br>Courtroom:   10A<br>Judge:       Hon. Stephen V. Wilson<br>Trial Date:  Not Set<br>Action Filed: March 13, 2026<br>Complaint Served: March 26, 2026<br><br>Filed/Concurrently Lodged With: Notice of Motion and Motion to Dismiss Complaint for Declaratory Relief; Memorandum of Points and Authorities; Declaration of Matthew T. Struhar ISO Motion to Dismiss; [Proposed] Order Granting Motion to Dismiss |

1

Defendant Armando Quintero, through his attorneys of record, requests that the Court take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence of the following documents in support of his Motion to Dismiss Plaintiffs' Complaint for Declaratory Relief. This Court may judicially notice a fact, including the existence of a document, "that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2). Upon a request from a party and upon being supplied with the necessary information showing that a fact is judicially noticeable, the Court must grant judicial notice. Fed. R. Evid. 201(c)(2). The relevance of these documents is set forth in Mr. Quintero's Memorandum of Points and Authorities in support of his Motion to Dismiss.

Mr. Quintero respectfully requests that the Court take judicial notice of the following:

1. An August 26, 1987 easement granted by the California Department of Parks and Recreation ("State Parks") to Celeron Pipeline, which is a public document. *See Grant v. Aurora Loan Servs., Inc.*, 736 F.Supp.2d 1257, 1264 (C.D. Cal. 2010) (taking judicial notice of a deed of trust recorded in the county's recorder office). This easement is also a record of this Court in *California Department of Parks and Recreation v. Sable Offshore Oil Corp., et al.*, ECF 23-4, Case No 2:26-cv-02739-SVW-SSC. The Court may also take judicial notice of this document because it is referred to in the Complaint. *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). A true and correct copy of the easement is attached as **Exhibit 1**.

2. A March 14, 2026, letter from State Parks, available at https://keyt.b-cdn.net/2026/03/Gaviota-SP-State-Parks-to-Sable-03142026.pdf, formally denying a pipeline easement for use through Gaviota State Park that was requested by plaintiffs Sable Offshore Corp and the Pacific Pipeline Company (together "Sable"). *See* Fed. R. Evid. 201(b); *see also W. Radio Servs. Co. v. Qwest Corp.*,

530 F.3d 1186, 1192 n. 4 (9th Cir. 2008) (taking judicial notice of a decision of a state public agency). This letter is also a record of this Court in *California Department of Parks and Recreation v. Sable Offshore Oil Corp., et al.*, ECF 23-4, Case No 2:26-cv-02739-SVW-SSC. A true and correct copy of the letter is attached as **Exhibit 2**.

3. The most recent annual right-of-entry ("ROE") permit issued by State Parks to Pacific Pipeline Company on July 25, 2025, and set to expire on July 2026, 2026, providing that "[a]ctivities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry." *See* Fed. R. Evid. 201(b); *see also Associated Indus. Ins. Co. v. Mt. Hawley Ins. Co.*, 536 F.Supp.3d 676, 679 (S.D. Cal. 2021) (taking judicial notice of permits issued by a public agency because they are an undisputed matter of public record). This easement is also a record of this Court in *California Department of Parks and Recreation v. Sable Offshore Oil Corp., et al.*, ECF 23-4, Case No 2:26-cv-02739-SVW-SSC. The Court may also take judicial notice of this document because it is referred to in the Complaint. *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). A true and correct copy of the ROE permit issued by State Parks is attached here as **Exhibit 3.**

4. A press release published by defendant Sable Offshore Corp. ("Sable") on March 16, 2026, available at https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx, admitting that Sable resumed the transportation of oil produced at the Santa Ynez Unit through the Santa Ynez Pipeline System from Las Flores Canyon to Pentland Station. *See* Fed. R. Evid. 201(b)(2); *see also Knight v. Kia America, Inc.*, 814 F.Supp.3d. 1117, 1131-32 (C.D. Cal. 2025) (granting judicial review of the existence of, among other materials, press releases as public records).

3

A true and correct copy of the press release published by Sable on March 16, 2026 is attached here as **Exhibit 4.**

5. "The Defense Production Act of 1950: History, Authorities, and Considerations for Congress," Congressional Research Service (2026), available at https://www.congress.gov/crs-product/R43767. *See* Fed. R. Evid. 201(b)(2); *see also Harbers v. Eddie Bauer, LLC*, 415 F.Supp.3d 999, 1007 (W.D. Wash. 2019) ("Information published on government websites, including legislative history, is a proper subject of judicial notice."); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.3d 1, 45 (D.D.C. 2025) ("The law is well-settled that judicial notice may be taken of factual content found on official public websites of government agencies.") (internal quotation omitted). A true and correct copy of the Defense Production Act of 1950: History, Authorities, and Considerations for Congress is attached hereto as **Exhibit 5**.

Dated: May 26, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General

*/s/ Matthew T. Struhar*
MATTHEW T. STRUHAR
Deputy Attorney General
*Attorneys for Defendant Armando Quintero*

# EXHIBIT INDEX

| Ex. 1 | pp. 6-50 |
|-------|----------|
| Ex. 2 | pp. 51-57 |
| Ex. 3 | pp. 58-66 |
| Ex. 4 | pp. 67-70 |
| Ex. 5 | pp. 71-106 |

# EXHIBIT 1

PIPELINE EASEMENT

CELERON PIPELINE COMPANY OF CALIFORNIA

GAVIOTA STATE PARK

STATE OF CALIFORNIA, acting by and through the Department of Parks and Recreation, hereinafter called "STATE", and pursuant to Public Resources Code Section 5012 and in accordance with Section 5400 et seq., grants to CELERON PIPELINE COMPANY OF CALIFORNIA, hereinafter called "COMPANY", an easement to construct, operate, maintain, and remove an underground pipeline together with its appurtenances .for the transportation of hydrocarbon substances over, under, and across that portion of Gaviota State Park described in Exhibit "A", attached hereto and made a part hereof.

THIS EASEMENT IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1. This easement is for a term of thirty (30) years, beginning July 28, 1986 and ending on July 27, 2016.

2. As consideration for the granting of this easement, COMPANY agrees to pay STATE $477,998.50, calculated as follows:

---

---

---

---





DO NOT RECORD!

1047899

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

Inland Area      250      871.13      217,782.50      $377,998.50

Mitigation of impacts to natural resources

and public recreation use      100,000.00

TOTAL      $477,998.50

Mitigation of impacts to natural resources and public recreation use are based on the project described in the Environmental Impact Report and Environmental Impact Statement, dated January 1985 and filed under State Clearing House Number 83110902. Impacts above and beyond those within said Gaviota State Park will be the subject of additional compensation to State.

This payment shall be made in a single lump sum payment within 60 days of the date of this easement.

Discrepancies between pipeline lengths actually installed and calculated lengths will be paid for additionally or reimbursed from one party to the other within 90 days of the completion of the construction of the pipeline, using the formula set forth above.

3. COMPANY acknowledges that this easement is expressly limited to the lands described in said Exhibit "A", and use of other STATE owned land is not conferred or implied, excepting the access road described in Paragraph 13 herein.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

301-0269

2

Exhibit 1

word "Grant" herein shall not be construed as a covenant against the existence of any thereof.

5.    COMPANY, in the exercise of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.

6.    (a)    In the exercise of this easement, COMPANY shall conduct archeological work under provisions of Exhibit "B", attached hereto and made a part hereof.

(b)    COMPANY agrees that construction monitors, as required under Santa Barbara County Final Development Plan C-1, will oversee all construction activities within said Park.  Said Plan C-1 is attached hereto as Exhibit "C" and made a part hereof.

(c)    COMPANY agrees that all areas disturbed during construction activities and during the term of this easement will be restored and revegetated as required under the approved Gaviota State Park Restoration and Revegetation Plan, attached hereto as Exhibit "D" and made a part hereof.

7.    COMPANY hereby waives all claims and recourse against the State of California, its officers, agents, and employees for loss or damage to persons or property arising from, growing out of, or in any way connected with or incident to this easement.  COMPANY agrees to indemnify, save harmless, and defend the State of California, its officers, agents, and employees against

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

3

301-0269

the State of California, its officers, agents, and employees arising out of or in any way connected with or incident to this easement, except those arising out of the sole negligence of STATE.

8. Upon any termination of this easement, COMPANY shall remove at the option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration.

9. It is mutually agreed that COMPANY, at its option, may extend the term of this easement for an additional period not to exceed ten (10) years, subject to the following provisions:

(a) COMPANY must give STATE, during year twenty-nine (29) of this easement, a written request for the extension of this easement. Said request shall set forth the length of the proposed extension.

(b) Consideration for said extension, payable by COMPANY in a lump sum prior to the expiration of the original term of this easement, shall be the fair market value of the property rights involved. If STATE and COMPANY fail to reach agreement as to said fair market value, the dispute shall be resolved under the provisions of paragraph 24 herein.

----

----

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8.72)

84 32915

4

$51-0263$

10

Exhibit 1

and B of this clause, and those terms and conditions changed by mutual consent of STATE and COMPANY, the terms and conditions of this easement shall remain in full force and effect.

10. COMPANY can at any time by providing thirty (30) days written notice to STATE of its intent to terminate this easement, do so.

11. In the event that COMPANY shall at any time be in default in respect to any liquidated monetary payment due hereunder STATE may at its option declare this easement forfeited and terminated, provided, however, before any forfeiture shall be declared hereunder, STATE shall cause to be given to COMPANY a written notice specifying the particulars wherein COMPANY is in default and demanding performance in accordance with the terms of this easement. If within thirty (30) days after such notice is given, COMPANY shall fully comply therewith, no forfeiture by reason of breach shall be declared hereunder; but, in the event of the failure of COMPANY to comply with such notice, STATE may then declare and effect a forfeiture by reason of the default therein specified.

COMPANY is prohibited from assigning, mortgaging, hypothecating, or transferring this easement or any interest therein without the prior written consent of STATE, which consent will not be unreasonably withheld.

12. In the event of a spill or leak of said pipeline contents into or over said Park, COMPANY shall immediately notify STATE'S Regional Director for

---

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 9-72)

84 37916

5

*SDI 0263*

The name and company of the person reporting, an information telephone number that can be contacted for further information, the time and date of the spill, the location of the spill, the discharger, the substance spilled, the estimated quantity spilled, the cause of the spill, and the action taken. Thereafter, a written report shall be filed with the STATE identifying the source, cause, size of spill, and the action taken.

13. COMPANY shall during the herein term maintain in full force and effect, with respect to this easement, a policy or policies of public liability insurance in the amount of Five Hundred Thousand Dollars ($500,000) each occurrence for bodily injury and property damage combined ($500,000 combined single limit). The policy or policies shall be underwritten to the satisfaction of STATE, in a form satisfactory to STATE, and a complete and signed copy of a Certificate of Insurance thereof shall be submitted to STATE concurrently with the signed copy of this easement. Certificates of Insurance shall contain the following special endorsement:

"The State of California, California State Park and Recreation Commission, Department of Parks and Recreation, their officers, employees, and agents, are hereby declared to be additional insureds under the terms of this policy, both as to the activities of the Company and as to the activities of the State, the State Park and Recreation Commission, the Department of Parks and Recreation, their officers, employees, and agents, as related to the activities contemplated in this easement."

6

301-0263

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34760

Exhibit 1

and recreation.

"The State of California is not liable for the payment of any premiums or assessments on this policy."

This cancellation provision shall not be construed in derogation of the duty of the COMPANY to furnish insurance during the entire term of the easement.

In the event COMPANY fails to keep in effect at all times insurance coverage as herein provided, STATE may, in addition to any other remedies it may have, terminate this easement and all privileges COMPANY may have hereunder.

14. The road to be used by COMPANY for ingress, egress, and access by COMPANY to this easement shall be reasonably designated and redesignated by STATE. COMPANY shall not call upon STATE, nor shall STATE have any responsibility to perform any maintenance work or to make any repairs or improvements on said road. If COMPANY feels more maintenance or repair work is needed than is actually performed by STATE, COMPANY may perform such repairs or maintenance at COMPANY'S own expense. COMPANY shall immediately repair any damage caused by COMPANY, or its invitees, to the road surface.

15. In its use of this easement, COMPANY shall comply with all STATE requirements, including, but not limited to, parking control and the uses

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 30N

7

16. COMPANY shall coordinate all construction activities herein authorized within said Park with STATE'S Superintendent of the Gaviota District to assure the safety of said Park visitors and also to minimize the inconvenience to said Park visitors and possible detrimental effect on said Park operations or resources.

17. If STATE grants other pipeline easements within this easement, each such easement shall require that the grantee pay COMPANY'S cost for inspectors to protect COMPANY'S pipeline, require grantee to indemnify COMPANY, and to have a plan that gives time and dates for revegetation and cathodic protection in accordance with industry standards. STATE shall not be liable to COMPANY for failure to require said grantees to provide these protections unless COMPANY gives written notice to STATE, prior to such grant, of the provisions of this paragraph. Also, in no event shall STATE have any liability for failure to require these protections if the pipeline is installed pursuant to a court order in an action in eminent domain.

18. During construction, COMPANY shall provide or cause to be provided: (1) adequate signing for its work, including all of its excavations, within said Park warning the public of dangerous conditions, and (2) adequate lighting to warn against open excavations or other dangerous conditions created during said construction. All trenches and excavations for the pipeline or other construction work shall be made in such a manner as to permit the visiting public uninterrupted access across the route of said construction.

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

8

301-0263

Exhibit 1

providing ac s throughout said Park for the isiting public.

20. No tree or plants outside this easement within said park shall be cut, injured, or disturbed as a result of the herein construction by COMPANY without prior approval of said Superintendent. Any tree or slash so cut or removed shall be disposed of in a manner satisfactory to STATE. Any trees or plants removed within said Park shall be replaced at no cost to STATE with trees and plants acceptable to STATE in accordance with provisions under Paragraph 6(c) above.

21. To secure the full and complete performance of COMPANY'S obligation hereunder to the good faith satisfaction of STATE, and until the termination herein provided, COMPANY shall furnish evidence for STATE of its financial net worth in excess of $10,000,000 or as an alternative, COMPANY may provide a bond in the amount of One Million Dollars ($1,000,000). Said bond shall be in the form shown on Exhibit "E", attached hereto and made a part hereof.

22. If, in the judgment of said Superintendent, the herein construction becomes hazardous to said Park or said Park visitors, the said Superintendent shall immediately request COMPANY to cease that specific construction task and COMPANY shall not proceed with that specific construction task until the hazardous problem is resolved in a manner acceptable to said Superintendent.

23. In the event of a rupture of the pipeline and consequent spill of pollutants within the said Park, COMPANY, at no cost to STATE, shall

9

spill or pollutants. Upon approval by STATE and COMPANY of the monetary determination of loss, COMPANY shall submit said amount to STATE. If STATE and COMPANY fail to reach agreement, the dispute shall be resolved under provisions of paragraph 24 herein.

24. If a monetary dispute arises under paragraphs 9, 23, or 25 of this easement, it shall be resolved by two persons skilled in appraisal of the type of valuation sought by STATE. STATE shall appoint one appraiser and COMPANY the other appraiser. STATE and COMPANY shall be bound by the determination made by the two appraisers. If the two appraisers do not come to an agreement upon the appraised damages and/or values, a third appraiser shall be appointed by the first two appraisers so that a decision can be made by the majority.

25. In the event a spill of pollutants results in the permanent loss of usability of part or all of said Park, COMPANY, upon request by STATE, shall hire a professional real property appraiser acceptable to STATE for the purpose of determining fee value of the land no longer usable and the cost to replace said with land of equal value and utility. Upon review and approval of the appraisal by STATE and COMPANY, COMPANY will proceed to obtain land of equal value to provide STATE a dollar amount equal to the value of the land no longer usable. STATE and COMPANY will then exchange properties. If STATE and COMPANY cannot agree to the exchange, the dispute shall be resolved under provisions of paragraph 24 above.

----

----

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-76)

85 34769

10

301-0268

Exhibit 1

68 District Boulevard
Bakersfield, CA 93313

27. Notices to STATE shall be addressed to:

District Superintendent
Gaviota District
Department of Parks and Recreation
#10 Refugio Beach Road
Goleta, CA 93117

IN WITNESS WHEREOF, the parties hereto have executed this Grant of easement this _____ day of _____, 19___.

CELERON PIPELINE COMPANY
OF CALIFORNIA

STATE OF CALIFORNIA
DEPT. OF PARKS AND RECREATION

By _____

_____

Ronald L. Hinn

Title _____President_____

Chief Deputy Director

Date _____August 6, 1987_____

8-26-87

APPROVED:

DEPARTMENT OF GENERAL SERVICES

By _____
PAUL V. SAVONA, Chief
Office of Real Estate
and Design Services

Date:   NOV 23 1987

27-0565

B-1132Q

11

Exhibit 1

Centerline description of a fifty (50) foot wide right of way in, through and across that certain parcel of land situated in the County of Santa Barbara, California more particularly referred to as "Gaviota State Park." Said land is depicted in Record of Survey Map recorded in Book 85, page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0° 25' East a distance of 152.7 feet from a 2" Iron Pipe with brass cap tagged L.S. 2602 and depicted as monument 40A on Record of Survey Map recorded in Book 85, Page 9, Sheets 1 to 5 inclusive.

1) THENCE North 71° 38' West for a distance of 547.9 feet;

2) THENCE North 65° 09' West for a distance of 46.0 feet;

3) THENCE North 54° 19' West for a distance of 40.0 feet;

4) THENCE North 61° 30' West for a distance of 40.0 feet;

5) THENCE North 32° 41' West for a distance of 108.5 feet;

6) THENCE North 22° 12' West for a distance of 40.0 feet;

7) THENCE North 11° 43' West for a distance of 575.3 feet;

8) THENCE North 19° 28' West for a distance of 40.0 feet;

9) THENCE North 27° 13' West for a distance of 116.5 feet;

10) THENCE North 36° 58' West for a distance of 40.0 feet;

11) THENCE North 46° 42' West for a distance of 40.0 feet;

12) THENCE North 56° 27' West for a distance of 33.5 feet;

13) THENCE North 68° 37' West for a distance of 40.0 feet;

14) THENCE North 80° 47' West for a distance of 40.0 feet;

15) THENCE South 87° 03' West for a distance of 45.8 feet;

16) THENCE South 78° 34' West for a distance of 40.0 feet;

17) THENCE South 70° 05' West for a distance of 40.0 feet;

18) THENCE South 61° 36' West for a distance of 75.5 feet;

19) THENCE South 72° 53' West for a distance of 40.0 feet;

21) THENCE North 85° 09' West for a distance of 40.0 feet;

22) THENCE North 74° 29' West for a distance of 40.0 feet;

23) THENCE North 63° 48' West for a distance of 208.8 feet to a point of curvature;

24) THENCE along a curve to the right with a radius of 44.5 feet and a central angle of 51° 30' for a distance of 40.0 feet;

25) THENCE North 12° 19' West for a distance of 805.0 feet to a point of curvature;



-1-

EXHIBIT-A

301-0263

28) THENCE South 14° 20' West for a distance of 43.5 feet;

29) THENCE South 65° 13' West for a distance of 121.3 feet;

30) THENCE South 41° 19' West for a distance of 149.5 feet;

31) THENCE South 29° 36' West for a distance of 991.4 feet;

32) THENCE South 40° 41' West for a distance of 40.0 feet;

33) THENCE South 51° 46' West for a distance of 305.6 feet;

34) THENCE South 62° 01' West for a distance of 40.0 feet;

35) THENCE South 72° 16' West for a distance of 40.0 feet;

36) THENCE South 82° 32' West for a distance of 40.0 feet;

37) THENCE North 87° 13' West for a distance of 261.4 feet;

38) THENCE South 81° 05' West for a distance of 238.7 feet;

39) THENCE South 70° 18' West for a distance of 40.0 feet;

40) THENCE South 59° 32' West for a distance of 40.0 feet;

41) THENCE South 48° 45' West for a distance of 40.0 feet;

42) THENCE South 38° 00' West for a distance of 281.4 feet;

43) THENCE South 49° 01' West for a distance of 40.0 feet;

44) THENCE South 60° 03' West for a distance of 157.1 feet;

45) THENCE South 70° 33' West for a distance of 107.0 feet to a point of curvature;

46) THENCE along a curve to the right having a radius of 32.1 feet and a central angle of 71° 52' for a distance of 40.2 feet;

47) THENCE North 37° 35' West for a distance of 383.3 feet;

48) THENCE North 48° 49' West for a distance of 40.0 feet;

49) THENCE North 60° 14' West for a distance of 40.0 feet;

50) THENCE North 71° 33' West for a distance of 734.2 feet;

51) THENCE North 79° 07' West for a distance of 485.2 feet;

52) THENCE North 70° 38' West for a distance of 40.0 feet;

53) THENCE North 62° 08' West for a distance of 40.0 feet;

54) THENCE North 53° 38' West for a distance of 82.2 feet to the POINT OF TERMINATION in the West property line of the above described tract of land. Said POINT OF TERMINATION bears South 07° 36' East a distance of 2280.9 feet from a standard P&R bronze disc index number 3 as per Record of Survey mentioned above:

55) THENCE re-entering Gaviota State Park along the West property line. Said POINT OF BEGINNING bears South 07° 36' East a distance of 25.6 feet from a standard P&R bronze disc mentioned above. THENCE along a curve to the right having a radius of 33.3 feet and a central angle of 69° 02' for a distance of 42.5 feet;

-2-

EXHIBIT A    301-0208

19

Exhibit 1

61) THENCE North 64° 21' East for a distance of 201.7 feet;

62) THENCE North 56° 54' East for a distance of 21.4 feet;

63) THENCE North 44° 55' East for a distance of 40.0 feet;

64) THENCE North 32° 57' East for a distance of 40.0 feet;

65) THENCE North 20° 58' East for a distance of 40.0 feet;

66) THENCE North 08° 59' East for a distance of 40.0 feet;

67) THENCE North 02° 59' West for a distance of 40.0 feet;

68) THENCE North 14° 58' West for a distance of 612.9 feet;

69) THENCE North 25° 52' West for a distance of 40.0 feet;

70) THENCE North 36° 46' West for a distance of 40.0 feet;

71) THENCE North 47° 39' West for a distance of 342.0 feet;

72) THENCE North 45° 52' West for a distance of 286.0 feet;

73) THENCE North 35° 30' West for a distance of 40.0 feet;

74) THENCE North 25° 08' West for a distance of 40.0 feet;

75) THENCE North 14° 47' West for a distance of 40.0 feet;

76) THENCE North 04° 25' West for a distance of 40.0 feet;

77) THENCE North 05° 57' East for a distance of 613.4 feet;

78) THENCE North 05° 51' West for a distance of 40.0 feet;

79) THENCE North 17° 39' West for a distance of 40.0 feet;

80) THENCE North 29° 27' West for a distance of 40.0 feet;

81) THENCE North 41° 16' West for a distance of 40.0 feet;

82) THENCE North 53° 02' West for a distance of 149.4 feet;

83) THENCE North 42° 33' West for a distance of 40.0 feet;

84) THENCE North 32° 04' West for a distance of 40.0 feet;

85) THENCE North 21° 35' West for a distance of 40.0 feet;

86) THENCE North 11° 06' West for a distance of 415.3 feet;

87) THENCE North 19° 10' West for a distance of 271.6 feet;

88) THENCE North 11° 59' West for a distance of 113.1 feet;

-3-

3

EXHIBIT A

301-0268

94) THENCE North 24° 49' East for a distance of 40.0 feet;

95) THENCE North 37° 09' East for a distance of 213.5 feet;

96) THENCE North 26° 49' East for a distance of 40.0 feet;

97) THENCE North 16° 28' East for a distance of 372.3 feet;

98) THENCE North 28° 03' East for a distance of 40.0 feet;

99) THENCE North 39° 39' East for a distance of 660.1 feet;

100) THENCE North 29° 57' East for a distance of 40.0 feet;

101) THENCE North 20° 16' East for a distance of 40.0 feet;

102) THENCE North 10° 34' East for a distance of 40.0 feet;

103) THENCE North 00° 52' East for a distance of 96.6 feet;

104) THENCE North 12° 24' East for a distance of 40.0 feet;

105) THENCE North 23° 56' East for a distance of 40.0 feet;

106) THENCE North 35° 28' East for a distance of 40.0 feet;

107) THENCE North 47° 00' East for a distance of 264.6 feet;

108) THENCE North 39° 36' East for a distance of 40.0 feet;

109) THENCE North 32° 12' East for a distance of 365.5 feet;

110) THENCE North 33° 15' East for a distance of 787.1 feet;

111) THENCE North 25° 53' East for a distance of 180.5 feet;

112) THENCE North 34° 22' East for a distance of 366.8 feet;

113) THENCE North 33° 21' East for a distance of 210.2 feet;

114) THENCE North 39° 14' East for a distance of 153.5 feet;

115) THENCE North 31° 35' East for a distance of 33.7 feet;

116) THENCE North 42° 25' East for a distance of 40.0 feet;

117) THENCE North 53° 15' East for a distance of 40.0 feet;

118) THENCE North 64° 05' East for a distance of 40.0 feet;

119) THENCE North 74° 55' East for a distance of 40.0 feet;

120) THENCE North 85° 45' East for a distance of 74.0 feet;

121) THENCE North 84° 50' East for a distance of 357.3 feet;

122) THENCE North 73° 09' East for a distance of 40.0 feet;

123) THENCE North 61° 28' East for a distance of 268.1 feet;

-4-

**EXHIBIT-A**

301-D268

Exhibit 1

129) THENCE North 56° ' East for a distance of 40.0 feet;

130) THENCE North 45° 13' East for a distance of 40.0 feet;

131) THENCE North 34° 12' East for a distance of 189.0 feet;

132) THENCE North 45° 19' East for a distance of 40.0 feet;

133) THENCE North 56° 25' East for a distance of 142.6 feet;

134) THENCE North 45° 49' East for a distance of 40.0 feet;

135) THENCE North 35° 12' East for a distance of 40.0 feet;

136) THENCE North 24° 36' East for a distance of 40.0 feet;

137) THENCE North 14° 00' East for a distance of 40.0 feet;

138) THENCE North 03° 23' East for a distance of 80.0 feet;

139) THENCE North 11° 40' East for a distance of 40.0 feet;

140) THENCE North 19° 57' East for a distance of 234.0 feet to the POINT OF TERMINATION in the Northerly property line of the above described tract of land. Said POINT OF TERMINATION bears North 68° 27' West a distance of 119.9 feet from Caltrans monument +00"A"/180.0 as shown on Caltrans Map for State Highway 1 Map P.M. 0.0-SB1.

Said centerline contains 21,452.7 lineal feet or 1300.2 rods in length, more or less.

The bearings calculated to establish the location of the above centerline was obtained from monuments "Surprise" and "Orford."

# EXHIBIT-A

S31-0263

22

Exhibit 1



Exhibit 1

ALL AMERICAN PIPELINE COMPANY   Kenneth A Pettit
3800 N    AVENUE SUITE 300                  Recorded
BAKERSFI    , CALIFORNIA 93308   20:28am 27-Ju, -89 /          RO   5
ATT: RIGHT-OF-WAY DEPARTMENT

When Recorded Mail to:

DOCUMENTARY TRANSFER TAX $ ......... — O —
.......COMPUTED ON FULL VALUE OF PROPERTY CONVEYED
.......OR COMPUTED ON FULL VALUE LESS LIENS AND
ENCUMBRANCES REMAINING AT TIME OF SALE.

All American Pipe Line Co. By _____
Signature of Declarant or Agent determining tax, firm Name

Space Above for Recorder's Use

AGREEMENT AND GRANT OF EASEMENT     Grantee:  All American Pipeline Company
                                              ~~Celeron-Pipeline-Company-of-~~
                                              ~~-California~~
                                              TR89 100-E
                                    Project:  Underground Communication and
                                              Electrical Supply Systems

                                    Park Unit: Gaviota State Park

THIS AGREEMENT made and entered into by and between the STATE OF

CALIFORNIA, acting through the Department of Parks and Recreation, hereinafter
                      ALL AMERICAN PIPELINE COMPANY                Texas
called State, and ~~CELERON-PIPELINE-COMPANY-OF-CALIFORNIA~~, a ~~Delaware~~

Corporation
~~Corporation~~, hereinafter called Grantee.


State pursuant to the provisions of Section 5012 of the Public

Resources Code of the State of California, and for valuable consideration,

receipt of which is hereby acknowledged, hereby grants unto Grantee, its

successors and assigns forever, an easement for the use, construction,

reconstruction, placement, replacement, repair, inspection, operation and

maintenance of an underground communication and electrical supply systems

consisting of underground conduits, cables, and vaults including aboveground

enclosures, markers, and concrete pads and all incidental appurtenant fixtures

and/or equipment in, under, across and along that certain real property

conveyed to the State of California by deed recorded October 10, 1967, in

OURT PAPER
TATE OF CALIFORNIA
TD. 113 (REV 8-72)

S 34769



301- 0207

1047903

Exhibit 1

California, and more particularly described as follows:

A strip of land 10 feet in width, lying 7 feet to the Westerly and 3 feet to the Easterly of the following described line:

Beginning at a point which bears North 20° 49' West, 1644.3 feet from a State Highway R.O.W. monument designated 05-SB-101 + 24.93/121 thence South 61° 14' East 13.3 feet; thence South 18° 40' East, 28.9 feet to point of termination on the North boundary of Celeron's existing East-West 50-foot wide pipeline easement recorded April 7, 1988 as Document No. 88-020459 Official Records, County of Santa Barbara.

PROVIDED, this Grant of Easement is subject to the following terms and conditions:

1.   This Grant is subject to existing contracts, leases, licenses, easements, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.

2.   Grantee waives all claims against State, its officers, agents, and employees, for loss or damage caused by, arising out of, or in any way connected with the exercise of this Easement, and Grantee agrees to save harmless, indemnify, and defend State, its officers, agents, and employees, from any and all loss, damage, or liability which may be suffered or incurred by State, its officers, agents, and employees caused by, arising out of, or in any way connected with exercise by Grantee of the rights hereby granted, except those arising out of the sole negligence of State.

---

hereunder.

4. State expressly reserves the right to require Grantee, at the expense of Grantee, to remove and relocate all improvements placed by Grantee within the easement, upon determination by State that the same interfere with future development of State's property. Within 180 days after State's written notice and demand for removal and relocation of the improvements, Grantee shall remove and relocate the improvements to a feasible location on the property of State, as designated by State, and State shall furnish Grantee with a good and sufficient similar easement in such new location, on the same terms and conditions as herein stated, and Grantee thereupon shall reconvey to State the Easement herein provided.

5. This Easement shall terminate in the event Grantee fails for a continuous period of one (1) year to use the Easement for the purposes herein granted. Upon such termination, Grantee shall forthwith upon service of written demand, deliver to State a quitclaim deed, to its right, title, and interest hereunder, and shall, on State request, without cost to State, and within 90 days from written demand by State, remove all property placed by or for Grantee upon said property and restore said premises as nearly as possible to the same condition they were in prior to the execution of this Easement. In the event Grantee should fail to restore the premises in accordance with such request, State may do so at the risk of Grantee, and all costs of such removal and restoration shall be paid by Grantee upon demand.

---

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8.72)

85 34769

3     301-0267

Exhibit 1

the ground around such excavation, and shall replace the earth so removed by it and restore the surface of the ground and any improvement thereon to as near the same condition as they were prior to such excavation as is practicable.

7.    Grantee is further given the right of reasonable ingress to and egress from the Easement hereby granted, provided, however, that existing roads and trails shall be utilized for such purpose whenever reasonably possible and further provided that if such road or trail is not available, Grantee shall secure the consent of the State as to the route or routes to be followed for the purpose of such ingress and egress.  Such right of ingress and egress shall at all times be exercised in a manner which will cause the least damage to the property of the State.

JUN 2 0 1989
Date

STATE OF CALIFORNIA
DEPARTMENT OF PARKS AND RECREATION

By _____

APPROVED
Department of General Services

Y-16000

By
Senior Land Agent
Office of Real Estate and Design Services

GRANTEE:
~~CELERON PIPELINE COMPANY OF~~ (now)
~~CALIFORNIA~~
ALL AMERICAN PIPELINE COMPANY

By _Larry M. Weil_

301-0267

4

27

Exhibit 1

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

65 34769

On this ___26ᵗʰ___ day of ___June___, in the year of 1989, before me, a Notary Public in and for the STATE OF CALIFORNIA, duly commissioned and sworn, personally appeared ___Henry G. Agonia___, known to me to be the _____ DIRECTOR OF PARKS AND RECREATION OF THE STATE OF CALIFORNIA and acknowledged to me that (x)he executed the within instrument in the name of and on behalf of the STATE OF CALIFORNIA.

IN WITNESS WHEREOF, I have hereunder set my hand and affixed my official seal in said County, the day and year first above written.

___Susan P. Harrington___
Notary Public

OFFICIAL SEAL
SUSAN P HARRINGTON
NOTARY PUBLIC CALIFORNIA
SACRAMENTO COUNTY
My Comm. Expires Sept 25, 1990


STATE OF CALIFORNIA )
                     ) SS.
COUNTY OF ___Kern___ )


On ___June 9, 1989___, before me, the undersigned, a Notary Public in and for said State, personally appeared HARRY M. WEED, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the VICE PRESIDENT – OPERATIONS of ALL AMERICAN PIPELINE COMPANY, a Texas corporation, the corporation that executed the within instrument, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

___Freda Dianna Bagby___
Notary Public

OFFICIAL SEAL
FREDA DIANNA BAGBY
NOTARY PUBLIC - CALIFORNIA
KERN COUNTY
My comm. expires AUG 25, 1992

3)1~ 02~7

28

Exhibit 1

**RECORDING REQUESTED BY**
**WHEN RECORDED MAIL TO:**
**ALL AMERICAN PIPELINE COMPANY**
**5500 MING AVENUE, SUITE 300**
**BAKERSFIELD, CALIFORNIA 93309**
**ATT: RIGHT-OF-WAY DEPARTMENT**

```
                                        96-007147      Rec Fee  Page   68.00
                                                     ¦ AU2               2.00
                                   Recorded          ¦ COP              23.00
                           Official Records          ¦ CER               2.00
                                 County of           ¦ NCO              66.00
                             Santa Barbara           ¦ CR Crd          161.00
                           Kenneth A Pettit          ¦
                              Recorder               ¦
                           11:33am 26-Jan-96         ¦    CARD     MM     22
```

DOCUMENTARY TRANSFER TAX $...................
☐ Computed on full value of property conveyed, or
☐ Computed on full value less liens & encumbrances
remaining thereon at time of sale.

Signature of declarant or agent determining tax - firm name

**SEPTEMBER 26, 1995**
**R/W 93050-OSB-023**
**GAVIOTA STATE PARK**
**COUNTY OF SANTA BARBARA**
**STATE OF CALIFORNIA**

## MEMORANDUM OF AMENDMENT TO PIPELINE EASEMENT

This Memorandum of Amendment to Pipeline Easement is made and entered into by and between the State of California, acting by and through the Department of Parks and Recreation ("**State**"), on the one hand, and All American Pipeline Company, successor by merger to Celeron Pipeline Company of California, ("**AAPL**"), on the other.

## RECITALS

WHEREAS, on or about August 6, 1987, a Pipeline Easement was made and entered into by and between **State** and **AAPL**, a memorandum of which said Pipeline Easement entitled Memorandum of Pipeline Easement, herein referred to as ("**Memorandum**"), was recorded April 7, 1988 as Document No. 88-020459 of the Official Records of Santa Barbara County, California, and;

WHEREAS, subsequent to the making of the **Memorandum**, the parties amended said Pipeline Easement, substituting Exhibit A-1 for Exhibit-A containing a centerline description and plat of the fifty foot (50') wide easement granted to **AAPL** to more specifically describe the location of the easement across and through Gaviota State Park property;

WHEREAS, it is the desire of the parties hereto to record this Memorandum of Amendment to Pipeline Easement to reflect the revised description of the fifty foot (50') wide easement as described in Exhibit A-1 of the Amendment of Pipeline Easement.

29

Exhibit 1

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do mutually agree as follows, to wit:

The centerline description and plat contained in Exhibit A-1 attached hereto and incorporated herein is the legal description and location of the fifty foot (50') wide easement through the Gaviota State Park property which is covered by the Pipeline Easement, entered into on or about August 6, 1987, and the amendment thereto. Exhibit-A of said **Memorandum** and said Pipeline Easement and any reference thereto shall be deleted therefrom and said Exhibit A-1 is substituted therefor.

All terms, conditions and provisions of the Pipeline Easement, as amended, are incorporated herein by reference and shall remain in full force and effect.

This Memorandum of Amendment to Pipeline Easement and the Pipeline Easement, as amended, shall be read together as one document. To the extent that there may be any conflict or inconsistency between the unrecorded Pipeline Easement, as amended, and this Memorandum of Amendment to Pipeline Easement, the unrecorded Pipeline Easement, as amended, shall control.

In witness whereof, the parties hereto have executed this Memorandum of Amendment to Pipeline Easement as of the day and year indicated below by the signature of their duly authorized representatives.

DATED:    11/30            , 1995        **STATE OF CALIFORNIA,**
                                         **DEPARTMENT OF PARKS AND**
                                         **RECREATION**

                                         By:  *Donald W Murphy*
                                              **Donald W. Murphy, Director**

DATED:    January 23      , 1996        **ALL  AMERICAN  PIPELINE**
                                         **COMPANY, a Texas corporation**

                                         By:  *Bruce K. Murchison*
                                              **Bruce K. Murchison, President**

1757.doc

STATE OF CALIFORNIA                )
                                   )
COUNTY OF KERN                     )

On _January 23, 1996_____, 1995, before me Debbie S. Cardell, Notary Public, personally appeared **BRUCE K. MURCHISON, PRESIDENT,** of **ALL AMERICAN PIPELINE COMPANY,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.



DEBBIE S. CARDELL
COMM. # 1058161
Notary Public — California
KERN COUNTY
My Comm. Expires MAY 7, 1999

                                   NOTARY PUBLIC


STATE OF CALIFORNIA                )
                                   )
COUNTY OF _Sacramento_____         )

On ___8 January_____, 1995, before me _Rebecca J. McGown___, Notary Public, personally appeared **DONALD W. MURPHY, DIRECTOR,** of **CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

REBECCA J. MC GOWN
COMM. #1006175
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires September 30, 1997

                                   NOTARY PUBLIC

Exhibit 1

STATE OF CALIFORNIA

0SB-023-SZ

Centerline description of a fifty (50') foot wide right-of-way in, through and across that certain parcel of land situated in the County of Santa Barbara, State of California more particularly referred to as "Gaviota State Park." Said land is depicted in Record of Survey Map, recorded in Book 85, Page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0° 24'51" East a distance of 154.93 feet from a 2" iron pipe with a brass cap tagged L.S. 2602 and depicted as index number 40A on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the County Recorder of Santa Barbara County.

1) THENCE, from said POINT OF BEGINNING North 71° 46' 31" West for a distance of 559.06 feet;
2) THENCE, North 66° 01' 16" West for a distance of 40.88 feet;
3) THENCE, North 51° 52' 50" West for a distance of 39.95 feet;
4) THENCE, North 41° 33' 53" West for a distance of 42.43 feet;
5) THENCE, North 30° 41' 54" West for a distance of 112.93 feet;
6) THENCE, North 19° 45' 18" West for a distance of 39.03 feet;
7) THENCE, North 11° 38' 46" West for a distance of 539.90 feet;
8) THENCE, North 13° 34' 45" West for a distance of 44.33 feet;
9) THENCE, North 26° 42' 46" West for a distance of 81.79 feet;
10) THENCE, North 26° 53' 47" West for a distance of 63.95 feet;
11) THENCE, North 36° 32' 47" West for a distance of 39.72 feet;
12) THENCE, North 54° 46' 50" West for a distance of 31.32 feet;
13) THENCE, North 67° 13' 49" West for a distance of 53.58 feet;
14) THENCE, North 72° 37' 51" West for a distance of 31.30 feet;
15) THENCE, North 79° 25' 18" West for a distance of 29.61 feet;

EXHIBIT A-1

Exhibit 1

16) THENCE, North 86° 10' 12" West for a distance of 33.59 feet;

17) THENCE, South 84° 47' 57" West for a distance of 40.24 feet;

18) THENCE, South 69° 09' 40" West for a distance of 38.90 feet;

19) THENCE, South 59° 23' 22" West for a distance of 41.73 feet;

20) THENCE, South 62° 25' 23" West for a distance of 45.67 feet;

21) THENCE, South 75° 02' 42" West for a distance of 44.89 feet;

22) THENCE, South 83° 27' 42" West for a distance of 92.86 feet;

23) THENCE, South 84° 22' 03" West for a distance of 656.41 feet;

24) THENCE, South 84° 10' 55" West for a distance of 374.04 feet;

25) THENCE, South 85° 01' 08" West for a distance of 75.41 feet;

26) THENCE, South 89° 46' 18" West for a distance of 69.44 feet;

27) THENCE, North 70° 54' 45" West for a distance of 51.81 feet;

28) THENCE, North 64° 11' 39" West for a distance of 48.39 feet;

29) THENCE, North 62° 37' 30" West for a distance of 157.42 feet;

30) THENCE, North 41° 32' 31" West for a distance of 15.41 feet;

31) THENCE, North 13° 47' 08" West for a distance of 18.15 feet;

32) THENCE, North 12° 13' 05" West for a distance of 741.84 feet;

33) THENCE, North 36° 29' 21" West for a distance of 17.90 feet;

34) THENCE, North 63° 25' 05" West for a distance of 22.59 feet;

35) THENCE, North 65° 52' 37" West for a distance of 23.65 feet;

36) THENCE, North 86° 32' 11" West for a distance of 24.60 feet;

37) THENCE, South 69° 41' 56" West for a distance of 95.08 feet to a point in the Eastern right-of-way for State Highway 101. Said point bears North 19° 35' 06" West a distance of 805.01 feet from a State Highway angle point described as +00/121' on the Eastern right-of-way for State Highway 101. Said angle point is shown on State of California Department of Public Works drawing SB-101-46.5, Sheet 7 of 28.

38) THENCE, continuing South 69° 41' 56" West for a distance of 175.91 feet to a point in the Western right-of-way for State Highway 101. Said point bears North 19° 40' 36" West a distance of 502.66 feet from a State Highway angle point described as +00/54' on the Western right-of-way for State Highway 101. Said angle point is shown on State of California Department of Public Works drawing SB-101-46.5, Sheet 7 of 28.

EXHIBIT A-1

2<sub>33</sub>

Exhibit 1

39)    THENCE, South 69° 41' 56" West for a distance of 109.97 feet;

40)    THENCE, South 64° 30' 25" West for a distance of 54.07 feet;

41)    THENCE, South 46° 32' 08" West for a distance of 90.02 feet;

42)    THENCE, South 41° 09' 43" West for a distance of 74.01 feet;

43)    THENCE, South 35° 30' 43" West for a distance of 53.14 feet;

44)    THENCE, South 29° 47' 06" West for a distance of 775.30 feet;

45)    THENCE, South 30° 30' 07" West for a distance of 185.42 feet;

46)    THENCE, South 49° 31' 39" West for a distance of 85.95 feet;

47)    THENCE, South 52° 18' 48" West for a distance of 205.04 feet;

48)    THENCE, South 53° 43' 14" West for a distance of 44.79 feet;

49)    THENCE, South 59° 04' 57" West for a distance of 41.23 feet;

50)    THENCE, South 74° 07' 05" West for a distance of 42.08 feet;

51)    THENCE, South 89° 42' 05" West for a distance of 44.94 feet;

52)    THENCE, North 87° 15' 03" West for a distance of 224.68 feet;

53)    THENCE, South 88° 01' 54" West for a distance of 45.09 feet;

54)    THENCE, South 80° 38' 57" West for a distance of 235.82 feet;

55)    THENCE, South 72° 00' 44" West for a distance of 40.47 feet;

56)    THENCE, South 50° 17' 05" West for a distance of 44.07 feet;

57)    THENCE, South 40° 26' 17" West for a distance of 91.96 feet;

58)    THENCE, South 36° 43' 35" West for a distance of 142.61 feet;

59)    THENCE, South 42° 48' 46" West for a distance of 54.02 feet;

60)    THENCE, South 46° 45' 05" West for a distance of 62.46 feet;

61)    THENCE, South 60° 18' 40" West for a distance of 46.92 feet;

62)    THENCE, South 59° 53' 44" West for a distance of 32.62 feet;

63)    THENCE, South 60° 07' 59" West for a distance of 47.52 feet;

64)    THENCE, South 65° 17' 02" West for a distance of 31.64 feet;

65)    THENCE, South 70° 32' 54" West for a distance of 83.25 feet;

66)    THENCE, South 75° 47' 18" West for a distance of 22.00 feet;

67)    THENCE, North 71° 55' 40" West for a distance of 17.95 feet;

68)    THENCE, North 37° 42' 10" West for a distance of 297.01 feet;

69)    THENCE, North 37° 59' 16" West for a distance of 51.49 feet;

70)    THENCE, North 42° 03' 53" West for a distance of 20.85 feet;

71)    THENCE, North 54° 04' 30" West for a distance of 42.79 feet;

EXHIBIT A-1

34

Exhibit 1

72) THENCE, North 71° 01' 20" West for a distance of 636.85 feet;

73) THENCE, North 71° 51' 38" West for a distance of 53.12 feet;

74) THENCE, North 76° 45' 06" West for a distance of 93.87 feet;

75) THENCE, North 79° 02' 12" West for a distance of 380.69 feet;

76) THENCE, North 79° 26' 57" West for a distance of 65.46 feet;

77) THENCE, North 67° 59' 02" West for a distance of 85.73 feet;

78) THENCE, North 53° 34' 28" West for a distance of 83.03 to the POINT OF EXIT in the West property line of the above described tract of land. Said POINT OF EXIT bears South 07° 39' 18" East a distance of 2278.66 feet from a standard P&R bronze disk depicted as index number 3 on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the County Recorder of Santa Barbara County.


THENCE re-entering Gaviota State Park along the West property line. Said POINT OF RE-ENTRY bears South 07° 39' 18" East a distance of 23.84 feet from standard P&R bronze disk depicted as index number 3 on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the Recorder of Santa Barbara County.

79) THENCE, North 41° 19' 12" East for a distance of 0.39 feet;

80) THENCE, North 22° 20' 38" East for a distance of 21.66 feet;

81) THENCE, North 22° 31' 52" West for a distance of 30.68 feet;

82) THENCE, North 27° 39' 40" West for a distance of 97.35 feet;

83) THENCE, North 26° 35' 06" West for a distance of 25.05 feet;

84) THENCE, North 10° 16' 17" East for a distance of 29.77 feet;

85) THENCE, North 41° 01' 27" East for a distance of 31.83 feet;

86) THENCE, North 55° 08' 54" East for a distance of 96.41 feet;

87) THENCE, North 55° 30' 31" East for a distance of 58.30 feet;

88) THENCE, North 57° 48' 50" East for a distance of 100.47 feet;

89) THENCE, North 58° 14' 25" East for a distance of 124.73 feet;

90) THENCE, North 58° 50' 09" East for a distance of 57.49 feet;

91) THENCE, North 62° 29' 33" East for a distance of 78.22 feet;

92) THENCE, North 63° 33' 16" East for a distance of 153.71 feet;

EXHIBIT A-1

93)     THENCE, North 58° 26' 55" East for a distance of 205.93 feet;

94)     THENCE, North 64° 43' 52" East for a distance of 138.72 feet;

95)     THENCE, North 64° 02' 35" East for a distance of 52.57 feet;

96)     THENCE, North 64° 46' 08" East for a distance of 41.81 feet;

97)     THENCE, North 53° 57' 37" East for a distance of 43.32 feet;

98)     THENCE, North 36° 37' 58" East for a distance of 44.62 feet;

99)     THENCE, North 22° 01' 34" East for a distance of 33.85 feet;

100)    THENCE, North 12° 45' 49" East for a distance of 25.01 feet;

101)    THENCE, North 4° 44' 59" East for a distance of 51.96 feet;

102)    THENCE, North 11° 53' 42" West for a distance of 71.53 feet;

103)    THENCE, North 14° 00' 26" West for a distance of 105.86 feet;

104)    THENCE, North 13° 38' 52" West for a distance of 87.21 feet;

105)    THENCE, North 13° 22' 59" West for a distance of 112.95 feet;

106)    THENCE, North 16° 32' 23" West for a distance of 99.93 feet;

107)    THENCE, North 17° 30' 21" West for a distance of 3.43 feet;

108)    THENCE, North 14° 53' 47" West for a distance of 72.90 feet;

109)    THENCE, North 17° 21' 18" West for a distance of 51.51 feet;

110)    THENCE, North 18° 18' 23" West for a distance of 41.73 feet;

111)    THENCE, North 21° 22' 16" West for a distance of 40.21 feet;

112)    THENCE, North 29° 34' 32" West for a distance of 44.13 feet;

113)    THENCE, North 36° 30' 22" West for a distance of 39.28 feet;

114)    THENCE, North 45° 09' 01" West for a distance of 49.86 feet;

115)    THENCE, North 48° 02' 46" West for a distance of 104.93 feet;

116)    THENCE, North 46° 57' 01" West for a distance of 128.51 feet;

117)    THENCE, North 45° 57' 45" West for a distance of 271.46 feet;

118)    THENCE, North 44° 07' 00" West for a distance of 39.59 feet;

119)    THENCE, North 34° 49' 04" West for a distance of 38.60 feet;

120)    THENCE, North 18° 20' 18" West for a distance of 45.18 feet;

121)    THENCE, North 4° 27' 42" West for a distance of 52.97 feet;

122)    THENCE, North 6° 28' 32" East for a distance of 512.96 feet;

123)    THENCE, North 6° 59' 05" East for a distance of 88.22 feet;

124)    THENCE, North 6° 50' 30" East for a distance of 45.27 feet;

EXHIBIT A-1

5 36

Exhibit 1

125)    THENCE, North  4° 16' 55" West for a distance of 33.12 feet;

126)    THENCE, North 17° 53' 09" West for a distance of 16.52 feet;

127)    THENCE, North 28° 54' 53" West for a distance of 15.54 feet;

128)    THENCE, North 38° 02' 45" West for a distance of 18.84 feet;

129)    THENCE, North 45° 02' 54" West for a distance of 25.04 feet;

130)    THENCE, North 52° 21' 14" West for a distance of 195.48 feet;

131)    THENCE, North 51° 58' 28" West for a distance of 29.67 feet;

132)    THENCE, North 35° 07' 42" West for a distance of 18.66 feet;

133)    THENCE, North 21° 19' 25" West for a distance of 24.24 feet;

134)    THENCE, North 12° 30' 01" West for a distance of 28.37 feet;

135)    THENCE, North 11° 03' 54" West for a distance of 34.11 feet;

136)    THENCE, North 10° 44' 57" West for a distance of 102.86 feet;

137)    THENCE, North 11° 01' 53" West for a distance of 135.30 feet;

138)    THENCE, North 10° 39' 33" West for a distance of 137.91 feet;

139)    THENCE, North 18° 21' 28" West for a distance of 52.38 feet;

140)    THENCE, North 18° 34' 30" West for a distance of 84.62 feet;

141)    THENCE, North 18° 57' 14" West for a distance of 89.59 feet;

142)    THENCE, North 18° 45' 23" West for a distance of 61.87 feet;

143)    THENCE, North 10° 25' 56" West for a distance of 37.78 feet;

144)    THENCE, North 13° 19' 34" West for a distance of 63.92 feet;

145)    THENCE, North 20° 37' 59" West for a distance of 36.44 feet;

146)    THENCE, North 24° 09' 47" West for a distance of 395.90 feet;

147)    THENCE, North 24° 25' 34" West for a distance of 68.71 feet;

148)    THENCE, North 17° 57' 30" West for a distance of 44.41 feet;

149)    THENCE, North 12° 04' 41" West for a distance of 41.00 feet;

150)    THENCE, North  5° 14' 59" West for a distance of 42.99 feet;

151)    THENCE, North  4° 16' 52" East for a distance of 42.38 feet;

152)    THENCE, North  9° 59' 24" East for a distance of 170.03 feet;

153)    THENCE, North 10° 28' 26" East for a distance of 77.66 feet;

154)    THENCE, North 13° 48' 46" East for a distance of 42.89 feet;

155)    THENCE, North 20° 14' 29" East for a distance of 41.82 feet;

156)    THENCE, North 25° 08' 23" East for a distance of 40.43 feet;

157)    THENCE, North 30° 40' 03" East for a distance of 45.05 feet;

EXHIBIT A-1                                    6<sub>37</sub>

Exhibit 1

158)    THENCE, North 36° 59' 39" East for a distance of 147.17 feet;

159)    THENCE, North 35° 04' 06" East for a distance of 40.49 feet;

160)    THENCE, North 23° 40' 36" East for a distance of 37.62 feet;

161)    THENCE, North 16° 37' 43" East for a distance of 288.02 feet;

162)    THENCE, North 20° 20' 19" East for a distance of 45.69 feet;

163)    THENCE, North 24° 12' 35" East for a distance of 51.76 feet;

164)    THENCE, North 28° 39' 33" East for a distance of 39.64 feet;

165)    THENCE, North 37° 26' 37" East for a distance of 32.91 feet;

166)    THENCE, North 39° 58' 38" East for a distance of 557.98 feet;

167)    THENCE, North 36° 00' 37" East for a distance of 39.90 feet;

168)    THENCE, North 28° 53' 01" East for a distance of 41.77 feet;

169)    THENCE, North 19° 46' 53" East for a distance of 40.21 feet;

170)    THENCE, North 13° 39' 38" East for a distance of 35.75 feet;

171)    THENCE, North  3° 07' 48" East for a distance of 51.70 feet;

172)    THENCE, North  0° 47' 39" East for a distance of 71.48 feet;

173)    THENCE, North 13° 48' 46" East for a distance of 33.49 feet;

174)    THENCE, North 24° 14' 56" East for a distance of 20.88 feet;

175)    THENCE, North 39° 40' 01" East for a distance of 29.72 feet;

176)    THENCE, North 45° 50' 18" East for a distance of 26.31 feet;

177)    THENCE, North 47° 56' 23" East for a distance of 197.62 feet;

178)    THENCE, North 44° 32' 33" East for a distance of 42.46 feet;

179)    THENCE, North 42° 17' 35" East for a distance of 24.87 feet;

180)    THENCE, North 38° 16' 06" East for a distance of 30.45 feet;

181)    THENCE, North 32° 28' 19" East for a distance of 382.18 feet;

182)    THENCE, North 33° 23' 25" East for a distance of 283.83 feet;

183)    THENCE, North 33° 25' 42" East for a distance of 376.89 feet;

184)    THENCE, North 31° 25' 08" East for a distance of 653.67 feet;

185)    THENCE, North 33° 54' 45" East for a distance of 144.36 feet;

186)    THENCE, South 89° 39' 48" East for a distance of 0.22 feet;

187)    THENCE, North 34° 26' 20" East for a distance of 70.85 feet;

188)    THENCE, North 37° 52' 29" East for a distance of 43.92 feet;

189)    THENCE, North 42° 45' 48" East for a distance of 38.72 feet;

190)    THENCE, North 37° 50' 22" East for a distance of 58.92 feet;

EXHIBIT A-1                                    7₃₈

Exhibit 1

191) THENCE, North 31° 41' 18" East for a distance of 90.60 feet;

192) THENCE, North 45° 58' 50" East for a distance of 21.64 feet;

193) THENCE, North 57° 22' 06" East for a distance of 29.65 feet;

194) THENCE, North 82° 34' 03" East for a distance of 35.75 feet;

195) THENCE, North 84° 38' 52" East for a distance of 469.23 feet;

196) THENCE, North 68° 01' 29" East for a distance of 45.18 feet;

197) THENCE, North 61° 29' 57" East for a distance of 273.42 feet;

198) THENCE, North 79° 29' 29" East for a distance of 85.81 feet;

199) THENCE, North 89° 24' 26" East for a distance of 132.44 feet;

200) THENCE, South 86° 25' 22" East for a distance of 48.24 feet;

201) THENCE, South 77° 29' 49" East for a distance of 34.14 feet;

202) THENCE, South 72° 08' 48" East for a distance of 38.14 feet;

203) THENCE, North 83° 46' 08" East for a distance of 37.69 feet;

204) THENCE, North 55° 46' 08" East for a distance of 39.03 feet;

205) THENCE, North 34° 31' 01" East for a distance of 268.34 feet;

206) THENCE, North 40° 49' 03" East for a distance of 35.28 feet;

207) THENCE, North 55° 31' 12" East for a distance of 135.38 feet;

208) THENCE, North 56° 14' 40" East for a distance of 66.47 feet;

209) THENCE, North 48° 18' 15" East for a distance of 41.07 feet;

210) THENCE, North 22° 19' 57" East for a distance of 35.86 feet;

211) THENCE, North 10° 17' 19" East for a distance of 42.15 feet;

212) THENCE, North 4° 35' 14" East for a distance of 146.90 feet;

213) THENCE, North 18° 11' 40" East for a distance of 49.66 feet;

214) THENCE, North 20° 22' 15" East for a distance of 191.73 feet to the POINT OF TERMINATION in the North property line of the above described tract of land. Said POINT OF TERMINATION bears North 68° 27' 25" West a distance of 113.70 feet from a State Highway angle point in the South right-of-way line for State Highway 1. Said angle point is described as +00 "A" 185.00' and is shown on California State Highway, State of California, Department of Public Works, District 5 drawing number SB-1-R0.00/SB-101-R48.85.

Said centerline contains 21,682.58 lineal feet or 1314.10 rods in length.

EXHIBIT A-1

89

Exhibit 1

The bearings calculated to establish the location of the above centerline were obtained from U.S.C. & G.S. monuments "TANK" and "SURPRISE" and monument 40A as shown on the Record of Survey Maps indicated above.

EXHIBIT A-1                                    9

| | | |
|---|---|---|
| 1 | N 71° 46' 31" W, 559.06' | |
| 2 | N 66° 01' 16" W, 40.88' | |
| 3 | N 51° 52' 50" W, 39.95' | |
| 4 | N 41° 33' 53" W, 42.43' | |
| 5 | N 30° 41' 54" W, 112.93' | |
| 6 | N 19° 45' 18" W, 39.03' | |
| 7 | N 11° 38' 46" W, 539.90' | |
| 8 | N 13° 34' 45" W, 44.33' | |
| 9 | N 26° 42' 46" W, 81.79' | |
| 10 | N 26° 53' 47" W, 63.95' | |
| 11 | N 36° 32' 47" W, 39.72' | |
| 12 | N 54° 46' 50" W, 31.32' | |
| 13 | N 67° 13' 49" W, 53.58' | |
| 14 | N 72° 37' 51" W, 31.30' | |
| 15 | N 79° 25' 18" W, 29.61' | |
| 16 | N 86° 10' 12" W, 33.59' | |
| 17 | S 84° 47' 57" W, 40.24' | |
| 18 | S 69° 09' 40" W, 38.90' | |
| 19 | S 59° 23' 22" W, 41.73' | |
| 20 | S 62° 25' 23" W, 45.67' | |
| 21 | S 75° 02' 42" W, 44.89' | |
| 22 | S 83° 27' 42" W, 92.86' | |
| 23 | S 84° 22' 03" W, 656.41' | |
| 24 | S 84° 10' 55" W, 374.04' | |
| 25 | S 85° 01' 08" W, 75.41' | |
| 26 | S 89° 46' 18" W, 69.44' | |
| 27 | N 70° 54' 45" W, 51.81' | |
| 28 | N 64° 11' 39" W, 48.39' | |
| 29 | N 62° 37' 30" W, 157.42' | |
| 30 | N 41° 32' 31" W, 15.41' | |
| 31 | N 13° 47' 08" W, 18.15' | |
| 32 | N 12° 13' 05" W, 741.84' | |
| 33 | N 36° 29' 21" W, 17.90' | |
| 34 | N 63° 25' 05" W, 22.59' | |
| 35 | N 65° 52' 37" W, 23.65' | |
| 36 | N 86° 32' 11" W, 24.60' | |
| 37 | S 69° 41' 56" W, 95.08' | |
| 38 | S 69° 41' 56" W, 175.91' | |
| 39 | S 69° 41' 56" W, 109.97' | |
| 40 | S 64° 30' 25" W, 54.07' | |
| 41 | S 46° 32' 08" W, 90.02' | |
| 42 | S 41° 09' 43" W, 74.01' | |
| 43 | S 35° 30' 43" W, 53.14' | |
| 44 | S 29° 47' 06" W, 775.30' | |
| 45 | S 30° 30' 07" W, 185.42' | |
| 46 | S 49° 31' 39" W, 85.95' | |
| 47 | S 52° 18' 48" W, 205.04' | |
| 48 | S 53° 43' 14" W, 44.79' | |
| 49 | S 59° 04' 57" W, 41.23' | |
| 50 | S 74° 07' 05" W, 42.08' | |
| 51 | S 89° 42' 05" W, 44.94' | |
| 52 | N 87° 15' 03" W, 224.68' | |
| 53 | S 88° 01' 54" W, 45.09' | |
| 54 | S 80° 38' 57" W, 235.82' | |
| 55 | S 72° 00' 44" W, 40.47' | |
| 56 | S 50° 17' 05" W, 44.07' | |
| 57 | S 40° 26' 17" W, 91.96' | |
| 58 | S 36° 43' 35" W, 142.61' | |
| 59 | S 42° 48' 46" W, 54.02' | |
| 60 | S 46° 45' 05" W, 62.46' | |
| 61 | S 60° 18' 40" W, 46.92' | |
| 62 | S 59° 53' 44" W, 32.62' | |
| 63 | S 60° 07' 59" W, 47.52' | |
| 64 | S 65° 17' 02" W, 31.64' | |
| 65 | S 70° 32' 54" W, 83.25' | |
| 66 | S 75° 47' 18" W, 22.00' | |
| 67 | N 71° 55' 40" W, 17.95' | |
| 68 | N 37° 42' 10" W, 297.01' | |
| 69 | N 37° 59' 16" W, 51.49' | |
| 70 | N 42° 03' 53" W, 20.85' | |
| 71 | N 54° 04' 30" W, 42.79' | |
| 72 | N 71° 01' 20" W, 636.85' | |
| 73 | N 71° 51' 38" W, 53.12' | |
| 74 | N 76° 45' 06" W, 93.87' | |
| 75 | N 79° 02' 12" W, 380.69' | |
| 76 | N 79° 26' 57" W, 65.46' | |
| 77 | N 67° 59' 02" W, 85.73' | |
| 78 | N 53° 34' 28" W, 83.03' | |
| 79 | N 41° 19' 12" E, 0.39' | |
| 80 | N 22° 20' 38" E, 21.66' | |
| 81 | N 22° 31' 52" W, 30.68' | |
| 82 | N 27° 39' 40" W, 97.35' | |
| 83 | N 26° 35' 06" W, 25.05' | |
| 84 | N 10° 16' 17" E, 29.77' | |
| 85 | N 41° 01' 27" E, 31.83' | |
| 86 | N 55° 08' 54" E, 96.41' | |
| 87 | N 55° 30' 31" E, 58.30' | |
| 88 | N 57° 48' 50" E, 100.47' | |
| 89 | N 58° 14' 25" E, 124.73' | |
| 90 | N 58° 50' 09" E, 57.49' | |
| 91 | N 62° 29' 33" E, 78.22' | |
| 92 | N 63° 33' 16" E, 153.71' | |
| 93 | N 58° 26' 55" E, 205.93' | |
| 94 | N 64° 43' 52" E, 138.72' | |
| 95 | N 64° 02' 35" E, 52.57' | |
| 96 | N 64° 46' 08" E, 41.81' | |
| 97 | N 53° 57' 37" E, 43.32' | |
| 98 | N 36° 37' 58" E, 44.62' | |
| 99 | N 22° 01' 34" E, 33.85' | |
| 100 | N 12° 45' 49" E, 25.01' | |
| 101 | N 04° 44' 59" E, 51.96' | |
| 102 | N 11° 53' 42" W, 71.53' | |
| 103 | N 14° 00' 26" W, 105.86' | |
| 104 | N 13° 38' 52" W, 87.21' | |
| 105 | N 13° 22' 59" W, 112.95' | |
| 106 | N 16° 32' 23" W, 99.93' | |
| 107 | N 17° 30' 21" W, 3.43' | |
| 108 | N 14° 53' 47" W, 72.90' | |
| 109 | N 17° 21' 18" W, 51.51' | |
| 110 | N 18° 18' 23" W, 41.73' | |

Exhibit 1



SANT

RANCH

U.S. HIGHWAY

42

Exhibit 1

# NTA BARBARA COUNTY, CALIFORNIA

## CHO NUESTRA SENORA DEL REFUGIO
## RANCHO LAS CRUCES



Exhibit 1

# CHEVRON U.S.A., INC.

## OSB-019.00-PN

N00°24'51"E
154.93'

2" I.P. WITH TAG
L.S. 2602
N 362,510.46
E 1,331,520.35

SEMENT

Exhibit 1

```
111    N 21° 22' 16" W, 40.21'
112    N 29° 34' 32" W, 44.13'
113    N 36° 30' 22" W, 39.28'
114    N 45° 09' 01" W, 49.86'
115    N 48° 02' 46" W, 104.93'
116    N 46° 57' 01" W, 128.51'
117    N 45° 57' 45" W, 271.46'
118    N 44° 07' 00" W, 39.59'
119    N 34° 49' 04" W, 38.60'
120    N 18° 20' 18" W, 45.18'
121    N 04° 27' 42" W, 52.97'
122    N 06° 28' 32" E, 512.96'
123    N 06° 59' 05" E, 88.22'
124    N 06° 50' 30" E, 45.27'
125    N 04° 16' 55" W, 33.12'
126    N 17° 53' 09" W, 16.52'
127    N 28° 54' 53" W, 15.54'
128    N 38° 02' 45" W, 18.84'
129    N 45° 02' 54" W, 25.04'
130    N 52° 21' 14" W, 195.48'
131    N 51° 58' 28" W, 29.67'
132    N 35° 07' 42" W, 18.66'
133    N 21° 19' 25" W, 24.24'
134    N 12° 30' 01" W, 28.37'
135    N 11° 03' 54" W, 34.11'
136    N 10° 44' 57" W, 102.86'
137    N 11° 01' 53" W, 135.30'
138    N 10° 39' 33" W, 137.91'
139    N 18° 21' 28" W, 52.38'
140    N 18° 34' 30" W, 84.62'
141    N 18° 57' 14" W, 89.59'
142    N 18° 45' 23" W, 61.87'
143    N 10° 25' 56" W, 37.78'
144    N 13° 19' 34" W, 63.92'
145    N 20° 37' 59" W, 36.44'
146    N 24° 09' 47" W, 395.90'
147    N 24° 25' 34" W, 68.71'
148    N 17° 57' 30" W, 44.41'
149    N 12° 04' 41" W, 41.00'
150    N 05° 14' 59" W, 42.99'
151    N 04° 16' 52" E, 42.38'
152    N 09° 59' 24" E, 170.03'
153    N 10° 28' 26" E, 77.66'
154    N 13° 48' 46" E, 42.89'
155    N 20° 14' 29" E, 41.82'
156    N 25° 08' 23" E, 40.43'
157    N 30° 40' 03" E, 45.05'
158    N 36° 59' 39" E, 147.17'
159    N 35° 04' 06" E, 40.49'
160    N 23° 40' 36" E, 37.62'
161    N 16° 37' 43" E, 288.02'
162    N 20° 20' 19" E, 45.69'
163    N 24° 12' 35" E, 51.76'
164    N 28° 39' 33" E, 39.64'
165    N 37° 26' 37" E, 32.91'
166    N 39° 58' 38" E, 557.98'
167    N 36° 00' 37" E, 39.90'
168    N 28° 53' 01" E, 41.77'
169    N 19° 46' 53" E, 40.21'
170    N 13° 39' 38" E, 35.75'
171    N 03° 07' 48" E, 51.70'
172    N 00° 47' 39" E, 71.48'
173    N 13° 48' 46" E, 33.49'
174    N 24° 14' 56" E, 20.88'
175    N 39° 40' 01" E, 29.72'
176    N 45° 50' 18" E, 26.31'
177    N 47° 56' 23" E, 197.62'
```

PACIFIC OCEAN

Exhibit 1



OSB-023.03-HZ

STATE HWY. 1
RIGHT-OF-WAY

LLOYDS BANK OF CALIFORNIA

TRUSTEE FOR LOUISE HANSON

OSB-034.00-PN

STATE HWY. 1
RIGHT-OF-WAY

ANGLE POINT
+00"A"
185.00'
N 375,059.48
E 1,327,948.84

N68°27'25"W
113.70'

46

Exhibit 1



Exhibit 1



# STATE OF CALIFORNIA
## (GAVIOTA STATE PARK)
OSB-023.00-SZ

PAUL A. MITCHELL

OSB-025.00-PN

Exhibit 1



U.S. HIGHWAY 101
OSB—023.01—HZ

MGIC EQUITIES CORP.
OSB—024.00—PN

NOTES:
1. THIS
   THR
   COU
   PAR
   LAND
   BOOK
   OF T
2. A 50
   SURV
3. PROP
   HAROI
   IN THI
   1992.

EXHIBIT A-1

AS-BUILT 30" PIPELINE
OF GAVIOTA

| DRAWN BY: R.H.W. | DATE: 2-18-87 |
|---|---|
| SCALE: | 1"=600' |

SHEET 1 of 1

Exhibit 1

| 178 | | 32' 33" E, 42.46' |
| 179 | N 42° 17' 35" E, 24.87' |
| 180 | N 38° 16' 06" E, 30.45' |
| 181 | N 32° 28' 19" E, 382.18' |
| 182 | N 33° 23' 25" E, 283.83' |
| 183 | N 33° 25' 42" E, 376.89' |
| 184 | N 31° 25' 08" E, 653.67' |
| 185 | N 33° 54' 45" E, 144.36' |
| 186 | S 89° 39' 48" E, 0.22' |
| 187 | N 34° 26' 20" E, 70.85' |
| 188 | N 37° 52' 29" E, 43.92' |
| 189 | N 42° 45' 48" E, 38.72' |
| 190 | N 37° 50' 22" E, 58.92' |
| 191 | N 31° 41' 18" E, 90.60' |
| 192 | N 45° 58' 50" E, 21.64' |
| 193 | N 57° 22' 06" E, 29.65' |
| 194 | N 82° 34' 03" E, 35.75' |
| 195 | N 84° 38' 52" E, 469.23' |
| 196 | N 68° 01' 29" E, 45.18' |
| 197 | N 61° 29' 57" E, 273.42' |
| 198 | N 79° 29' 29" E, 85.81' |
| 199 | N 89° 24' 26" E, 132.44' |
| 200 | S 86° 25' 22" E, 48.24' |
| 201 | S 77° 29' 49" E, 34.14' |
| 202 | S 72° 08' 48" E, 38.14' |
| 203 | N 83° 46' 08" E, 37.69' |
| 204 | N 55° 46' 08" E, 39.03' |
| 205 | N 34° 31' 01" E, 268.34' |
| 206 | N 40° 49' 03" E, 35.28' |
| 207 | N 55° 31' 12" E, 135.38' |
| 208 | N 56° 14' 40" E, 66.47' |
| 209 | N 48° 18' 15" E, 41.07' |
| 210 | N 22° 19' 57" E, 35.86' |
| 211 | N 10° 17' 19" E, 42.15' |
| 212 | N 04° 35' 14" E, 146.90' |
| 213 | N 18° 11' 40" E, 49.66' |
| 214 | N 20° 22' 15" E, 191.73' |

TRACT: OSB–023.00–SZ
GAVIOTA STATE PARK
FEET: 21,682.58'
RODS: 1,314.10

TRACT: OSB–023.01–HZ
U.S. HIGHWAY 101
FEET: 175.91'
RODS: 10.66

NOTES:
1. THIS CENTERLINE DESCRIBES A 50' WIDE RIGHT–OF–WAY IN, THROUGH AND ACROSS A PARCEL OF LAND SITUATED IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA MORE PARTICULARY REFERED TO AS "GAVIOTA STATE PARK." SAID LAND IS DEPICTED IN RECORD OF SURVEY MAP, RECORDED IN BOOK 85, PAGE 29, SHEETS 1 TO 5 INCLUSIVE, IN THE OFFICE OF THE COUNTY RECORDER OF SANTA BARBARA COUNTY.
2. A 50' PERMANENT RIGHT–OF–WAY (25' ON EACH SIDE OF THE SURVEYED LINE) EXISTS.
3. PROPERTY SURVEY FOR GAVIOTA STATE PARK WAS DONE BY HAROLD D. HARDIN, L.S. 3555, A LICENSED LAND SURVEYOR IN THE STATE OF CALIFORNIA DURING DEC. 1991 THRU FEB. 1992.

← 2278.66

EXHIBIT A–1

| NO. | DATE | REVISION | BY |
|---|---|---|---|
| 1 | 10-9-95 | AS–BUILT & DRAWN IN AUTOCAD | J.D.R. |

## ALL AMERICAN PIPELINE COMPANY

### AS-BUILT 30" PIPELINE CROSSING PROPERTY OF GAVIOTA STATE PARK

| DRAWN BY: R.H.W. | DATE: 2–18–87 | APPROVED BY: C.R.C. | DATE: 2–18–87 |
|---|---|---|---|
| SCALE: 1"=600' | | DWG NO: PL–1119A | |

SHEET 1 of 1

50

Exhibit 1

# EXHIBIT 2

Exhibit 2

| | |
|---|---|
| State of California • Natural Resources Agency | **Gavin Newsom,** *Governor* |
| **DEPARTMENT OF PARKS AND RECREATION** | **Armando M. Quintero,** *Director* |
| **Legal Office • Post Office Box 924896 • Sacramento, CA 94296-000** | |

March 14, 2026                                    ***Sent via Electronic Mail Only***
                                                   ***slaperouse@sableoffshore.com***

Stephen T. Laperouse
Vice President Land
Sable Offshore
845 Texas Avenue, Suite 2920
Houston, TX 77002

Dear Mr. Laperouse:

This letter is to notify Sable Offshore and Pacific Pipeline Company ("Sable") that California Department of Parks and Recreation ("State Parks") is denying Sable's easement request, and demanding Sable immediately remove the pipeline according to section 8 of the Expired Easement.

Section 8 of the temporary pipeline easement granted to Sable's predecessor, Celeron Pipeline Company, which expired in 2016 ("Expired Easement"), attached hereto, authorizes State Parks to demand Sable to remove the pipeline and restore the property to its original condition after the end of the term. This letter demands immediate removal of the pipeline on State Parks' property pursuant to section 8 of the Expired Easement. State Parks has determined that due to Sable's excessive drain on state resources and incompatibility of their project with the park unit, State Parks will not be granting Sable an easement to continue to use Gaviota State Park for its oil pipeline operations. Additionally, although, State Parks has discussed the possibility of an easement with Sable, all prior permissions and discussions have been premised on the requirement that Sable comply with all applicable state laws and obtain all applicable state approvals, and Sable has now indicated that it has begun or imminently intends to begin restarting operations without adhering to those requirements or obtaining permission to use the State of California's land.

Consequently, State Parks is immediately ceasing any easement negotiations and related CEQA process.

If Sable does not formally respond within 10 days with plans for removal of the pipeline segment within Gaviota State Park, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim.  State Parks is prepared to withdraw this letter, however, if Sable confirms in writing to State Parks no later than 12 PM Pacific Time on Monday, March

Page **1** of **6**

Exhibit 2

Stephen Laperouse
March 14, 2026
Page 2

16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed.

*Background*

State Parks stewards Gaviota State Park, which consists of 2,712 acres of oak woodland and chaparral backcountry, beach and campground property, and natural sulfur hot springs in varied ecologically diverse habitats. It also contains significant known archeological, tribal, and historic resources, including the Las Cruces Adobe.

In 1986, Sable's predecessor received a 30-year pipeline easement from State Parks. Sable's pipeline runs four miles through Gaviota State Park, but has been offline since the May 2015 Refugio oil spill. The federal pipeline safety oversight agency determined the cause of the spill was in part the result of "ineffective protection against external corrosion of the pipeline." (Plains Pipeline, LP – Failure Investigation Report, Santa Barbara County, California Crude Oil Release – May 19, 2015, PHMSA (May 2016).) As a result of the spill, various state and federal agencies entered into a Consent Decree with Sable's predecessor as a settlement to a lawsuit containing a variety of claims. State Parks, as a resource trustee, is party to that Consent Decree which requires, among other things, that Sable comply with existing laws in its effort to restart its pipeline.[1]

Sable's 30-year easement for its pipeline expired in 2016, after the Refugio spill. Section 5 of the Expired Easement required Sable, "in the exercise of the privileges [therein] granted, [to] at all times be in compliance with all applicable laws, rules, and regulations." Section 8 of the Expired Easement stated that "[u]pon termination of this easement, COMPANY shall remove at option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration."

---

[1] Section 78 of the Consent Decree states: "This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, and permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or any other provisions of federal, state, or local laws, regulations, or permits."

Page **2** of **6**

Exhibit 1

Docusign Envelope ID: 9F9AF68A-9C3E-498A-BC3G-5405CBB5078C

Stephen Laperouse
March 14, 2026
Page 3

Since 2016, State Parks has issued successive year-long right of entry permits in order to permit Sable (or its predecessors) access to the offline pipeline for general maintenance and monitoring. These permits have always been "expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations." (Annual ROE, § 2.)

For years, State Parks understood Sable would ultimately abandon the current pipeline and replace and potentially realign the pipeline if it were to resume operations, and thus limited the ROE to those actions and access needs necessary for closure of the pipeline. Thus, the Annual ROE does not and cannot authorize operations. The second recital of the current Annual ROE states (omitting emphasis):

> Whereas, Permittee [Sable] has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart."

*Sable's Lack of Cooperation with State Parks, Violations of Past Permits, and Illegal Acts Damaging State Land*

Over the course of Sable and State Parks' negotiations, Sable has resisted every step of the process rather than working with State Parks. In July 2024, State Parks explained that Sable needed an easement in order to restart, and that a Right of Entry Permit for the anomaly digs would only be appropriate if the easement was near execution.

Instead of working with State Parks, Sable pushed for an immediate Right of Entry Permit, arguing there was no time for easement negotiations, despite the fact that State Parks had initiated the discussion about easement negotiations in July 2024. No law or contract required State Parks to continue working with Sable, or affiliated entities Exxon or Plains Pipeline, yet in order to provide physical access to the existing offline pipeline on public property, State Parks continued to offer a Right of Entry Permit so that Sable could have physical access to the property. State Parks did this with the

Page **3** of **6**

Exhibit 1

Docusign Envelope ID: 9F9AF68A-9C3E-498A-BC3C-5405CBB5978C

Stephen Laperouse
March 14, 2026
Page 4

understanding that if the pipeline company ever continued operations, it would need to construct a new pipeline.  The Consent Decree is clear that it does not waive any other requirements (see footnote 1), including legal authorization from State Parks to use and access the pipeline.

State Parks retains its usual discretion whether to grant an easement. Under Public Resources Code section 5012, State Parks may, but is not required to, grant an easement for pipeline purposes. Under State Parks' policy, encumbrances that do little or nothing to contribute toward State Parks' mission are presumed to be inappropriate, and State Parks is required to carefully analyze impacts before the encumbrance is approved by the State Parks Director. (State Parks' Department Operations Manual ("DOM"), § 2103.2.) Those requests that do little or nothing to contribute toward State Parks' mission must have no feasible offsite alternatives. Sable has stated that it has an offsite alternative. (https://sableoffshore.com/news/news-details/2025/Sable-Offshore-Corp--Announces-Alternative-Offtake-Strategy/default.aspx.)

Additionally, because Sable has requested a 30-year easement, State Parks has to be particularly careful in its analysis of whether and how to grant an easement that will impact this environmentally and culturally sensitive public land for decades. State Parks has informed Sable that under its policy "careful consideration must be given to impacts that may occur over the life of the encumbrance, including the burden and effect of ongoing maintenance or other intrusions." (DOM, § 2103.2.) In response, Sable has not provided sufficient information and follow State Parks' process and has shown time and again that it is not interested in complying with State Parks' process and will only be a burden and a liability to State Parks for the next three decades if it receives the right to operate within Gaviota State Park.

State Parks has always been clear that the annual Right of Entry Permit described above did not cover the extensive work involved with the anomaly digs. However, in February 2025, Sable elected to re-interpret the then-existing annual Right of Entry Permit and trespassed on State Parks' property, resulting in damage to natural resources. While Sable ceased work upon State Parks' demands, it showed that it is not a partner of the State and that obtaining full compensation and mitigation from Sable without litigation or other expensive, time consuming negotiations, is highly unlikely. Yet, State Parks cooperated with Sable's request and on May 8, 2025, State Parks issued a Right of Entry Permit for Sable's 18 anomaly digs ("Anomaly Dig ROE").

The Anomaly Dig ROE included restoration requirements which Sable has yet to perform, including restoration of a road that they demolished that provides access to an elementary school. Once the anomaly digs were complete[2], it became clear that Sable

---

[2] While the anomaly digs themselves were complete, Sable still has not finished completing the work required under the Anomaly Dig Right of Entry Permit, as noted above, including reconstruction of the

Stephen Laperouse
March 14, 2026
Page 5

needed a much wider footprint for its easement area than they had proposed in their easement request.

On May 22, 2025, State Parks and Sable met to discuss the requirements for the easement request. State Parks informed Sable that restart is not authorized without an easement in place. While the basis for this is basic real property law rather than laws specific to state property, State Parks has had to continually explain to Sable why Sable needs a land right in order to operate on property it does not own, and that a license or permit to access property is not a land right and does not govern continuing operations. State Parks has been clear and consistent on this basic real property principle since the beginning of negotiations.

As a result of (1) Sable's consistent reluctance to work with State Parks' process, (2) Sable's illegal destruction of public property, (3) State Parks' statutory obligation to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public," (Public Resources Code § 5003), (4) State Parks' general policy against granting encumbrances that do not directly serve that mission, and (5) Sable's indications that it has begun or imminently intends to begin restarting operations without securing all required state approvals or a new easement, State Parks is denying Sable's easement request.

As stated above, if State Parks does not receive a plan for removal of the pipeline within 10 days of the date of this letter, or if Sable does not confirm in writing to State Parks no later than 12 PM Pacific Time on Monday, March 16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim.

Sincerely,

DocuSigned by:

*Tara E. Lynch*
F610A257FA1247D...

Tara E. Lynch
Chief Counsel

---

damaged road that provides access to a local elementary school, and revegetation of the anomaly dig area. Sable has claimed that the anomaly dig footprint is revegetated, but in fact it came back with invasives, which can be expected where the footprint was not reseeded with State Parks-approved native mix as required by the Right of Entry Permit.

Page **5** of **6**

Exhibit 1

Docusign Envelope ID: 9F9AF68A-9C3E-498A-BC3C-5405CBB5078C

Stephen Laperouse
March 14, 2026
Page 6

Enclosures
1. Annual ROE
2. Expired Easement

Cc:

    Anthony Duenner, Sable Offshore General Counsel
    Lee Alcock, Sable Offshore Assistant General Counsel
    Dena Bellman, Channel Coast District Superintendent, State Parks
    Katharine Wilson, Channel Coast District Planning Chief, State Parks
    Emma Siverson, Senior Staff Counsel, State Parks

# EXHIBIT 3

Exhibit 3

| | |
|---|---|
| **RIGHT OF ENTRY PERMIT** | Agency:  Department of Parks and Recreation<br><br>Project:  **Pacific Pipeline 2025-26**<br>Gaviota State Park |

This Right of Entry Permit (Permit) is made and entered into this 27 day of July 2025, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Pacific Pipeline Company,** hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota State Park (S.P.), in the County of Santa Barbara, State of California; and

- **Whereas**, Permittee has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart.**

- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota S.P. for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved, and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2).** The environmental document is attached hereto as Exhibit "A" and the original easement is attached hereto as Exhibit "D" are both herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

## TERMS AND CONDITIONS

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:**  By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A and Exhibit D for the purpose of **pipeline maintenance and access for existing Line 325 that is currently subject to closure orders** (the Project), **and detailed below:**

   a) **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
   b) **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.**
   c) **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required by State.**
   d) **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads for Permittee's use. Permittee shall be**

Exhibit 3

responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent.  If Permittee damages any road it shall immediately repair the damage in accordance with State standards.

e)  In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.

f)  Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.

g)  No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.

2.  **Permit Subject to Laws and Regulatory Agency Permits:**  This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.





3.  **Term of Permit:**  This Permit shall only be for the period beginning on **July 27, 2025**, and ending on, **July 26, 2026** or as may be reasonably extended by written mutual agreement of the Parties.

4.  **Consideration:**  Permittee agrees to pay State the sum of **$ 48,046.85** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5.  **Permit Subject to Existing Claims:**  This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6.  **Waiver of Claims and Indemnity:**  Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted.  Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State.  Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7.  **Contractors:**  Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder.  Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein.  Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see "20. Default" paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8.  **Insurance Requirements:**  As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

**General Provisions Applying to All Policies**

A.  **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

**B.**     **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

**C.**     **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

**D.**     **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

**E.**     **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management.  If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

**F.**     **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

**G.**     **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

**H.**     **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR).  The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

**I.**     **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

**J.**     **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State.  This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract.  Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence.  Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

**9.**     **Reservation of Rights:**  State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

**10.**     **Access Limits and Conditions:**  Access to the Property shall be limited to the access designated by State.

- **Access to Gaviota State Park shall be for access to and maintenance of existing Line 325 pipeline as outlined in the original environmental document, the original easement and amendment. See Exhibits A and D.**
- **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not covered by this Right of Entry.**

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least two full business days (which do not include state holidays) prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property. Permittee shall also notify the State contact[s] listed below in writing at least two full business days (which do not include state holidays) prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**

Contact: Katharine Wilson
District Planning Chief
Katharine.Wilson@Parks.Ca.Gov

District:   Channel Coast
Address:  911 San Pedro Street
Ventura, CA

Telephone: (805) 804-2060

**PERMITTEE'S CONTACT:**

Contact: Stephen T. Laperouse
Vice President Land
slaperouse@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
Houston, Texas 77002

Telephone: (337) 316-3034

12. **Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13. **Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone. Permittee shall remove such fencing within two (2) days after the completion of work. Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

14. **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work. State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site. Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring. During excavation, the State archaeological monitor may observe and report to the State on all excavation activities. State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee. The specific protocol, guidelines and channels of communication outlined by the California Native

Exhibit 3

American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed.  Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days.  Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:**  Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first.  This obligation shall survive the expiration or termination of this Permit.

16. **Right to Halt Work:**  The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

17. **Use Restrictions:**  The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

    Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park.  Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

    Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

    Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

18. **State's Right to Enter:**  At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

    Permittee shall not interfere with State's right to enter.

19. **Protection of Property:**  Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

    (a)  Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

    (b)  Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

    (c)  Permittee shall not cut, prune or remove any vegetation upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (d)  Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (e)  Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

Exhibit 3

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

20. **Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

21. **State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

22. **Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

23. **Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

24. **Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

25. **Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee

Exhibit 3

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

**PACIFIC PIPELINE COMPANY**

Signature: _____

Signature: _____

Date: _____

Date: _____ July 25, 2025 _____

Name: **Dena Bellman**
Title:   District Superintendent
          Channel Coast District

Name: **J. Caldwell Flores**
Title:   President

Exhibit 3

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.


**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: _____

Date: _____

Name: **Dena Bellman**
Title:   District Superintendent
          Channel Coast District


**PACIFIC PIPELINE COMPANY**

Signature: _____

Date: _____

Name: **J. Caldwell Flores**
Title:   President


66

Exhibit 3

# EXHIBIT 4

Exhibit 4



About Us ⌄    News    Events & Presentations    Stock Info ⌄    Financials ⌄    Governance ⌄

Resources ⌄    Careers

## News Details

VIEW ALL NEWS →

# Sable Resumes Oil Flow As Ordered By The Federal DPA With Expected Gross Oil Rate Of 50,000 Bbls/D And Expects First Sales By April 1, 2026

**03/16/2026**

HOUSTON--(BUSINESS WIRE)-- Sable Offshore Corp. ("Sable," or the "Company") (NYSE: SOC) today announced that on March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through the federally regulated and approved to operate Santa Ynez Pipeline System ("SYPS") from Las Flores Canyon ("LFC") to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright.

On March 13, 2026, President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to Sable invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil. Sable immediately complied with this federal DPA Order and began shipping hydrocarbons from LFC to Pentland Station on March 14, 2026 with federal safety regulators present in observance.

As stated in the DPA Order, all federally produced barrels from the SYU must flow through the SYPS, up to the existing pipeline capacity of 200,000 Bbls/d. Sable completed its onshore anomaly repair program and hydrotested all segments of the SYPS consistent with applicable requirements as of May 2025.

Prior to resuming hydrocarbon transportation from LFC to Sable's sales point at Pentland Station, Sable had approximately 540,000 barrels of processed crude oil in storage at LFC, representing more than the line fill volume for the SYPS between LFC and Pentland Station. Sable is fully staffed and will continue to implement the conditions of the Emergency Special Permit previously issued by the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration.

Skip to main content

Exhibit 4



**News    Events & Presentations**

**Careers**

"Sable Offshore is putting California consumers first by increasing domestic supply of crude oil into the California market by approximately 17% and we look forward to continuing to execute as so ordered by the Defense Production Act executed on March 13, 2026," said Jim Flores, Sable's Chairman and Chief Executive Officer. Flores continued, "We look forward to working closely with the Department of Energy in fully complying with the DPA and working with the Trump administration to take all necessary steps to deliver the energy necessary for the security and defense of the country."

**About Sable**

Sable Offshore Corp. is an independent oil and gas company, headquartered in Houston, Texas, focused on responsibly developing the Santa Ynez Unit in federal waters offshore California. The Sable team has extensive experience safely operating in California.

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward- looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence full production of the SYU assets; our ability to recommence sales of oil, the cost and time required therefor, and production levels once recommenced; availability of future financing; our financial performance; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2025, which is filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

The Santa Ynez Unit restarted production in May 2025. Sable has not sold commercial quantities of hydrocarbons since the acquisition of the Santa Ynez Unit. The Santa Ynez Unit was shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from the Santa Ynez Unit to market ceased transportation.

  Investor Contact:
Harrison Breaud
Vice President, Finance & Investor Relations
IR@sableoffshore.com
713-579-8111

Source: Sable Offshore Corp.

**VIEW ALL NEWS →**

Skip to main content

Exhibit 4

# SABLE
## OFFSHORE

**News**    **Events & Presentations**

**Careers**

## Quick Links

**SEC FILINGS**

## Investor Email Alerts

Enter your Email Address                    **SIGN UP**

☐  News                      ☐  Quarterly Reports
☐  Annual Reports            ☐  SEC Filings
☐  End of Day Stock Quote    ☐  Events & Presentations

Unsubscribe

## SABLE
### OFFSHORE

Terms of Service    |    Privacy Policy

Exhibit 4

# EXHIBIT 5



# The Defense Production Act of 1950: History, Authorities, and Considerations for Congress

Updated October 6, 2023

**Congressional Research Service**

https://crsreports.congress.gov

R43767

**CRS REPORT**
Prepared for Members and
Committees of Congress

Exhibit 5

**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R43767

October 6, 2023

**Alexandra G. Neenan**
Analyst in U.S. Defense
Infrastructure Policy

# The Defense Production Act of 1950: History, Authorities, and Considerations for Congress

The Defense Production Act (DPA) of 1950 (P.L. 81-774, 50 U.S.C. §§4501 et seq.), as amended, confers upon the President a broad set of authorities to influence domestic industry in the interest of national defense. The authorities can be used across the federal government to shape the domestic industrial base so that, when called upon, it is capable of providing essential materials and goods needed for the national defense.

Though initially passed in response to the Korean War, the DPA is historically based on the War Powers Acts of World War II. Gradually, Congress has expanded the term *national defense,* as defined in the DPA. Based on this definition, the scope of DPA authorities now extends beyond shaping U.S. military preparedness and capabilities, as the authorities may also be used to enhance and support domestic preparedness, response, and recovery from natural hazards, terrorist attacks, and other national emergencies.

Current DPA authorities include

- **Title I: Priorities and Allocations**, which allows the President to require persons (including businesses and corporations) to prioritize and accept contracts for materials and services as necessary to promote the national defense.

- **Title III: Expansion of Productive Capacity and Supply**, which allows the President to incentivize the domestic industrial base to expand the production and supply of critical materials and goods. Authorized incentives include loans, loan guarantees, direct purchases and purchase commitments, and the authority to procure and install equipment in private industrial facilities.

- **Title VII: General Provisions**, which includes key definitions for the DPA and several distinct authorities, including the authority to establish voluntary agreements with private industry; the authority to block proposed or pending foreign corporate mergers, acquisitions, or takeovers that threaten national security; and the authority to employ persons of outstanding experience and ability and to establish a volunteer pool of industry executives who could be called to government service in the interest of the national defense.

Generally speaking, these authorities are statutorily afforded to the President, who may in turn delegate them to other executive branch officials. While DPA authorities are most frequently used by, and commonly associated with, the Department of Defense (DOD), they can be—and have been—used by other government departments and agencies.

Since 1950, the DPA has been reauthorized and modified dozens of times. As most DPA authorities periodically terminate, much of the legislation must be regularly reauthorized Congress last reauthorized the DPA in Section 1791 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (P.L. 115-232). This extended the termination of the act by six years, from September 30, 2019, to September 30, 2025, when nearly all DPA authorities will terminate. A few authorities of the DPA, such as the Exon-Florio Amendment (which established government review of the acquisition of U.S. companies by foreigners) and anti-trust protections for certain voluntary industry agreements, have been made permanent by Congress. The DPA lies within the legislative jurisdiction of the House Committee on Financial Services and the Senate Committee on Banking, Housing, and Urban Affairs.

Congress may consider enhancing its oversight of executive branch activities related to the DPA in a number of ways. To enhance oversight, Congress could expand executive branch reporting requirements, track and enforce rulemaking requirements, review the activities of the Defense Production Act Committee, and broaden the committee oversight jurisdiction of the DPA in Congress. Congress may also consider amending the DPA, either by creating new authorities or repealing existing ones. In addition, Congress may consider amending the definitions of the DPA to expand or restrict the DPA's scope, amending the statute to supersede the President's delegation of DPA authorities made in E.O. 13603, or consider adjusting future appropriations to the DPA Fund in order to manage the scope of Title III projects initiated by the President.

Exhibit 5

# Contents

Introduction ........................................................................................................................................ 1
History of the DPA ............................................................................................................................ 2
    Origin ........................................................................................................................................... 2
    Committee Jurisdiction ............................................................................................................... 2
    History of DPA Reauthorizations ............................................................................................... 3
Major Authorities of the DPA ........................................................................................................... 3
    General Scope of the DPA ........................................................................................................... 4
    Authorities under Title I of the DPA .......................................................................................... 5
        Priorities and Allocations Authority ...................................................................................... 5
        Delegations of Title I Authorities .......................................................................................... 7
        Examples of Use of Title I Authorities ................................................................................... 8
    Authorities Under Title III of the DPA ....................................................................................... 9
        Loan Guarantees and Direct Loans ........................................................................................ 9
        Purchase, Purchase Commitments, and Installation of Equipment ..................................... 10
        Delegation of Section 301, 302, and 303 Authorities in E.O. 13603 .................................. 11
        Defense Production Act Fund ............................................................................................... 12
        Examples of Use of Title III Authorities .............................................................................. 13
    Authorities Under Title VII of the DPA .................................................................................... 14
        Special Preference for Small Businesses .............................................................................. 14
        Definitions of Key Terms in the DPA .................................................................................. 14
        Industrial Base Assessments ................................................................................................ 15
        Voluntary Agreements .......................................................................................................... 15
        Nucleus Executive Reserve .................................................................................................. 16
        Committee on Foreign Investment in the United States ....................................................... 17
        Termination of the Act ......................................................................................................... 18
        Defense Production Act Committee ...................................................................................... 19
        Impact of Offsets Report ...................................................................................................... 19
Considerations for Congress ............................................................................................................ 20
    Enhancing Oversight ................................................................................................................. 20
        Expanding Reporting or Notification Requirements ............................................................ 20
        Enforcing and Revising Rulemaking Requirements ............................................................ 20
        Broadening Committee Oversight Jurisdiction .................................................................... 21
    Amending the Defense Production Act of 1950 ........................................................................ 21
        Declaration of Policy ........................................................................................................... 21
        Definitions ............................................................................................................................ 22
        Amending the Delegations of Authority in E.O. 13603 ....................................................... 22
        Appropriations to the DPA Fund .......................................................................................... 22

# Tables

Table 1. Appropriations to the DPA Fund, FY2013-FY2023 ......................................................... 12


Table A-1. Additional Resources by Defense Production Act Subject ........................................... 24

Exhibit 5

Table A-2. Key Provisions of the Defense Production Act, Related Portions of Executive
Order 13603, and Associated Regulations ...................................................................... 25
Table A-3. Delegation of Priorities and Allocations Authorities to Cabinet Secretaries ............... 27
Table A-4. Chronology of Laws Reauthorizing the Defense Production Act of 1950 .................... 1

# Appendixes

Appendix. Supplementary Tables.................................................................................................. 24

# Contacts

Author Information...................................................................................................................... 2

Congressional Research Service

Exhibit 5

# Introduction

The Defense Production Act of 1950, as amended (DPA), provides the President a broad set of authorities to ensure that domestic industry can meet national defense requirements.[1] In the DPA, Congress has found that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States."[2] Through the DPA, the President can, among other activities, prioritize government contracts for goods and services over competing customers, and offer incentives within the domestic market to enhance the production and supply of critical materials and technologies when necessary for national defense. Since 1950, the DPA has been reauthorized over 50 times by Congress, most recently in 2018 (Sec. 791 of P.L. 115-232). The majority of DPA authorities will expire on September 30, 2025, unless reauthorized.

This report examines some of the extensive history of the DPA, focusing primarily on its creation and most recent legislative reauthorization. This report also discusses the foremost active authorities of the DPA. Nevertheless, this report is not intended to evaluate all authorities of the DPA comprehensively. For example, though significant authorities for the Committee on Foreign Investment in the United States (CFIUS) are included in the DPA, CFIUS is generally considered separate and distinct from the DPA and this report defers to other CRS reports for in-depth discussion on that issue.[3] This report also identifies relevant delegations of the President's DPA authorities made in Executive Order (E.O.) 13603, *National Defense Resources Preparedness*.[4] Finally, this report provides a brief overview of issues Congress may consider in its oversight of executive branch use of DPA authorities, as well as the implementation of changes made in the most recent reauthorization. The report also discusses congressional considerations for expanding, restricting, or otherwise modifying the authorities provided by the DPA through new legislation.

As appendices to this report, several supplementary tables provide: additional resources related to various DPA subjects; a tabled analysis of key provisions of the DPA and related portions of E.O. 13603 and in regulations; the delegation of Title I priorities and allocations authority to Cabinet Secretaries in E.O. 13603; and a chronology of laws reauthorizing DPA authorities since first enactment. There is also an Appendix discussing how DPA authorities changed as a result of the last major reauthorization of the law that included reforms (P.L. 113-172, To reauthorize the Defense Production Act, to improve the Defense Production Act Committee, and for other purposes).[5]

---

[1] 50 U.S.C. §§4501 et seq. The DPA has been reclassified and renumbered from the former Appendix to Title 50 of the U.S. Code, where it was numerated at 50 U.S.C. Appx. §§2061 et seq.

[2] 50 U.S.C. §4502(a)(1); Section 2(a)(1) of the DPA.

[3] See CRS Report RL33388, *The Committee on Foreign Investment in the United States (CFIUS)*, by James K. Jackson (for further inquiries, congressional offices may contact Cathleen D. Cimino-Isaacs); and CRS In Focus IF10952, *CFIUS Reform Under FIRRMA*, by James K. Jackson and Cathleen D. Cimino-Isaacs.

[4] Executive Order 13603, "National Defense Resource Preparedness," 77 *Federal Register* 16651, March 22, 2012.

[5] These changes are discussed at length in this report, and are summarized in **Table A-2** of the Appendix.

Exhibit 5

# History of the DPA

## Origin

The DPA was modelled the First and Second War Powers Acts of 1941 and 1942, which gave the executive branch broad authority to regulate industry during World War II.[6] Much of this authority lapsed after 1945, and the beginning of the Cold War (and particularly the June 1950 outbreak of the Korean War) led the Truman Administration to identify a need for greater executive powers to control defense production and manage the nation's economy.[7]

As initially enacted on September 8, 1950, the DPA granted broad authority to the President to control aspects of industrial and economic policy.[8] Containing seven separate titles, the legislation allowed the President to, inter alia, demand that manufacturers give priority to defense production, to requisition materials and property, expand government and private defense production capacity, ration consumer goods, fix wage and price ceilings, force settlement of some labor disputes, control consumer credit and regulate real estate construction credit and loans, provide certain antitrust protections to industry, and establish a voluntary reserve of private sector executives who would be available for emergency federal employment.

Of the DPA's seven initial titles, four—Title II (Authority to requisition), Title IV (Price and wage stabilization), Title V (Settlement of labor disputes), and Title VI (Control of consumer and real estate credit)—terminated in 1953 when Congress allowed them to lapse.[9]

## Committee Jurisdiction

Though commonly associated with national defense, the DPA currently lies within the jurisdiction of the House Committee on Financial Services and the Senate Committee on Banking, Housing, and Urban Affairs. This is a legacy of the DPA's initial scope—because of the broad economic

---

[6] First War Powers Act, 1941 (H.R. 6233, P.L. 77-354, 55 Stat. 838), and Second War Powers Act, 1942 (S. 2208, P.L. 77-507, 56 Stat. 176). The first of these statutes conferred considerable emergency power on the President to reorganize the executive branch, to enter into contracts and make payments on them, and to regulate "trade with the enemy." The second act expanded the powers of the Interstate Commerce Commission to improve the efficiency of transportation of war materials; expanded an existing authority for military departments to acquire private property by condemnation, purchase, donation, or other transfer; permitted the Secretaries of War and the Navy to place orders and contracts and the President to give such contracts priority over all deliveries for private accounts or for export; and gave the President the authority to require acceptance of and performance under these contracts and to allocate materials and facilities for their fulfillment. The act also empowered the President to obtain information, records, and reports sufficient to enforce the provisions of the act and clarified existing law on the amount of compensation required if property was requisitioned for defense purposes. The act also included provisions relating to free postage for members of the military services, naturalization of persons serving in the armed forces, acceptance of conditional gifts to further the war program, metal content of coinage, inspection and audit of war contractors, and the gathering and assessment of war information by the Department of Commerce.

[7] In a message sent to Congress at the outbreak of war in Korea in mid-1950, President Truman stated that the United States and the United Nations were responding to a military invasion of the Republic of Korea by forces from north of the 38th parallel, that the nation urgently needed additional military manpower, supplies, and equipment, and that the nation's military and economic preparedness were inseparable. He urged Congress to pass legislation that would guarantee the prompt supply of adequate quantities of needed military and civilian goods, including measures to help compensate for manufacturing demand growth caused by military expansion. For more history of the DPA, see U.S. Congress, House Banking and the Currency, *Defense Production Act of 1950*, report to accompany H.R. 9176, 81st Cong., 2nd sess., July 28, 1950, H.Rept. 81-2759 (Washington: GPO, 1950), p. 1.

[8] P.L. 81-774, 64 Stat. 798.

[9] P.L. 83-95, 67 Stat. 129. P.L. 83-95 permitted the termination of Titles II and VI as of June 30, 1953, and Titles IV and V to terminate as of April 30, 1953.

---

Exhibit 5

powers the legislation conferred upon the President, the bill that became the Defense Production Act was assigned in 1950 to the House and Senate Committees on Banking and Currency (their successors are the House Committee on Financial Services and the Senate Committee on Banking, Housing, and Urban Affairs).[10] Although the parts of the act dealing with the requisitioning of materials, wages and prices, labor, and credit are no longer in force, these committees have retained jurisdiction.

In addition to the standing committees of jurisdiction, the original statute created a Joint Committee on Defense Production. This committee was composed of selected members from the standing Committees on Banking and Currency of the Senate and House. This committee was intended to review the programs established by the DPA and advise the standing committees whenever they drafted legislation on the subject. Although the provision in the DPA establishing the Joint Committee on Defense Production was officially repealed in 1992,[11] in effect, the Joint Committee has not existed since 1977, when salaries and expenses for the committee were last funded.[12]

## History of DPA Reauthorizations

The DPA has been amended and reauthorized numerous times since 1950. Aside from its initial enactment, the most consequential modification of the DPA occurred in 1953, when P.L. 85-95 reauthorized Titles I, III, and VII while allowing Titles II, IV, V, and VI to expire.[13] Like the War Power Acts that preceded it, the DPA included a sunset provision that has required periodic reauthorization and offered recurring opportunities for amendment. As of 2023, Congress has reauthorized the DPA 53 times (including many short-term "stop-gap" extensions). From time to time, the DPA has expired without Congress passing a law reauthorizing and extending its termination date. In such circumstances, Congress has often ultimately passed a law retroactively setting the effective date for the law to the previous expiration date. Most notably, for example, the DPA expired on October 20, 1990, and was not reauthorized until August 17, 1991. However, upon passage of P.L. 102-99, the effective date of the law was set to October 20, 1990. The DPA was most recently reauthorized by the 115th Congress, in Section 1791 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (P.L. 115-232). This extended the termination of the act by six years, from September 30, 2019, to September 30, 2025, when nearly all DPA authorities will terminate. See **Table A-4** in the Appendix for a full chronology of reauthorizations.

# Major Authorities of the DPA

This section provides summaries of the major authorities granted to the President in the three remaining active titles of the DPA.[14] Each summary describes how the DPA authorities are delegated to Cabinet officials or other offices of the U.S. government in the issued Executive

---

[10] Prior to 1975, House rules did not permit simultaneous referral of bills to two or more committees. Precedents in both chambers did not allow divided or joint referrals, regardless of bill content. Instead, bills were assigned to committees based on the preponderance of their subject matter.

[11] Section 153 of the Defense Production Act Amendments of 1992 (P.L. 102-558, 106 Stat. 4219).

[12] Although in 1977 Congress extended the 1950 Act through September 30, 1979 (P.L. 95-37), no appropriation for salaries and expenses of the Joint Committee was made for FY1978. The last appropriation for salaries and expenses for the Joint Committee was made in P.L. 94-440.

[13] Act of June 30, 1953, Defense Production Act Amendments of 1953 (S. 1080, P.L. 83-95).

[14] Titles I, III, and VII. The former Titles of the DPA (II, IV, V, and VI) terminated in 1953, but were officially repealed in the Reauthorization of 2009.

Exhibit 5

Order (E.O.) 13603, *National Defense Resource Preparedness*.[15] It is not intended to comprehensively evaluate all authorities in the DPA. The information provided below is reviewed in **Table A-2** for select provisions of the DPA. **Table A-1** also provides a list of additional materials, information, and resources on various topics of the DPA that may be of use to Congress.

## General Scope of the DPA

The DPA provides the President an "array of authorities to shape *national defense* preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base."[16] [Italics added.] DPA authorities are tied to the definition of *national defense*, as the use of any major DPA authority must be interpreted to promote, support, or otherwise be deemed needed or essential for the national defense.[17] *National defense* is currently defined in the statute as

> programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity. Such term includes emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act [42 U.S.C. §§5195 et seq.] and critical infrastructure protection and restoration.[18]

Thus, the allowable use of DPA authorities extends beyond shaping U.S. military preparedness and capabilities, including purposes such as domestic preparedness, response, and recovery from hazards, terrorist attacks, and other national emergencies.[19] This represents a substantial expansion of the term's initial definition—as originally enacted, the DPA defined *national defense* as "the operations and activities of the armed forces, the Atomic Energy Commission, or any other department or agency directly or indirectly and substantially concerned with the national defense."[20]

Another important definition affecting the scope of the DPA is that of the *domestic industrial base*, which is currently defined in the statute as "domestic sources which are providing, or which would be reasonably expected to provide, materials or services to meet national defense requirements during peacetime, national emergency, or war."[21] *Domestic sources*, in turn, are defined as businesses that perform contracted activities at, and source contracted components and

---

[15] Executive Order 13603, "National Defense Resource Preparedness," 77 *Federal Register* 16651, March 22, 2012. E.O. 13603 replaced the previous E.O. 12919 on National Defense Industrial Resource Preparedness, which had been issued by President William J. Clinton on June 3, 1994. See Executive Order 12919, "National Defense Industrial Resources Preparedness," 59 *Federal Register* 29525, June 7, 1994.

[16] 50 U.S.C. §4502(a)(4); Section 2(a)(4) of the DPA (emphasis added).

[17] There are various references to national defense throughout the DPA. Some examples: Title I, Section 101 priorities and allocations authority requires the President to deem action as "necessary or appropriate to promote the national defense" (50 U.S.C. §4511(a)); Title III authorities can be used when "essential for the national defense" (50 U.S.C. §§4531(a), 4532(a), 4533(a)); and Title VII voluntary agreement authority requires that the use helps "provide for the national defense" (50 U.S.C. §4558(c)(1)).

[18] 50 U.S.C. §4552(14); Section 702(14) of the DPA. Title VI of the Stafford Act defines "emergency preparedness activities" as any activities or measures "designed or undertaken to prepare for or minimize the effects of a hazard upon the civilian population, to deal with the immediate emergency conditions which would be created by the hazard, and to effectuate emergency repairs to, or the emergency restoration of, vital utilities and facilities destroyed or damaged by the hazard." 42 U.S.C. §5195(a)(3)

[19] The most recent amendment to this definition occurred in 2009, when "critical infrastructure assistance to any foreign nation" and "homeland security" were added. 123 Stat. 2017, Section 8 of P.L. 111-67.

[20] See Section 702(d) of P.L. 81-774.

[21] 50 U.S.C. §4552(6).

---

Exhibit 5

assemblies from, locations inside the United States or Canada.[22] This definition is important because the provision of assistance to private industry under DPA Title III authorities is restricted to the *domestic industrial base*, meaning that only businesses in the United States and Canada that meet the current definition are eligible to receive such assistance.

The DPA statute also includes congressional "Findings" and a "Statement of Policy."[23] This section of the law provides additional guidance to the executive branch on why and how the DPA authorities should be used. For example, the "Findings" section contains guidance on the promotion of renewable energy sources:

> to further assure the adequate maintenance of the domestic industrial base, to the maximum extent possible, domestic energy supplies should be augmented through reliance on renewable energy sources (including solar, geothermal, wind, and biomass sources), more efficient energy storage and distribution technologies, and energy conservation measures.[24]

Similarly, the "Statement of Policy" includes the following language on the locations of defense production sites:

> It is the policy of the United States that... in order to ensure productive capacity in the event of an attack on the United States, the United States Government should encourage the geographic dispersal of industrial facilities in the United States to discourage the concentration of such productive facilities within limited geographic areas that are vulnerable to attack by an enemy of the United States.[25]

# Authorities under Title I of the DPA

## Priorities and Allocations Authority

Section 101(a) of Title I of the DPA states

> The President is authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.[26]

The *priority* performance authority allows the federal government to ensure the timely availability of critical materials, equipment, and services produced in the private market in the interest of national defense, and to receive those materials, equipment, and services through contracts before any other competing interest.[27] Under the language of the DPA, a *person* (including corporations, as defined in statute) is required to accept prioritized contracts/orders, though regulations implementing Title I authorities provide practical exemptions to this

---

[22] 50 U.S.C. §4552 (8).

[23] 50 U.S.C. §4502; Section 2 of the DPA. This section comprises congressional findings, Section 2(a), and a statement of policy of the United States, Section 2(b).

[24] 50 U.S.C. §4502(a)(6); Section 2(a)(6) of the DPA.

[25] 50 U.S.C. §4502(b)(6); Section 2(b)(6) of the DPA.

[26] 50 U.S.C. §4511(a); Section 101(a) of the DPA.

[27] As noted in regulations for Title I authorities, especially 15 C.F.R. §700.1(b), this priority authority is broader than similar priority authorities provided in other statutes including Section 18 of the Selective Service Act of 1948 (50 U.S.C. §3816).

Exhibit 5

mandate.[28] The limited allowances for when a person is required to or may optionally reject a prioritized order can be superseded by the direction of the implementing federal department.[29] In executing a contract under the DPA, a contractor is not liable for actions taken to comply with governing rules, regulations, and orders (e.g., prioritization requirements), including any rules, regulations, or orders later declared legally invalid.[30] The government can also prioritize the performance of contracts between two private parties, such as a contract between a prime contractor and a subcontractor, if needed to fulfill a priority contract and promote the national defense.[31]

Title I also allows the President to *allocate* or control the general distribution of materials, services, and facilities. Allocation authority relates historically to the controlled materials programs of World War II, when the distribution of critical materials and resources had to be managed to maximize the production of goods needed in the war effort.[32] No allocation action has been taken by the President since the end of the Cold War.[33]

There are several notable restrictions to the priorities and allocation authority. For example, it cannot be used for contracts of employment.[34]Additionally, unless authorized by a joint resolution of Congress, the authority cannot be used for wage or price controls. Private persons are also not required to assist in the production or development of chemical or biological weapons unless directly authorized by the President or a Cabinet secretary.[35]

Title I also contains several provisions related to domestic energy. Section 101(c) specifically authorizes the President to allocate and prioritize contracts relating to materials, equipment, and services to maximize domestic energy supplies in certain circumstances.[36] However, Section 101(c) also restricts this use unless the President makes certain findings.[37] Further, Section 105 of

---

[28] 50 U.S.C. §4552(15), Section 702(15) of the DPA, defines person as "individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative thereof, or any State or local government or agency thereof." Contracts and "rated orders" have the same meaning in the regulations for Title I authorities. See, for example, the definition for "rated order" provided by 15 C.F.R. §700.8.

[29] See, for example, the regulations establishing standards and procedures for the use of the Secretaries of Agriculture, Commerce, Energy, Health and Human Services, and Transportation delegated authorities under Title I of the DPA (7 C.F.R. §786.13, 15 C.F.R. §700.13, 10 C.F.R. §217.33, 45 C.F.R. §101.33, and 49 C.F.R. §33.33, respectively). These regulations explain the circumstances under which a person may reject a prioritized contract, though these conditions are limited by the clause "Unless otherwise directed by the [implementing department]." Additionally, President Biden issued Presidential Determination No. 2022-11 in March 2022, determining that renewable domestic energy production is essential to national defense.

[30] 50 U.S.C. §4557; Section 707 of the DPA. Immunity under this provision is limited, and does not confer blanket tort immunity to a contractor for liability to injured third parties. Also, carrying out a contract according to its terms does not necessarily entitle a contractor to be indemnified by the government when the resulting product injures third parties, absent an indemnification clause in the contract. *Hercules v. United States*, 516 U.S. 417 (1996).

[31] See, for example, 15 C.F.R. §700.3(d).

[32] See further explanation of allocation authority in 15 C.F.R. §700.30.

[33] Department of Homeland Security, *The Defense Production Act Committee Report to Congress*, Calendar Year 2017 Report to Congress, June 18, 2019, p. 11.

[34] This restriction is written as a parenthetical in Section 101(a)(1), but is a considerable constraint on Title I priorities authority.

[35] 50 U.S.C. §4514; Section 104 of the DPA. It should be noted that development and production of chemical weapons and biological weapons are prohibited by the Chemical Weapons Convention (CWC) and the Biological Weapons Convention (BWC), respectively. The United States is a state party to both of these international treaties and is legally bound by their obligations and prohibitions.

[36] 50 U.S.C. §4511(c); Section 101(c) of the DPA.

[37] 50 U.S.C. §4511(c)(2); Section 101(c)(2) of the DPA stipulates that the Title I authority related to domestic energy (continued...)

---

Exhibit 5

the DPA restricts the authorities from being used to ration the end-use of gasoline without the approval of Congress.[38] Section 106 of Title I, as amended, also designates *energy* as a *strategic and critical* material.[39] This designation enables other authorities in the DPA, especially Title III authorities discussed below, to be used for policy purposes related to energy.

## Delegations of Title I Authorities

E.O. 13603 of March 16, 2012 provides for the delegation of the President's priorities and allocation authority to six different Cabinet Secretaries based upon their areas of expertise in different resource and material sectors. These resource areas are further defined in Section 801 of E.O. 13603. In practice, the priorities authority held by one Cabinet Secretary is frequently allowed to be used by other federal agencies, thereby allowing one agency to use another agency's authorities (e.g., DHS was allowed to use the Department of Agriculture's priorities authority related to food resources).[40] **Table A-3** in the Appendix summarizes this delegation of priorities and allocation authority. In addition, E.O. 13909 of March 18, 2020 delegated Title I authority to the Secretary of Health and Human Services "with respect to all health and medical resources needed to respond to the spread of COVID-19 within the United States."[41]

In statute, Title I priorities and allocation authority can only be used to "promote national defense." In E.O. 13603, the President further constrained this authority so that it "may be used only to support programs that have been determined in writing as necessary or appropriate to promote the national defense" by either the Secretary of Defense, the Secretary of Homeland Security, or the Secretary of Energy, depending on the issue involved. Once a program is determined to promote the national defense, other Secretaries who have been delegated the priorities and allocation authority can use their authority for those pre-designated program purposes.

The Secretary of Defense makes determinations related to military production and construction, military assistance to foreign nations, military use of civil transportation, stockpiles managed by DOD, space, and directly related activities; the Secretary of Energy makes determinations related to energy production and construction, distribution and use, and directly related activities; and the

---

"may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that—

(A) such materials, services, and facilities are scarce, critical, and essential—

    (i) to maintain or expand exploration, production, refining, transportation;

    (ii) to conserve energy supplies; or

    (iii) to construct or maintain energy facilities; and

(B) maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection."

[38] 50 U.S.C. §4515; Section 105 of the DPA.

[39] 50 U.S.C. §4516; Section 106 of the DPA.

[40] Department of Homeland Security, *The Defense Production Act Committee: Report to Congress*, Calendar Year 2017 Report, June 18, 2019, p. 11.

[41] E.O. 13909, March 18, 2020, available online at https://www.federalregister.gov/documents/2020/03/23/2020-06161/prioritizing-and-allocating-health-and-medical-resources-to-respond-to-the-spread-of-covid-19.

---

Exhibit 5

*The Defense Production Act of 1950*

Secretary of Homeland Security makes determinations related to all other national defense programs, including civil defense and continuity of government.[42]

Each of the six federal agencies to which the President delegated priorities and allocations authority through E.O. 13603 are required by law to issue and annually review regulations that "establish standards and procedures by which the priorities and allocations authority under this section is used to promote the national defense, under both emergency and nonemergency conditions."[43] Five of the six delegated the authority—the Departments of Agriculture, Commerce, Energy, Health and Human Services, and Transportation—have issued those regulations. DOD has not issued its regulation as it relates to using the priorities and allocation authority for water resources, as of November 20, 2018. However, DOD has indicated that its regulation is in preliminary draft.[44] Historically, the Department of Commerce's rule establishing the Defense Priorities and Allocations System (DPAS) has been the most frequently used by the executive branch. As encouraged by statute, the DPAS regulation was used as a model to create a "consistent and unified Federal priorities and allocations system."[45] This system is referred to as the "Federal Priorities and Allocations System" (FPAS).[46] Each of the regulations that make up the FPAS establish two levels of priority for issued orders notated as "DO" and "DX." In the DPAS regulations, a "DO" rating is lower than a "DX" rating. A "DO" rating order for a product means that it must be prioritized over all other nonrated orders. However, if a product that has a "DO" rated order is needed for a different "DX" rated order, the "DX" rated order takes precedence. As a matter of practice, few select programs may receive a "DX" rating.[47]

## Examples of Use of Title I Authorities

The authority to prioritize contracts is routinely employed by DOD. These prioritized contracts are typically issued under the Department of Commerce's (DOC's) delegated authority with respect to materials, services, and facilities, including construction materials, and under its Defense Priorities and Allocations System (DPAS) regulations guiding the use of this authority.[48] DOD has reported that it includes a priority rating as a standard clause in virtually all eligible contracts and orders for items under DOC's resource jurisdiction.[49] Some past examples of DOD's use of Title I priorities authority include supporting the Integrated Ballistic Missile Defense System, the B-2 Bomber, the VC-25A Presidential Aircraft (i.e., Air Force One), and Mine Resistant Ambush Protected (MRAP) Vehicles.[50]

While the priorities authority was historically used less frequently by departments and agencies outside of DOD, it has been used for a variety of purposes, including pandemic response,

---

[42] See Section 202 of E.O. 13603. An example of a written determination, issued by the Department of Homeland Security through FEMA, can be found at http://www.fema.gov/pdf/about/programs/dpa/signed-program-determinations-100506.pdf.

[43] 50 U.S.C. §4511(d)(1), Sec. 101(d)(1) of the DPA.

[44] Email response from Department of Defense, Legislative Affairs, November 8, 2018.

[45] 50 U.S.C. §4511(d)(2), Sec. 101(d)(2) of the DPA.

[46] For additional information on FPAS, see FEMA's website about it at https://www.fema.gov/federal-priorities-and-allocations-system.

[47] For a discussion of the different priority ratings, see 15 C.F.R. §700.11.

[48] Ibid. DOD has been re-delegated authority by DOC to use their regulations and authorities for Title I priorities authority.

[49] Department of Homeland Security, *The Defense Production Act Committee: Report to Congress*, Calendar Year 2015 Report, June 16, 2016, p. 5.

[50] For a list of Department of Defense programs that were approved for DX-rating as of March 2016, see https://www.bis.doc.gov/index.php/forms-documents/pdfs/1257-dx-rated-program-list/file.

---

Exhibit 5

terrorism prevention, and natural disaster preparedness. Much of this recent usage occurred in the context of the COVID-19 pandemic: according to a 2021 Government Accountability Office report, between March 2020 and September 2021, Title I authorities were used on at least 73 occasions for pandemic response purposes.[51] Other non-COVID related uses outside the traditional remit of DOD have included the prioritization of contracts in support of hurricane mitigation activities in Louisiana (2013); disaster relief efforts in Puerto Rico (2017); and natural gas procurement for state utilities facing blackouts (2001).[52]

The allocation authority supports the Civil Reserve Air Fleet (CRAF) program, which was created initially in 1951, and is now managed by the U.S. Department of Transportation. Under the CRAF program, civilian aircraft are "allocated" for the potential use, if required, by the DOD so that it may augment its airlift capability with civilian aircraft during a national defense related crisis. In return for their participation in the CRAF program, civilian carriers are given preference in carrying commercial peacetime cargo and passenger traffic for the DOD.[53]

## Authorities Under Title III of the DPA

Title III authorities are intended to help ensure that the nation has an adequate supply of, or the ability to produce, essential materials and goods necessary for the national defense. Using Title III authorities, the President may provide appropriate financial incentives to develop, maintain, modernize, restore, and expand the production capacity of domestic sources for critical components, critical technology items, materials, and industrial resources essential for the execution of the national security strategy of the United States.[54] The President may also use Title III authorities to ensure that critical components, critical technology items, essential materials, and industrial resources are available from reliable sources when needed to meet defense requirements during peacetime, graduated mobilization, and national emergency.[55]

### Loan Guarantees and Direct Loans

Sections 301 and 302 of Title III of the DPA authorize the President to issue loan guarantees and direct loans to reduce current or projected shortfalls of industrial resources, critical technology items, or essential materials needed for national defense purposes.[56] Loan guarantees and direct loans can be issued to private businesses to help them create, maintain, expedite, expand, protect, or restore production and deliveries or services essential to the national defense.[57] A direct loan is

---

[51] "COVID-19: Agencies Are Taking Steps to Improve Future Use of Defense Production Act Authorities", Government Accountability Office, December 2021. Available online at https://www.gao.gov/assets/gao-22-105380.pdf. For more information on the use of DPA authorities to respond to COVID-19, see CRS Insight IN11619, *New COVID-19 Defense Production Act (DPA) Actions: Implementation Considerations* and CRS Insight IN11593, *New Presidential Directives on the Defense Production Act (DPA) and the COVID-19 Pandemic*.

[52] U.S. Congress, House Committee on Financial Services, Subcommittee on Monetary Policy and Trade, *Reauthorizing the Defense Production Act*, 113th Cong., 1st sess., May 8, 2013, H.Hrg. 113-18 (Washington: GPO, 2013), p. 13. Department of Homeland Security, *The Defense Production Act Committee: Report to Congress*, Calendar Year 2017 Report, June 18, 2018, p. 10. U.S. Congress, Senate Committee on Banking, Housing, and Urban Affairs, *California Energy Crisis and Use of the Defense Production Act*, 107th Cong., 1st sess., February 9, 2001, S.Hrg. 107-215 (Washington: GPO, 2001).

[53] For more on the CRAF program, see U.S. Department of Transportation's website on the program at http://www.dot.gov/ost/oiser/craf.htm.

[54] 50 U.S.C. §4517; Section 107(a) of the DPA. Many of these terms are defined further in 50 U.S.C. §4552.

[55] 50 U.S.C. §4517; Section 107(b)(1) of the DPA.

[56] 50 U.S.C. §4531(a)(1). The beginning of 50 U.S.C. §4532(a) includes the same basic text as §4531(a)(1).

[57] Ibid.

---

Exhibit 5

a loan from the federal government to another government or private sector borrower that requires repayment, with or without interest. A loan guarantee allows the federal government to guarantee a loan made by a nonfederal lender to a nonfederal borrower, either by pledging to pay back all or part of the loan in cases when the borrower is unable to do so. These authorities, for instance, could be used to provide a loan, or to guarantee a loan, to a defense contractor that is responsible for the provision of critical services essential to the national defense when credit is otherwise unavailable in the private market.

There are a number of restrictions placed on the executive branch before these loan authorities may be used in the interest of national defense. First, the budget authority for guarantees and direct loans must be specifically included in appropriations passed by Congress and enacted by the President before such loan mechanisms can be issued.[58] Except during periods of national emergency declared by Congress or the President,[59] the DPA statute also requires the President to determine that loan guarantees or direct loans meet a number of conditions before issuance. One of the conditions in using the loan authority is that the loan or loan guarantee is the most cost-effective, expedient, and practical alternative method for meeting the need.[60] There are also a number of determination requirements for loan guarantees and direct loans that may help ensure that the loan is repaid by the recipient.[61] For example, the President is required to determine that there is "reasonable assurance" that a recipient of a loan or loan guarantee will be able to repay the loan.[62]

## Purchase, Purchase Commitments, and Installation of Equipment

Section 303 of Title III grants the President an array of authorities to create, maintain, protect, expand, or restore domestic industrial base capabilities essential to the national defense.[63] These authorities include, but are not limited to

- purchasing or making purchase commitments of industrial resources or critical technology items;[64]
- making subsidy payments for domestically produced materials;[65] and
- installing and purchasing equipment for government and privately owned industrial facilities to expand their productive capacity.[66]

In general, Section 303 authorities can be used by the President to provide incentives for domestic private industry to produce and supply critical goods that are necessary for the national defense. The scope of Section 303 authorities allows for these incentives to be structured in a number of ways, including direct purchases or subsidies of such goods. Therefore, whereas Title I authorities help ensure that the government has priority access to goods that are already being produced by

---

[58] See 50 U.S.C. §4531(a)(3) and 50 U.S.C. §4532(c).

[59] See 50 U.S.C. §4531(a)(2) and 50 U.S.C. §4532(b)(2).

[60] 50 U.S.C. §4531(a)(2)(C) and 50 U.S.C. §4532(b)(2)(C).

[61] See, for example, 50 U.S.C. §§4531(a)(2)(D), (E), (F) and (G) and 50 U.S.C. §§4532(b)(2)(D) and (E); which are Sections 301(a)(2)(D), (E), and (F) and Sections 302(b)(2)(D) and (E) of the DPA, respectively.

[62] See 50 U.S.C. §4531(a)(2)(D), Section 301(a)(2)(D) of the DPA.

[63] 50 U.S.C. §4533, Section 303 of the DPA.

[64] 50 U.S.C. §4533(a), Section 303(a)(1)(A) of the DPA. The terms "critical technology item" and "industry resource" are further defined in 50 U.S.C. §4552, Section 702 of the DPA.

[65] 50 U.S.C. §4533(c), Section 303(c) of the DPA.

[66] 50 U.S.C. §4533(e), Section 303(e) of the DPA.

Exhibit 5

*The Defense Production Act of 1950*

domestic industries, Section 303 authorities help create a sufficient supply of these essential goods in the interest of national defense.

Prior to using Section 303 authorities, the law requires the President, on a nondelegable basis, to determine that there is a "domestic industrial base shortfall" for a particular industrial resource, material, or critical technology item that threatens the national defense.[67] This determination includes finding that the industry of the United States cannot reasonably be expected to provide the capability for the good in a timely manner, and that purchases, purchase commitments, or other actions are the most cost effective, expedient, and practical alternative method for meeting the need.[68] For projects that cumulatively cost more than $50 million to address an industrial base shortfall, the projects must first be authorized by an act of Congress. Additionally, the President is required to notify the committees of jurisdiction, and give the committees 30 days to comment, when the actions to remedy the shortfall are expected to exceed $50 million.[69] Generally, very few Title III projects exceed the $50 million threshold. The President is authorized to waive the determination and notification provisions in periods of national emergency or in situations that the President, on a nondelegable basis, determines the industrial base shortfall would severely impair national defense.[70]

---

**DOD's Broad Agency Announcements Under the DPA**

DOD's DPA Title III office (located in the office of the Assistant Secretary of Defense for Industrial Base Policy) sometimes issues Broad Agency Announcements requesting interested parties to submit white papers or proposals for "projects that create, maintain, protect, expand, or restore domestic industrial base capabilities essential for the national defense." As an example, a 2018 announcement identified three broad focus areas for potential projects:

- Sustainment of Critical Production,
- Commercialization of R&D Investments, and
- Scaling of Emerging Technologies.

A Broad Agency Announcement is a method by which an agency solicits interest in solving a development problem. No budget is allocated and no particular procurement approach is determined in advance. Such announcements, however, often lead to a contract, grant, or some other financial agreement. (For more information on this particular BPA, see https://www.businessdefense.gov/DPA-Title-III/Opportunities/.)

---

## Delegation of Section 301, 302, and 303 Authorities in E.O. 13603

In E.O. 13603, the "head of each agency engaged in procurement for national defense" is delegated the majority of the authorities of Sections 301, 302, and 303 of Title III of the DPA.[71] These agencies are specifically identified in E.O. 13603.[72] This delegation includes the ability to

---

[67] The President previously delegated authority to make this determination to the "head of each agency engage[d] in procurement for national defense" in Section 305(b) of E.O. 13603. However, changes to the DPA in P.L. 113-72 made subsequent to the issuance of the E.O. 13603 have overridden these delegations because the President is no longer allowed to delegate this determination and notification responsibility.

[68] 50 U.S.C. §4533(a)(5)(B) and (C), Section 303(a)(5)(B) and (C) of the DPA.

[69] 50 U.S.C. §4533(a)(6), Section 303(a)(6) of the DPA.

[70] 50 U.S.C. §4533(a)(7), Section 303(a)(7) of the DPA.

[71] See Sections 301, 302, 303, 304, and 305 of E.O. 13603.

[72] Section 801(h) of E.O. 13603 states "the heads of the Departments of State, Justice, the Interior, and Homeland Security, the Office of the Director of National Intelligence, the Central Intelligence Agency, the National Aeronautics and Space Administration, the General Services Administration, and all other agencies with authority delegated under section 201 of this order." Under Section 201 of the executive order, the additional agencies are the Departments of Agriculture, Commerce, Defense, Energy, Health and Human Services, and Transportation.

Exhibit 5

make all determinations not explicitly cited in the statute as being nondelegable.[73] However, this delegation does not include the authority to encourage the exploration, development, and mining of strategic and critical materials and other materials. This authority is provided to the President in the statute, and is delegated only to the Secretaries of Defense and the Interior.[74]

In addition, E.O. 13911 of March 27, 2020 delegated Title III authorities to the Secretary of Health and Human Services and the Secretary of Homeland Security to "to respond to the spread of COVID-19."[75]

## Defense Production Act Fund

Title III of the DPA establishes a Treasury account, the Defense Production Act Fund, which is available to carry out all of the provisions and purposes of Title III. The DPA Fund is also used to collect all proceeds from DPA activities under Title III, such as the resale of DPA-procured commodities or products.[76] The monies in the DPA Fund are available until expended. However, the unobligated balance in the DPA Fund at the end of any fiscal year cannot exceed $750 million, excluding monies appropriated for that fiscal year.[77]

**Table 1** provides the appropriations to the DPA Fund between FY2013 and FY2023. It is possible for appropriations to the DPA Fund to be made in any of the bills providing funding to the numerous agencies delegated Title III authorities; however, most recent discretionary appropriations have come from defense appropriations acts.[78] Recent appropriations to the DPA Fund made through other legislative vehicles have included $500 million enacted through the Inflation Reduction Act of 2022 (P.L. 117-169), $600 million enacted through the Additional Ukraine Supplemental Appropriations Act, 2022 (P.L. 117-128), and $1 billion enacted through the Coronavirus Aid, Relief, and Economic Security (CARES) Act of 2020 (P.L. 116-136).

### Table 1. Appropriations to the DPA Fund, FY2013-FY2023

Amounts in millions

| Fiscal Year | Law | Amount |
|---|---|---|
| 2013 | P.L. 113-6 | $223.5 |
| 2014 | P.L. 113-76 | $60.1[a] |
| 2015 | P.L. 113-235 | $51.6 |
| 2016 | P.L. 114-113 | $76.7 |
| 2017 | P.L. 115-31 | $64.1 |
| 2018 | P.L. 115-141 | $67.4 |

---

[73] Section 305 of E.O. 13603.

[74] In statute, see 50 U.S.C. §4533(a)(1)(B); Section 303(a)(1)(B) of the DPA. The authority is delegated in Section 306 of E.O. 13603. The Secretary of Interior is delegated this authority in consultation with the Secretary of Defense, as the National Defense Stockpile Manager.

[75] Sec. 2 of E.O. 13911.

[76] 50 U.S.C. §4534; Section 304 of the DPA.

[77] 50 U.S.C. §4534(e); Section 304(e) of the DPA. The obligation of funds is defined in the DOD Financial Management Regulation as an "amount representing orders placed, contracts awarded, services received, and similar transactions during an accounting period that will require payment during the same, or a future, period." Office of the Comptroller, Department of Defense, *Financial Management Regulation*, DOD 7000.14-R, Washington, DC, April 2015, p. Glossary-22.

[78] See footnote 72 for an explanation and full list of the delegated agencies with Title III authorities.

Exhibit 5

| Fiscal Year | Law | Amount |
|---|---|---|
| 2019 | P.L. 115-245 | $53.6 |
| 2020 | P.L. 116-93 and P.L. 116-136 | $1,064.4[b] |
| 2021 | P.L. 116-260 | $174.6 |
| 2022 | P.L. 117-103, P.L. 117-128, and P.L. 117-169. | $1,488.3[c] |
| 2023 | P.L. 117-328 | $372.9 |

**Source:** CRS analysis of appropriations acts.

**Notes:** Amounts not adjusted for inflation.

a. In FYs 2014, 2015, and 2016, Congress also authorized the Department of Energy to transfer up to $45 million to the DPA Fund from each FY appropriation from the Energy Efficiency and Renewable Energy account. For FY2014, see P.L. 113-76, 128 Stat. 165; for FY2015, see P.L. 113-235, 128 Stat. 2313; for FY2016, P.L. 114-113, 129 Stat. 2408. These transfers were made by DOE, for a total of $135 million

b. $1 billion of the FY2020 total was appropriated by the CARES Act (P.L. 116-136) to "to prevent, prepare for, and respond to coronavirus, domestically or internationally."

c. Of the $1.488.3 billion appropriated in FY2022, $600 million was appropriated by the Additional Ukraine Supplemental Appropriations Act, 2022 (P.L. 117-128) "to respond to the situation in Ukraine and for related expenses" and $500 million was appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169).

The President is required to designate a "Fund manager" to carry out general accounting functions for the fund.[79] The Secretary of Defense has been designated to be the Fund Manager in E.O. 13603.[80] As the Fund Manager, the Secretary of Defense (or official to whom the authority is further delegated in DOD) is responsible for the financial accounting of the fund, but does not necessarily have decision-making authority over the use of the fund.

## Examples of Use of Title III Authorities

Successive presidential administrations have made extensive use of Title III authorities to expand productive capacity for capabilities deemed essential for national defense. Examples of Title III actions taken in 2023 include

- A $90 million agreement with Albemarle Corporation "to support the expansion of domestic mining and production of lithium" (September 2023);[81]

- A $20.6 million agreement with Talon Nickel, LLC "to increase the domestic production of nickel" (September 2023);[82]

- A $37.5 million agreement with Graphite One (Alaska) "to secure a reliable, sustainable supply of graphite materials within the U.S. to be used in the production of large-capacity batteries" (July 2023);[83]

---

[79] 50 U.S.C. §4534(f); Section 304(f) of the DPA.

[80] Section 309 of E.O. 13603.

[81] According to DOD, this action utilized funds appropriated by the Inflation Reduction Act of 2022. DOD, "DoD Enters Agreement to Expand Domestic Lithium Mining for U.S. Battery Supply Chains," DOD News, September 12, 2023, at https://www.defense.gov/News/Releases/Release/Article/3522657/dod-enters-agreement-to-expand-domestic-lithium-mining-for-us-battery-supply-ch/.

[82] According to DOD, this action utilized funds appropriated by the Additional Ukraine Supplemental Appropriations Act of 2022. DOD, "Department of Defense Enters an Agreement to Strengthen the U.S. Supply Chain for Nickel Production," DOD News, September 12, 2023, at https://www.defense.gov/News/Releases/Release/Article/3522652/department-of-defense-enters-an-agreement-to-strengthen-the-us-supply-chain-for/.

[83] According to DOD, this action utilized funds appropriated by the Inflation Reduction Act of 2022. DOD, "DOD (continued...)

Exhibit 5

*The Defense Production Act of 1950*

- A $45.5 million agreement with Arconic Corporation "to increase production of High Purity Aluminum (HPA) for use in missile and munition production" (June 2023);[84] and

- A $ 15 million agreement with Jervois Mining USA "to conduct feasibility studies to expand cobalt extraction in Idaho."[85]

## Authorities Under Title VII of the DPA

Title VII of the DPA contains various provisions that 1) clarify how DPA authorities can and should be used, and 2) provide additional presidential authorities. Some significant provisions of Title VII are summarized below.

### Special Preference for Small Businesses

Two provisions in the DPA direct the President to accord special preference to small businesses when issuing contracts under DPA authorities. Section 701 reiterates[86] and expands upon a requirement in Section 108 of Title I directing the President to "accord a strong preference for small business concerns which are subcontractors or suppliers, and, to the maximum extent practicable, to such small business concerns located in areas of high unemployment or areas that have demonstrated a continuing pattern of economic decline, as identified by the Secretary of Labor."[87]

### Definitions of Key Terms in the DPA

The DPA statute historically has included a section of definitions.[88] Though *national defense* is perhaps the most important term, there are additional definitions provided both in current law and in E.O. 13603.[89] Over time, the list of definitions provided in both the law and implementing executive orders has been added to and edited, most recently in 2009, when Congress added a definition for *homeland security*[90] to place it within the context of *national defense*.[91]

---

Enters Agreement to Expand Capabilities for Domestic Graphite Mining and Processing for Large-Capacity Batteries," DOD News, July 17, 2023, at https://www.defense.gov/News/Releases/Release/Article/3459556/dod-enters-agreement-to-expand-capabilities-for-domestic-graphite-mining-and-pr/.

[84] According to DOD, this action utilized funds appropriated by the Additional Ukraine Supplemental Appropriations Act of 2022. DOD, "DoD Enters Agreement to Expand Domestic Manufacturing to Strengthen U.S. Missiles and Munitions Supply Chains," DOD News, June 16, 2023, at https://www.defense.gov/News/Releases/Release/Article/3431173/dod-enters-agreement-to-expand-domestic-manufacturing-to-strengthen-us-missiles/.

[85] According to DOD, this action utilized funds appropriated by the Additional Ukraine Supplemental Appropriations Act of 2022. DOD, "DOD Enters Agreement to Expand Domestic Manufacturing and Strengthen U.S. Cobalt Supply Chains," DOD News, June 15, 2023, at https://www.defense.gov/News/Releases/Release/Article/3429442/dod-enters-agreement-to-expand-domestic-manufacturing-and-strengthen-us-cobalt/.

[86] 50 U.S.C. §4551; Section 701 of the DPA.

[87] 50 U.S.C. §4518; Section 108(a) of the DPA.

[88] The original law provided five definitions, including a definition of "national defense." See Section 702 of P.L. 81-774.

[89] In total, there are 17 terms defined in law in 50 U.S.C. §4552, and 13 additional definitions in Section 801 of E.O. 13603.

[90] 50 U.S.C. §4552(11). *Homeland security* means efforts "(A) to prevent terrorist attacks within the United States; (B) to reduce the vulnerability of the United States to terrorism; (C) to minimize damage from a terrorist attack in the United States; and (D) to recover from a terrorist attack in the United States."

[91] 123 Stat 2017-2018. Congress amended, in addition to the definition of *national defense*, the existing definitions of (continued...)

---

Congressional Research Service                                                                                        14

Exhibit 5

*The Defense Production Act of 1950*

## Industrial Base Assessments

To appropriately use numerous authorities of the DPA, especially Title III authorities, the President may require a detailed understanding of current domestic industrial capabilities and therefore need to obtain extensive information from private industries. Under Section 705 of the DPA, the President may "by regulation, subpoena, or otherwise obtain such information from ... any person as may be necessary or appropriate, in his discretion, to the enforcement or the administration of this Act [the DPA]."[92] This authority is delegated to the Secretary of Commerce in E.O. 13603.[93] Though this authority has many potential implications and uses, it is most commonly associated with what the DOC's Bureau of Industry and Security calls "industrial base assessments."[94] These assessments are often conducted in coordination with other federal agencies and the private sector to "monitor trends, benchmark industry performance, and raise awareness of diminishing manufacturing capabilities."[95] The statute requires the President to issue regulations to insure that the authority is used only after "the scope and purpose of the investigation, inspection, or inquiry to be made have been defined by competent authority, and it is assured that no adequate and authoritative data are available from any Federal or other responsible agency."[96] This regulation has been issued by DOC.[97]

## Voluntary Agreements

Normally, voluntary agreements or plans of action between competing private industry interests could be subject to legal sanction under anti-trust statutes or contract law. Title VII of the DPA authorizes the President to "consult with representatives of industry, business, financing, agriculture, labor, and other interests in order to provide for the making by such persons, with the approval of the President, of voluntary agreements and plans of action to help provide for the national defense."[98] The President must determine that a "condition exists which may pose a direct threat to the national defense or its preparedness programs"[99] prior to engaging in the consultation process. Following the consultation process, the President or presidential delegate may approve and implement the agreement or plan of action.[100] Parties entering into such voluntary agreements are afforded a special legal defense if their actions within that agreement would otherwise violate antitrust or contract laws.[101] Historically, the National Infrastructure Advisory Council noted that the voluntary agreement authority has been used to "enable companies to cooperate in weapons manufacture, solving production problems and standardizing

---

*critical component*, *critical technology*, *domestic industrial base*, *industrial resources*, and *services*. Congress struck the definitions for c*ritical industry for national security*, *essential weapon system*, and *small business concern owned and controlled by socially and economically disadvantaged individuals*. Congress added the definitions *guaranteeing agency* and *homeland security*.

[92] 50 U.S.C. §4555(a); Section 705(a) of the DPA.

[93] Generally, see Section 104(d) of E.O. 13603.

[94] For examples of some publicly available industrial base assessments, see the agency's website at http://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/industrial-base-assessments.

[95] Ibid.

[96] 50 U.S.C. §4555(a); Section 705(a) of the DPA.

[97] See 15 C.F.R. Part 702.

[98] 50 U.S.C. §4558(c)(1); Section 708(c)(1) of the DPA.

[99] Ibid. The consultation process is described in 50 U.S.C. §§4558(d) and (e); Section 708(d) and (e) of the DPA.

[100] 50 U.S.C. §4558(f); Section 708(f) of the DPA.

[101] 50 U.S.C. §4558, Section 708 of the DPA provides a legal defense to parties of voluntary agreements or plans of action that can be used in civil suits or criminal actions brought against them under anti-trust laws (§4558(j)) or for breach of contract (§2158(o)). These exemptions do not grant them blanket immunity from these laws.

---

Exhibit 5

designs, specifications and processes," among other examples.[102] It could also be used, for example, to develop a plan of action with private industry for the repair and reconstruction of major critical infrastructure systems following a domestic disaster.

The authority to establish a voluntary agreement has been delegated to the head of any federal department or agency otherwise delegated authority under any other part of E.O. 13603.[103] Thus, the authority could be potentially used by a large group of federal departments and agencies. Use of these voluntary agreements is tracked by the Secretary of Homeland Security,[104] who is tasked under E.O. 13603 with issuing regulations that are required by law on the "standards and procedures by which voluntary agreements and plans of action may be developed and carried out."[105] The Federal Emergency Management Agency (FEMA), which at the time was an independent agency and tasked with these responsibilities under the DPA, issued regulations in 1981 to fulfill this requirement.[106] FEMA is now a part of DHS, and those regulations remain in effect.

The Maritime Administration (MARAD) of the U.S. Department of Transportation manages the only currently established voluntary agreements in the federal government, the Voluntary Intermodal Sealift Agreement (commonly referred to as "VISA") and the Voluntary Tanker Agreement. These programs are maintained in partnership with the U.S. Transportation Command of DOD, and have been established to ensure that the maritime industry can respond to the rapid mobilization, deployment, and transportation requirements of DOD. Voluntary participants from the maritime industry are solicited to join the agreements annually.[107]

## Nucleus Executive Reserve

Title VII of the DPA authorizes the President to establish a volunteer body of industry executives, the "Nucleus Executive Reserve," or more frequently called the National Defense Executive Reserve (NDER).[108] The NDER would be a pool of individuals with recognized expertise from various segments of the private sector and from government (except full-time federal employees). These individuals would be brought together for training in executive positions within the federal government in the event of an emergency that requires their employment. The historic concept of the NDER has been used as a means of improving the war mobilization and productivity of industries.[109]

---

[102] The National Infrastructure Advisory Council, *Framework for Dealing with Disasters and Related Interdependencies: Final Report and Recommendations*, Appendix G: The Defense Production Act, Washington, DC, July 14, 2009, p. 45, at http://www.dhs.gov/xlibrary/assets/niac/niac_framework_dealing_with_disasters.pdf.

[103] Section 401 of E.O. 13603.

[104] Section 401 of E.O. 13603.

[105] 50 U.S.C. §4558(e); Section 708(e) of the DPA.

[106] FEMA's regulations can be found at 44 C.F.R. Part 332. They were issued at Federal Emergency Management Agency, "Voluntary Agreements: Standards and Procedures," 46 *Federal Register* 2349, January 9, 1981.

[107] For more, see approval of the VISA program in the *Federal Register* at Maritime Administration, "Voluntary Intermodal Sealift Agreement," 79 *Federal Register* 64462, October 29, 2014. See also MARAD's website at https://www.marad.dot.gov/ships-and-shipping/strategic-sealift/voluntary-intermodal-sealift-agreement-visa/.

[108] 50 U.S.C. §4560(e); Section 710(e) of the DPA.

[109] President Dwight D. Eisenhower created the NDER in 1956 by issuing E.O.10660 under the authorities granted in Title VII. It has served as a vehicle for training highly qualified private industry executives in war production mobilization should the nation be faced with the need to place the nation's industrial base on a war footing. This program was inspired by the experiences of the War Industries Board of World War I and the War Production Board of World War II, when corporate executives were brought into government service, often with little or no compensation, (continued...)

Exhibit 5

The head of any governmental department or agency may establish a unit of the NDER and train its members.[110] No NDER unit is currently active, though the statute and E.O. 13603 still provide for this possibility. Units may be activated only when the Secretary of Homeland Security declares in writing that "an emergency affecting the national defense exists and that the activation of the unit is necessary to carry out the emergency program functions of the agency."[111]

## Committee on Foreign Investment in the United States[112]

The Committee on Foreign Investment in the United States (CFIUS) is an interagency committee that serves the President in overseeing the national security implications of foreign investment in the economy. It reviews foreign investment transactions to determine if (1) they threaten to impair U.S. national security; (2) the foreign investor is controlled by a foreign government; or (3) the transaction could affect homeland security or would result in control of any critical infrastructure that could impair the national security. The President has the authority to block proposed or pending foreign investment transactions that threaten to impair the national security.

CFIUS initially was created and operated through a series of Executive Orders.[113] In 1988, Congress passed the "Exon-Florio" amendment to the DPA, granting the President authority to review certain corporate mergers, acquisitions, and takeovers, and to investigate the potential impact on national security of such actions.[114] This amendment codified the CFIUS review process due in large part to concerns over acquisitions of U.S. defense-related firms by Japanese investors. In 2007, amid growing concerns over the proposed foreign purchase of commercial operations of six U.S. ports, Congress passed the Foreign Investment and National Security Act of 2007 (P.L. 110-49) to create CFIUS in statute.

On August 13, 2018, President Trump signed into law new rules governing national security reviews of foreign investment, known as the *Foreign Investment Risk Review Modernization Act* (FIRRMA, Title XVII, P.L. 115-235).[115] FIRRMA amends several aspects of the CFIUS review process under Section 721 of the DPA.[116] Notably, it expands the scope of transactions that fall under CFIUS' jurisdiction. It maintains core components of the current CFIUS process for

---

to organize the nation's industries for war production. For background on the origins and operation of the War Industries Board, see Paul A. C. Koistinen, "The 'Industrial-Military Complex' in Historical Perspective: World War I," *The Business History Review*, vol. 41, no. 4 (Winter 1967), pp. 378-403; and Robert D. Cuff, "A 'Dollar-a-Year Man' in Government: George N. Peek and the War Industries Board," *The Business History Review*, vol. 41, no. 4 (Winter 1967), pp. 404-420.

[110] Section 501(c) in E.O. 13603.

[111] Section 501(e) in E.O. 13603.

[112] This section was written by James K. Jackson, Specialist in International Trade and Finance, and Cathleen Cimino-Isaacs, Analyst in International Trade and Finance. For more information on CFIUS, see CRS Report RL33388, *The Committee on Foreign Investment in the United States (CFIUS)*, by James K. Jackson (for further inquiries, congressional offices may contact Cathleen D. Cimino-Isaacs), and CRS In Focus IF10952, *CFIUS Reform Under FIRRMA*, by James K. Jackson and Cathleen D. Cimino-Isaacs.

[113] The various CFIUS authorities are not delegated by the President in E.O. 13603 with the majority of other DPA authorities. Rather, CFIUS authorities are delegated by the President in E.O. 11858, *Foreign Investment in the United States*, as amended, which was originally issued in 1975 but has been amended since then (notably by E.O. 13456, *Further Amendment of Executive Order 11858 Concerning Foreign Investment in the United States*). See Executive Order 13456, "Foreign Investment in the United States," 73 *Federal Register* 4677, January 25, 2008.

[114] 50 U.S.C. §4565; Section 721 of the DPA.

[115] For more detail on FIRRMA, see CRS In Focus IF10952, *CFIUS Reform Under FIRRMA*, by James K. Jackson and Cathleen D. Cimino-Isaacs.

[116] For the U.S. Treasury's summary and FAQs of the changes, see https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius.

---

Exhibit 5

evaluating proposed or pending investments in U.S. firms, but increases the allowable time for reviews and investigations. Upon receiving written notification of a proposed acquisition, merger, or takeover of a U.S. firm by a foreign investor, the CFIUS process can proceed potentially through three steps: (1) a 45-day national security review; (2) a 45-day maximum national security investigation (with an option for a 15-day extension for "extraordinary circumstances"); and (3) a 15-day maximum Presidential determination. The President can exercise his authority to suspend or prohibit a foreign investment, subject to a CFIUS review, if he finds that (1) "credible evidence" exists that the foreign investor might take action that threatens to impair the national security; and (2) no other laws provide adequate and appropriate authority for the President to protect national security. FIRRMA shifts the filing requirement for foreign investors from voluntary to mandatory in certain cases, and provides a two-track method for reviewing certain investment transactions. Other changes mandated by FIRRMA would provide more resources for CFIUS, add new reporting requirements, and reform export controls.

## Termination of the Act

Title VII of the DPA also includes a "sunset" clause for the majority of the DPA authorities. All DPA authorities in Titles I, III, and VII have a termination date, with the exception of four sections.[117] As explained in Section 717 of the DPA, the sections that are exempt from termination are

- 50 U.S.C. §4514, Section 104 of the DPA that prohibits both the imposition of wage or price controls without prior congressional authorization and the mandatory compliance of any private person to assist in the production of chemical or biological warfare capabilities;
- 50 U.S.C. §4557, Section 707 of the DPA that grants persons limited immunity from liability for complying with DPA-authorized regulations;
- 50 U.S.C. §4558, Section 708 of the DPA that provides for the establishment of voluntary agreements; and
- 50 U.S.C. §4565, Section 721 of the DPA, the so-called Exon-Florio Amendment, that gives the President and CFIUS review authority over certain corporate acquisition activities.

P.L. 115-232 extended the termination date of Section 717 from September 30, 2019, to September 30, 2025. In addition, Section 717(c) provides that any termination of sections of the DPA "shall not affect the disbursement of funds under, or the carrying out of, any contract, guarantee, commitment or other obligation entered into pursuant to this Act" prior to its termination. This means, for instance, that prioritized contracts or Section 303 projects created with DPA authorities prior to September 30, 2025, would still be executed until completion even if the DPA is not reauthorized. Similarly, the statute specifies that the authority to investigate, subpoena, and otherwise collect information necessary to administer the provisions of the act, as provided by Section 705 of the DPA, will not expire until two years after the termination of the DPA.[118] For a chronology of all laws reauthorizing the DPA since inception, see **Table A-4**.

---

[117] 123 Stat. 2006; 50 U.S.C. §4564.

[118] 50 U.S.C. §4555(a); Section 705(a) of the DPA. Thus, under current law, Section 705 authority would expire on September 30, 2027.

Exhibit 5

## Defense Production Act Committee

The Defense Production Act Committee (DPAC) is an interagency body originally established by the 2009 reauthorization of the DPA.[119] Originally, the DPAC was created to advise the President on the effective use of the full scope of authorities of the DPA. Now, the law requires DPAC to be centrally focused on the priorities and allocations authorities of Title I of the DPA.

The statute assigns membership in the DPAC to the head of each federal agency delegated DPA authorities, as well as the Chairperson of the Council of Economic Advisors. A full list of the members of the DPAC is included in E.O. 13603.[120] As stipulated in law, the Chairperson of the DPAC is to be the "head of the agency to which the President has delegated primary responsibility for government-wide coordination of the authorities in this Act."[121] As currently established in E.O. 13603 delegations, the Secretary of Homeland Security is the chair-designate, but the language of the law could allow the President to appoint another Secretary with revision to the E.O.[122] The Chairperson of the DPAC is also required to appoint one full-time employee of the federal government to coordinate all the activities of the DPAC. Congress has exempted the DPAC from the requirements of the Federal Advisory Committee Act.[123]

The DPAC has annual reporting requirements relating to the Title I priority and allocation authority, and is also required to include updated copies of Title I-related rules in its report. The annual report also contains, among other items, a "description of the contingency planning ... for events that might require the use of the priorities and allocations authorities" and "recommendations for legislative actions, as appropriate, to support the effective use" of the Title I authorities.[124] The DPAC report is provided to the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services.

## Impact of Offsets Report

Offsets are industrial compensation practices that foreign governments or companies require of U.S. firms as a condition of purchase in either government-to-government or commercial sales of defense articles and/or defense services as defined by the Arms Export Control Act (22 U.S.C. §2751, et seq.) and the International Traffic in Arms Regulations (22 C.F.R. §§120-130). In the defense trade, such industrial compensation can include mandatory co-production, licensed production, subcontractor production, technology transfer, and foreign investment.

The Secretary of Commerce is required by law to prepare and to transmit to the appropriate congressional committees an annual report on the impact of offsets on defense preparedness,

---

[119] P.L. 111-67, 123 Stat. 2019-2020. The DPAC is now authorized in Section 722 of the DPA, 50 U.S.C. §4567.

[120] Section 701 of E.O. 13603. The DPAC is composed of the Secretaries of Agriculture; Commerce; Defense; Energy; Labor; Health and Human Services; Homeland Security; the Interior; Transportation; the Treasury, and State; the Attorney General; the Administrator of the National Aeronautics and Space Administration; the Administrator of General Services; the Chair of the Council of Economic Advisers; and the Directors of the Central Intelligence Agency and of National Intelligence. In addition, the Director of the Office of Management and Budget and the Director of the Office of Science and Technology Policy serve in an advisory role.

[121] See Section 722(b)(2) of the DPA; 50 U.S.C. §4567(b)(2).

[122] See Section 104(b)(2) of E.O. 13603, which includes as one of the responsibilities of the Secretary of Homeland Security to "provide for the central coordination of the plans and programs incident to authorities and functions delegated under this order...." Given this language, the Secretary of Homeland Security is the Chairperson, though a change to E.O. 13603 (or a different interpretation of E.O. 13603 by the Administration), could allow for another Chairperson to be designated.

[123] Section 722(e) of the DPA; 50 U.S.C. §4567(e). For more on the Federal Advisory Committee Act, see CRS Report R44253, *Federal Advisory Committees: An Introduction and Overview*, by Meghan M. Stuessy.

[124] See Section 722(d) of the DPA; 50 U.S.C. §4567(d).

Exhibit 5

industrial competitiveness, employment, and trade. Specifically, the report discusses "offsets" in the government or commercial sales of defense materials.[125]

# Considerations for Congress

## Enhancing Oversight

### Expanding Reporting or Notification Requirements

Congress may consider whether to add more extensive notification and reporting requirements on the use of all or specific authorities in the DPA. These reporting or notification requirements could be added to the existing law, or could be included in conference or committee reports accompanying germane legislation, such as appropriations bills or the National Defense Authorization Act. Additional reporting or notification requirements could involve formal notification of Congress prior to or after the use of certain authorities under specific circumstances. For example, Congress may consider whether to require the President to notify Congress (or the oversight committees) when the priorities and allocations authority is used on a contract valued above a threshold dollar amount.[126] Congress might also consider expanding the existing reporting requirements of the DPAC, to include semi-annual updates on the recent use of authorities or explanations about controversial determinations made by the President. Existing requirements could also be expanded from notifying/reporting to the committees of jurisdiction to Congress as a whole, or to include other interested committees, such as the House and Senate Armed Services Committees.

### Enforcing and Revising Rulemaking Requirements

Congress may consider reviewing the agencies' compliance with existing rulemaking requirements. A rulemaking requirement exists for the voluntary agreement authority in Title VII that has been completed by DHS, but it has not been updated since 1981 and may be in need of an update given changes to the authority and government reorganizations since that date.[127] One of the agencies responsible for issuing a rulemaking on the use of Title I authorities has yet to do so. Congress may also consider potentially expanding regulatory requirements for other authorities included in the DPA. For example, Congress may consider whether the President should promulgate rules establishing standards and procedures for the use of all or certain Title III authorities. In addition to formalizing the executive branch's policies and procedures for using DPA authorities, these regulations could also serve an important function by offering an opportunity for private citizens and industry to comment on and understand the impact of DPA authorities on their personal interests.

---

[125] Offsets are defined in Section 801(k) of E.O. 13603. Offsets can be direct, where offsetting sales of goods and services are related to the military export sale being contracted, or indirect, where they are not. These reports are prepared by the Department of Commerce Bureau of Industry and Security (BIS) and are posted on at BIS's website at http://www.bis.doc.gov/index.php/other-areas/strategic-industries-and-economic-security-sies/offsets-in-defense-trade.

[126] For example, such a notification requirement is placed on Title III projects based on total project cost. See the section "Purchase, Purchase Commitments, and Installation of Equipment" of this report for more.

[127] 50 U.S.C. §4558(e); Section 708(e) of the DPA. This rule is established in 44 C.F.R. Part 332. The voluntary agreement authority was revised most recently in P.L. 111-67. The national defense context and potential need for voluntary agreement authorities has evolved since 1981, which could also potentially prompt the need to revise the regulation.

---

Exhibit 5

## Broadening Committee Oversight Jurisdiction

Since its enactment, the House Committee on Financial Services, the Senate Committee on Banking, Housing, and Urban Affairs, and their predecessors have exercised legislative oversight of the Defense Production Act. The statutory authorities granted in the various titles have been vested in the President, who has delegated some of these authorities to various agency officials through E.O. 13603. As an example of the scope of delegations, the membership of the Defense Production Act Committee (DPAC), created in 2009 and amended in 2014, includes the Secretaries of Agriculture, Commerce, Defense, Energy, Labor, Health and Human Services, Homeland Security, the Interior, Transportation, the Treasury, and State; the Attorney General; the Administrators of the National Aeronautics and Space Administration and of General Services, the Chair of the Council of Economic Advisers; and the Directors of the Central Intelligence Agency and National Intelligence.

To complement existing oversight, given the number of agencies that currently use or could potentially use the array of DPA authorities to support national defense missions, Congress may consider reestablishing a select committee with a purpose similar to the former Joint Committee on Defense Production.[128] As an alternative to the creation of a new committee, Congress may consider formally broadening DPA oversight responsibilities to include all relevant standing committees when developing its committee oversight plan.

Should DPA oversight be broadened, Congress might consider ways to enhance inter-committee communication and coordination of its related activities. This coordination could include periodic meetings to prepare for oversight hearings or ensuring that DPA-related communications from agencies are shared appropriately. Finally, because the DPA was enacted at a time when the organization and rules of both chambers were markedly different to current practice, Congress may consider the joint referral of proposed DPA-related legislation to the appropriate oversight committees.

# Amending the Defense Production Act of 1950

While the act in its current form may remain in force until September 30, 2025, the legislature could amend the DPA at any time to extend, expand, restrict, or otherwise clarify the powers it grants to the President. For example, Congress could eliminate certain authorities altogether. Likewise, Congress could expand the DPA to include new authorities to address novel threats to the national defense. For example, Congress may consider creating new authorities to address specific concerns relating to production and security of emerging technologies necessary for the national defense.

### Declaration of Policy

The "Declaration of Policy" in the DPA describes the general intentions of Congress in granting the authorities conferred on the President. Congress may amend this section of the statute in order to expand, restrict, or clarify the overall purpose of the authorities. For instance, given the wide variety of circumstances in which DPA authorities have been employed, Congress could include an expanded discussion of the specific conditions in which it would find DPA authorities appropriate for use by the President. Though this section serves as a guide for the overall use of DPA authorities, changes to the Declaration of Policy may not fully endow or deny the

---

[128] P.L. 102-558, 106 Stat. 4219. This committee was intended to review the programs established by the DPA and advise the standing committees in their legislation on the subject.

Exhibit 5

President's authorities covered in the titles of the DPA without also amending the DPA's other provisions.

## Definitions

Congress may amend the definitions of key terms found in the DPA to shape the scope and use of the authorities, especially the definitions of *national defense* and *domestic sources*.

As an example, Congress could amend the definition of national defense to remove *space* from the definition of *national defense*, thus weakening the President's ability to support space-related projects through the use of DPA authorities.[129] On the other hand, for example, Congress could amend the definition of *national defense* to specifically include counter-narcotics, cybersecurity, or organized crime. Doing so would more explicitly enable the use of DPA authorities to address these homeland security and national defense concerns.

If Congress wanted to expand the number of entities eligible for DPA Title III activities, it could consider amending the definition of *domestic sources* to include, for instance, business concerns located in allied or friendly nations other than Canada.[130] Alternatively, if Congress believed too many entities were eligible for Title III assistance, it could amend this definition to restrict eligibility.

## Amending the Delegations of Authority in E.O. 13603

Congress may consider limiting the use of certain DPA authorities to specific agencies. To do so, Congress could amend the President's delegation of DPA authorities, superseding those made in E.O. 13603, by amending the statute to assign specific authorities to individual Cabinet Secretaries rather than the President. Further, Congress could expand the use of the legislative clause "on a nondelegable basis" to ensure that the authority is not delegated beyond the person identified in the statute.[131] In considering these options, Congress may determine that the use of some authorities by certain agencies is appropriate and necessary for the national defense, but not for others.

## Appropriations to the DPA Fund

Congress could adjust future appropriations to the DPA Fund in order to manage the scope of Title III projects initiated by the President (see **Table 1** for appropriations to the DPA Fund since FY2013). The use of the DPA Fund, however, is specific to Title III. Therefore, adjusting appropriations to the DPA Fund is unlikely to have an effect on the President's ability to exercise authorities under the other titles of the DPA, unless Congress drafts legislation changing the nature of the Fund itself or authorizing its use beyond a specific title. Congress may also reintroduce a separate provision in Section 711 of the DPA authorizing only certain appropriation amounts over a given time period for Title III or other DPA authorities.[132] Likewise, Congress may direct the use of such funds more specifically, such as has been done in relation to past Title

---

[129] For the definition of national defense, see 50 U.S.C. §4552(14); Section 702(14) of the DPA.

[130] As of this writing, a provision that would amend this definition to include businesses based in Australia and the United Kingdom is included as part of the Senate-passed bill for an FY2024 NDAA (S. 2226; Section 1080).

[131] For an example of this clause, see 50 U.S.C. §4558(c)(3); Section 708(c)(3) of the DPA.

[132] For example, appropriations for Title I could be authorized for only one year, but for Title III for five, and vice versa.

Exhibit 5

III projects.[133] Congress may also consider including specific restrictions or reporting requirements related to the DPA in the appropriations made to other accounts that could be used to pay for Title I activities, such as the Disaster Relief Fund managed by FEMA.[134]

---

[133] For example, see Section 315, P.L. 112-239, the National Defense Authorization Act for Fiscal Year 2013. This provision limited the use of funds for a Title III project on biofuels production.

[134] The Disaster Relief Fund is the main account to fund a wide variety of federal disaster assistance programs and activities pursuant to the Robert T. Stafford Relief and Emergency Assistance Act (P.L. 93-288). As such, it has been used to pay for priority-rated contracts to support disaster relief efforts.

Exhibit 5

# Appendix. Supplementary Tables

### Table A-1. Additional Resources by Defense Production Act Subject

| DPA Subject | Additional Resources |
|---|---|
| **General Information on DPA Authorities** | FEMA website on the DPA at https://www.fema.gov/defense-production-act-program. |
| | DOD website on Title III of the DPA at https://www.businessdefense.gov/Programs/DPA-Title-III/ |
| | Annual reports on the industrial capabilities from the DOD, to include how DPA has been used to support those capabilities, at https://www.businessdefense.gov/resources/ |
| **Title I: Priorities and Allocations** | Department of Commerce "Defense Priorities and Allocations System" website at http://www.bis.doc.gov/dpas/default.htm. This website includes online training courses and various additional resources on the authorities. |
| | DOD website on the Defense Priorities and Allocations System at http://www.dcma.mil/DPAS/ |
| **Title III Projects** | DOD website at https://www.businessdefense.gov/Programs/DPA-Title-III/ |
| **Committee on Foreign Investment in the United States (CFIUS)** | Department of the Treasury CFIUS website at https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius |
| | CRS Report RL33388, *The Committee on Foreign Investment in the United States (CFIUS)*, by James K. Jackson (for further inquiries, congressional offices may contact Cathleen D. Cimino-Isaacs). |
| **Impact of Offsets in Defense Trade** | Department of Commerce website on offsets at http://www.bis.doc.gov/index.php/other-areas/strategic-industries-and-economic-security-sies/offsets-in-defense-trade |

**Source:** CRS.

Exhibit 5

## Table A-2. Key Provisions of the Defense Production Act, Related Portions of Executive Order 13603, and Associated Regulations

| Authority and DPA Statute | Related Portions of Executive Order13603[a] | Regulations or Guiding Documents | Summary of How the Authority Changed in P.L. 113-172 | Example of Use of Authority |
|---|---|---|---|---|
| **Declaration of Policy**; Section 2 of the DPA, 50 U.S.C. §4502 | Sections 101, 102, and 103 | Not applicable | No changes were made. | Not applicable |
| **Priorities and Allocations**; Title I of the DPA, 50 U.S.C. §4511 | Part II | 7 C.F.R. Part 789, 10 C.F.R. Part 217, 15 C.F.R. Part 700, 45 C.F.R. Part 101, and 49 C.F.R. Part 33. An additional regulation from DOD is required.[b] | Revised the existing rulemaking requirement for all federal departments and agencies delegated Title I authorities. Requirement now is for these agencies to issue and annually review their final rules whenever appropriate. | Priority contracts have been issued in the past to support the Integrated Ballistic Missile Defense System.[c] |
| **Loan Guarantees**; Section 301 and 302 of Title III of the DPA, 50 U.S.C. §§4531 and 4532 | Part III | Not applicable | No changes were made. | According to the DPAC, none in recent history. |
| **Purchases, Purchase Commitments, and Installation of Equipment**; Section 303 of Title III of the DPA, 50 U.S.C. §4553 | Part III | Not applicable | Revised the determination requirement for Section 303 of Title III in several ways, including: requiring the President to submit determinations on Title III projects without delegating the responsibility; reinstituted a $50 million cost cap on the size of Title III projects without an act of Congress; and reinstituted the requirement that the President find that actions are the most cost effective, expedient, and cost-effective method of meeting the need. | "Radiation-Hardened Cryogenic Readout Integrated Circuits" Project which involved Title III resources to "establish a viable, domestic foundry for commercial production" of microelectronics that are a "critical technology employed in the manufacture of focal plane arrays (FPAs), which are utilized in high altitudes, space-based imaging, and missile systems."[d] |
| **Definitions**; Section 702 of the DPA, 50 U.S.C. §4552 | Section 802 | Not applicable | No changes were made. | Not applicable |

CRS-25

100

Exhibit 5

| Authority and DPA Statute | Related Portions of Executive Order 13603[a] | Regulations or Guiding Documents | Summary of How the Authority Changed in P.L. 113-172 | Example of Use of Authority |
|---|---|---|---|---|
| **Voluntary Agreements**; Section 708 of the DPA, 50 U.S.C. §4558 | Part IV | 44 C.F.R. Part 332 | No changes were made. | Voluntary Intermodal Sealift Agreement (VISA) managed by the Maritime Administration (MARAD) in the U.S. Department of Transportation.[e] |
| **National Defense Executive Reserve (NDER)**; Section 710 of the DPA, 50 U.S.C. §4560 | Part V | Interim Guidance for the NDER Program[f] | No changes were made. | Not applicable |
| **Committee on Foreign Investment in the United States (CFIUS)**; Section 721 of the DPA, 50 U.S.C. §4565 | Executive Order 11858: Foreign Investment in the United States, as amended. | 31 C.F.R. Part 800, as amended | No changes were made in P.L. 113-72; however, significant changes were made in the Foreign Investment Risk Review Modernization Act (FIRRMA) of 2018 (Title XVII, P.L. 115-232) | See CRS Report RL33388, *The Committee on Foreign Investment in the United States (CFIUS)*, by James K. Jackson (for further inquiries, congressional offices may contact Cathleen D. Cimino-Isaacs). |
| **Defense Production Act Committee (DPAC)**; Section 722 of the DPA, 50 U.S.C. §4567 | Part VII | None that are currently applicable.[g] | Revised the focus of the DPAC to be exclusively on coordinating and planning for the use of Title I priorities and allocations authority. Revised DPAC Chairperson designation and the annual reporting requirement to reflect new Title I focus of the DPAC. | Not applicable.[g] |

**Source:** CRS analysis of E.O. 13603, 50 U.S.C. §§4501 et seq., and information from available resources.

**Notes:**

a.  Unless otherwise noted, provisions cited are found in E.O. 13603.

b.  DOD, via the U.S. Army Corps of Engineers, also has been directed by law to issue a rulemaking for Title I, by virtue of being delegated priorities and allocations authority related to water resource in E.O. 13603. DOD has indicated that a preliminary draft of this rulemaking has been completed, as of November 8, 2018.

c.  For more examples, see Department of Homeland Security, *The Defense Production Act Committee*: Report to Congress, Calendar Year 2017, p. 10; or see a list of Department of Defense programs that were approved for DX-rating as of March 2016, see https://www.bis.doc.gov/index.php/forms-documents/pdfs/1257-dx-rated-program-list/file.

d.  For specific information on this project and other examples of Title III projects, see Department of Defense, *Annual Industrial Capabilities*, Fiscal Year 2015 Report to Congress, September 2016, p. C-15, at https://www.businessdefense.gov/Portals/51/Documents/Resources/2015%20AIC%20RTC%2010-03-16%20-%20Public%20Unclassified.pdf?ver=2017-04-18-072624-770.

e.  For more, see approval of the VISA program in the *Federal Register* at Maritime Administration, "Voluntary Intermodal Sealift Agreement," 79 *Federal Register* 64462, October 29, 2014. See also MARAD's website at https://www.marad.dot.gov/ships-and-shipping/strategic-sealift/voluntary-intermodal-sealift-agreement-visa/.

f.  Federal Emergency Management Agency, *The National Defense Executive Reserve: Policies and Procedures Manual*, Washington, DC, June 20, 2007, at http://www.fema.gov/library/viewRecord.do?id=3606.

g.  The Defense Production Act Committee's purpose and focus was revised by P.L. 113-172. Prior to this change, the DPAC statute was support by a Presidential Memorandum Designating the Chairperson of the Committee; an official Charter of the DPAC; and a Memorandum of Understanding between DHS and DOD on their shared responsibilities to support the DPAC. These documents are now outdated by P.L. 113-172.

### Table A-3. Delegation of Priorities and Allocations Authorities to Cabinet Secretaries

| Cabinet Secretary | Delegated Area of Authority in E.O. 13603[a] | Definitions in E.O. 13603[b] |
| --- | --- | --- |
| Secretary of Agriculture | Food resources, food resource facilities, livestock resources, veterinary resources, plant health resources, and the domestic distribution of farm equipment and commercial fertilizer | "Farm equipment" means equipment, machinery, and repair parts manufactured for use on farms in connection with the production or preparation for market use of food resources.<br><br>"Fertilizer" means any product or combination of products that contain one or more of the elements nitrogen, phosphorus, and potassium for use as a plant nutrient.<br><br>"Food resources" means all commodities and products (simple, mixed, or compound), or complements to such commodities or products, that are capable of being ingested by either human beings or animals, irrespective of other uses to which such commodities or products may be put, at all stages of processing from the raw commodity to the products thereof in vendible form for human or animal consumption. "Food resources" also means potable water packaged in commercially marketable containers, all starches, sugars, vegetable and animal or marine fats and oils, seed, cotton, hemp, and flax fiber, but does not mean any such material after it loses its identity as an agricultural commodity or agricultural product.<br><br>"Food resource facilities" means plants, machinery, vehicles (including on farm), and other facilities required for the production, processing, distribution, and storage (including cold storage) of food resources, and for the domestic distribution of farm equipment and fertilizer (excluding transportation thereof). |
| Secretary of Energy | All forms of energy | "Energy" means all forms of energy including petroleum, gas (both natural and manufactured), electricity, solid fuels (including all forms of coal, coke, coal chemicals, coal liquefaction, and coal gasification), solar, wind, other types of renewable energy, atomic energy, and the production, conservation, use, control, and distribution (including pipelines) of all of these forms of energy. |
| Secretary of Health and Human Services | Health resources | "Health resources" means drugs, biological products, medical devices, materials, facilities, health supplies, services and equipment required to diagnose, mitigate or prevent the impairment of, improve, treat, cure, or restore the physical or mental health conditions of the population. |

| Cabinet Secretary | Delegated Area of Authority in E.O. 13603[a] | Definitions in E.O. 13603[b] |
| --- | --- | --- |
| Secretary of Transportation | All forms of civil transportation | "Civil transportation" includes movement of persons and property by all modes of transportation in interstate, intrastate, or foreign commerce within the United States, its territories and possessions, and the District of Columbia, and related public storage and warehousing, ports, services, equipment and facilities, such as transportation carrier shop and repair facilities. "Civil transportation" also shall include direction, control, and coordination of civil transportation capacity regardless of ownership. "Civil transportation" shall not include transportation owned or controlled by the Department of Defense, use of petroleum and gas pipelines, and coal slurry pipelines used only to supply energy production facilities directly. |
| Secretary of Defense | Water resources | "Water resources" means all usable water, from all sources, within the jurisdiction of the United States, that can be managed, controlled, and allocated to meet emergency requirements, except "water resources" does not include usable water that qualifies as "food resources." |
| Secretary of Commerce | All other materials, services, and facilities, including construction materials | Materials, services, and facilities are all defined in statute; see 50 U.S.C. §4552(13), (16), and (8), respectively. |

**Source:** CRS analysis of E.O. 13603 and 50 U.S.C. §§4501 et seq.

**Notes:**

a.   See Section 201(a)(1) to (6) of E.O. 13603.

b.   These definitions are found in Section 802 of E.O. 13603.

103

Exhibit 5

CRS-28

## Table A-4. Chronology of Laws Reauthorizing the Defense Production Act of 1950

| Public Law and Statutes at Large Citation, and Date of Enactment | General Expiration Date[a] |
| --- | --- |
| P.L. 81-774, 64 Stat. 798, September 8, 1950 | June 30, 1951 |
| P.L. 82-69, 65 Stat. 110, June 30, 1951 | July 31, 1951 |
| P.L. 82-96, 65 Stat. 131, July 31 1951 | June 30, 1952 |
| P.L. 82-429, 66 Stat. 296, June 30, 1952 | June 30, 1953 |
| P.L. 83-95, 67 Stat. 129, June 30, 1953[b] | June 30, 1955[b] |
| P.L. 84-119, 69 Stat. 225, June 30, 1955 | July 31, 1955 |
| P.L. 84-295, 69 Stat. 580, August 9, 1955 | June 30, 1956 |
| P.L. 84-632, 70 Stat. 408, June 29, 1956 | June 30, 1958 |
| P.L. 85-471, 72 Stat. 241, June 28, 1958 | June 30, 1960 |
| P.L. 86-560, 74 Stat. 282, June 30, 1960 | June 30, 1962 |
| P.L. 87-505, 76 Stat. 112, June 28, 1962 | June 30, 1964 |
| P.L. 88-343, 78 Stat. 235, June 30, 1964 | June 30, 1966 |
| P.L. 89-482, 80 Stat. 235, June 30, 1966 | June 30, 1968 |
| P.L. 90-370, 82 Stat. 279, July1, 1968 | June 30, 1970 |
| P.L. 91-300, 84 Stat. 367, June 30, 1970 | July 30, 1970 |
| P.L. 91-371, 84 Stat. 694, August 1, 1970 | August 15, 1970 |
| P.L. 91-379, 84 Stat. 796, August 15, 1970 | June 30, 1972 |
| P.L. 92-325, 86 Stat. 390, June 30, 1972 | June 30, 1974 |
| P.L. 93-323, 88 Stat. 280, June 30, 1974 | July 30, 1974 |
| P.L. 93-367, 88 Stat. 419, August 7, 1974 | September 30, 1974 |
| P.L. 93-426, 88 Stat. 1166, September 30, 1974 | June 30, 1975 |
| P.L. 94-42, 89 Stat. 232, June 28, 1975 | September 30, 1975 |
| P.L. 94-100, 89 Stat. 483, October 1, 1975 | November 30, 1975 |
| P.L. 94-152, 89 Stat. 810, December 16, 1975 | September 30, 1977 |
| P.L. 95-37, 91 Stat. 178, June 1, 1977 | September 30, 1979 |
| P.L. 96-77, 93 Stat. 588, September 29, 1979 | January 28, 1980 |
| P.L. 96-188, 94 Stat. 3, January 28, 1980 | March 28, 1980 |
| P.L. 96-225, 94 Stat. 310, April 3, 1980 | May 27, 1980 |
| P.L. 96-250, 94 Stat. 371, May 26, 1980 | August 27, 1980 |
| P.L. 96-294, 94 Stat. 611, June 30, 1980 | September 30, 1981 |
| P.L. 97-47, 95 Stat. 954, September 30, 1981 | September 30, 1982 |
| P.L. 97-336, 96 Stat. 1630, October 15, 1982 | March 31, 1983 |
| P.L. 98-12, 97 Stat. 53, March 29, 1983 | September 30, 1983 |
| P.L. 98-181, 97 Stat. 1267, November 30, 1983 | March 30, 1984 |
| P.L. 98-265, 98 Stat. 149, April 17, 1984 | September 30, 1986 |
| P.L. 99-441, 100 Stat. 1117, October 3, 1986 | September 30, 1989 |

Exhibit 5

| Public Law and Statutes at Large Citation, and Date of Enactment | General Expiration Date[a] |
|---|---|
| P.L. 101-137, 103 Stat. 824, November 3, 1989 | August 10, 1990 |
| P.L. 101-351, 104 Stat. 404, August 9, 1990 | September 30, 1990 |
| P.L. 101-407, 104 Stat. 882, October 4, 1990 | October 5, 1990 |
| P.L. 101-411, 104 Stat. 893, October 6, 1990 | October 20, 1990 |
| P.L. 102-99, 105 Stat. 487, August 17, 1991 | September 30, 1991[c] |
| P.L. 102-193, 105 Stat. 1593, December 6, 1991 | March 1, 1992 |
| P.L. 102-558, 106 Stat. 4198, October 28, 1992 | September 30, 1995 |
| P.L. 104-64, 109 Stat. 689, December 18, 1995 | September 30, 1998 |
| P.L. 105-261, 112 Stat. 2137, October 17, 1998 | September 30, 1999 |
| P.L. 106-65, 113 Stat. 769, October 5, 1999 | September 30, 2000 |
| P.L. 106-363, 114 Stat. 1407, October 27, 2000 | September 30, 2001 |
| P.L. 107-47, 115 Stat. 260, October 5, 2001 | September 30, 2003 |
| P.L. 108-195, 117 Stat. 2892, December 17, 2003 | September 30, 2008 |
| P.L. 110-367, 122 Stat. 4026, October 8, 2008 | September 30, 2009 |
| P.L. 111-67, 123 Stat. 2006, September 30, 2009 | September 30, 2014 |
| P.L. 113-172, September 26, 2014 | September 30, 2019 |
| P.L. 115-232, August 13, 2018 | September 30, 2025 |

**Source:** CRS.

**Notes:** This table does not include all laws that amended the DPA, only those that altered the termination date of the act, currently codified at 50 U.S.C. §4564, Section 717 of the DPA.

a.  Not all provisions of the DPA may have expired on each given date, as the law has frequently offered an evolving set of exceptions to the termination of DPA authorities. For example, currently the majority of DPA authorities will terminate on September 30, 2025, with the exception of four sections.

b.  P.L. 83-95 permitted the termination of Titles 2 and 6 as of June 30, 1953, and Titles IV and V to terminate as of April 30, 1953.

c.  The termination of authorization from October 20, 1990, to August 17, 1991, is the longest period on record since inception. However, in Section 7 of P.L. 102-99, Congress set the effective date of the passage to October 20, 1990, thus technically authorizing the DPA through this time period.

## Author Information

Alexandra G. Neenan
Analyst in U.S. Defense Infrastructure Policy

## Acknowledgments

This CRS Report was previously maintained and updated by former CRS Analyst in Defense Acquisition Policy Heidi Peters.

Exhibit 5

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Exhibit 5