LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice*)
  *nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:  +1 202.853.3491

HOLLAND & KNIGHT LLP
  James W. Noe (*pro hac vice*)
  *jim.noe@hklaw.com*
  Ashley Akers (*pro hac vice*)
  *ashley.akers@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Plaintiffs Sable Offshore Corp. and Pacific Pipeline Company*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABLE OFFSHORE CORP., and PACIFIC PIPELINE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ARMANDO QUINTERO, in his official capacity as Director of the California Department of Parks and Recreation, <br><br> Defendant. | **CASE NO. 2:26-cv-02739-SVW-SSC** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF** <br><br> Date: June 29, 2026 <br> Time: 1:30 p.m. <br> Courtroom: 10A <br> Judge: Hon, Stephen V. Wilson <br> Trial date: Not Set <br> Action Filed: March 13, 2026 |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................... 1

II.  PLEADED FACTS ......................................................................................... 2

III.  LEGAL STANDARD ..................................................................................... 5

IV.  ARGUMENT ................................................................................................. 6

    A.  Defendant Cannot Show That the Pipeline Safety Act Does Not Preempt State-Law Claims ................................................6

        1.  Whether Defendant's agency is acting in its capacity as a landowner or as a safety regulator is a fact-intensive inquiry that cannot be resolved on a Rule 12(b)(6) motion. ..................................................6

        2.  Whether Defendant's actions with respect to the easement constitute regulation is a factual dispute not resolvable on a motion to dismiss........................11

        3.  Defendant cannot regulate the pipeline regardless of whether it is interstate or intrastate.............................12

    B.  Defendant Cannot Show That the Defense Production Act Does Not Preempt State-Law Claims...........................................13

        1.  Defendant's Argument Against "Requisition" and "Anti-Commandeering" is a Strawman .................................14

        2.  Defendant Ignores the Modern Law of DPA Preemption and Reverses the Canons of Statutory Construction ...................................................................15

        3.  Defendant Cannot Overcome the Plain Language of Section 4557 ...............................................................18

    C.  The Parties' Competing Interpretations of the Consent Decree Cannot be Resolved on the Pleadings.................................19

V.  ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND .................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ANR Pipeline Co. v. Iowa State Com. Comm'n*,
828 F.2d 465 (8th Cir. 1987) ...................................................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................5

*Couser v. Shelby County*,
139 F.4th 664 (8th Cir. 2025) ......................................................................7, 12, 13

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000).....................................................................................14, 15, 17

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...............................................................................21

*Enbridge Energy, Ltd. P'ship v. Whitmer*,
813 F. Supp. 3d 777 (W.D. Mich. Dec. 17, 2025)....................................8, 10, 12

*Haaland v. Brackeen*,
599 U.S. 255 (2023)...............................................................................................6, 14

*Hercules, Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) ..........................................................................15, 16

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996)................................................................................................16

*Hillman v. Maretta*,
569 U.S. 483 (2013)................................................................................................17

*In re Basquez*,
No. 6:18-BK-19790-WJ, 2020 WL 6929242 (Bankr. C.D. Cal.
Nov. 16, 2020) ........................................................................................................19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

NO. 2:26-cv-02739-SVW-SSC
OPPOSITION TO MOTION TO DISMISS

*Johnson v. Tyson Foods, Inc.*,
    580 F. Supp. 3d 382 (N.D. Tex. 2022) ...............................................................16, 17

*Luis v. Metro. Life Ins. Co.*,
    142 F. Supp. 3d 873 (N.D. Cal. 2015)...............................................................20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018)...............................................................15

*New York v. Dep't of Just.*,
    343 F. Supp. 3d 213 (S.D.N.Y. 2018) ...............................................................15

*Olympic Pipe Line Co. v. City of Seattle*,
    437 F.3d 872 (9th Cir. 2006) ...............................................................7, 9, 12, 13

*Olympic Pipe Line Co. v. City of Seattle*,
    C03-2343L, 2003 WL 27392855 (W.D. Wash. Aug. 21, 2003) ...............................8

*Reed v. Tyson Foods, Inc.*,
    No. 21-CV-01155-STA-JAY, 2021 WL 5107725 (W.D. Tenn.
    Nov. 3, 2021) ...............................................................16, 17

*Russello v. United States*,
    464 U.S. 16 (1983)...............................................................17

*Savage v. Jones*,
    225 U.S. 501 (1912)...............................................................17

*Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*,
    204 U.S. 426 (1907)...............................................................10

*United States v. Schafer*,
    625 F.3d 629 (9th Cir. 2010) ...............................................................20

*United States v. Vertac Chemical Corp.*,
    46 F.3d 803 (8th Cir. 1995) ...............................................................16

*United States v. Youssef*,
    547 F.3d 1090 (9th Cir. 2008) ...............................................................17

*Williams Pipe Line Co. v. City of Mounds View*,
    651 F. Supp. 551 (D. Minn. 1987)...............................................................9, 10, 12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

*Young v. NeoCortext, Inc.*,
  690 F. Supp. 3d 1091 (C.D. Cal. 2023) .............................................................5, 8

## STATUTES

49 U.S.C.
  § 60101 et seq. ......................................................................................................1, 4
  § 60102(a)(1) .............................................................................................................6
  § 60102(a)(2) .........................................................................................................7, 12
  § 60102(b) ..............................................................................................................7, 12
  § 60104(c) .............................................................................................................12, 13
  § 60105 ....................................................................................................................13

50 U.S.C. app. § 633(7) .................................................................................................18

50 U.S.C.
  § 4501 et seq. ...........................................................................................................1
  § 4513 ......................................................................................................................15
  § 4557 ................................................................................................................*passim*
  § 4558(j) ..................................................................................................................17

Cal. Gov't. Code § 51010 ..............................................................................................13

## RULES

Fed R. Civ. P.
  8(a) .........................................................................................................................14
  8(a)(2) ......................................................................................................................5

## REGULATIONS

49 C.F.R. pt. 195, app. A ................................................................................................7

85 Fed. Reg. 26,313 (Apr. 28, 2020) .............................................................................16

90 Fed. Reg. 8433 (Jan. 20, 2025) ...................................................................................4

## OTHER AUTHORITIES

*Comptroller Gen. Warren to the Adm'r, Civ. Aeronautics Admin.*, 31
  Comp. Gen. 408 (Feb. 19, 1952) .......................................................................18

*Comptroller Gen. Warren to the Sec'y of Com.*, 32 Comp. Gen. 497
 (May 8, 1953)......................................................................................................18

## I.      INTRODUCTION

Defendant Armando Quintero's Motion to Dismiss, ECF 27, disregards the well-pleaded claims in Sable Offshore Corp.'s and Pacific Pipeline Company's (collectively, "Sable") Complaint and should be denied.

Sable brings two claims for relief. First, it seeks declaratory judgment that Defendant Armando Quintero, Director of the California Department of Parks and Recreation ("State Parks," "CDPR," or "Defendant") is barred, estopped, and preempted in his efforts to "regulate, direct, oversee, inspect, control, or otherwise interfere with" the operation of Sable's Santa Ynez Pipeline System ("SYPS"), by, among other actions, "attaching regulatory conditions in negotiations over easements or rights-of-way through Gaviota State Park." Compl. ¶ 48, ECF 1. Sable raises three bases for preemption and/or estoppel: (1) preemption over matters of pipeline safety under the federal Pipeline Safety Act ("PSA"), 49 U.S.C. § 60101 et seq.; (2) preemption as a result of an order under the Defense Production Act, 50 U.S.C. § 4501 et seq., requiring Sable to operate the SYPS, ECF 1-1 (the "DPA Order"); and (3) Defendant's and his agency's own prior conduct in agreeing to a restart plan that did not require a new easement or new regulations other than those agreed to in the Consent Decree. *Id.* ¶¶ 45-47. Second, Sable seeks declaratory judgment that the Defense Production Act bars any legal or equitable action by Defendant seeking to prevent Sable from complying with the terms of the DPA Order. *Id.* ¶¶ 49-52.

Defendant raises arguments in his motion to dismiss which are largely recycled from California's multitude of other filings, and so do not speak to the legal issues raised by Sable here, and which improperly dispute Sable's pleaded facts. None warrant dismissal. *First*, Defendant argues, inappositely, that the Pipeline Safety Act does not "confer Sable with easement rights, nor does it generally preempt state actions affecting pipelines." Mot at 12-17. Yet Sable plausibly alleges that CDPR pretextually used easement negotiations as a backdoor mechanism to

regulate pipeline safety—a field exclusively reserved to federal authority and an act squarely prohibited by controlling Ninth Circuit authority. Defendant disputes Sable's factual allegations—but disputed facts are not a basis for dismissal on the pleadings.

*Second*, Defendant argues, again inappositely, that the "Defense Production Act does not confer the federal government with requisition authority." Mot. at 17-22. But, again, Sable has not pleaded that the DPA Order requires it to requisition property. Indeed, its Complaint specifically acknowledges that Defendant may lawfully seek fair market value for easements and require appropriate indemnities for use of its property. *See* Compl. at 13 n.4. What Sable *does* plead is that the DPA preempts Defendant's attempts to prevent Sable from operating the SYPS as required by federal law—and that to the extent CDPR attempts to prevent such operation, such attempts stand as an irreconcilable obstacle to Sable's compliance with the DPA Order and are preempted.

*Third*, Defendant argues that despite CDPR signing the Consent Decree, his agency is not bound by the provisions to which it agreed, and that its prior representations and conduct do not estop it from barring Sable from Gaviota State Park now. *See* Mot. at 22-23. Again, Defendant's arguments ignore Sable's well-pleaded facts and assume the resolution of all factual disputes in his favor—inappropriate on a motion to dismiss.

Defendant's motion should be denied.

## II.    PLEADED FACTS

This case concerns one onshore section of the integrated SYPS: a four-mile stretch that runs under Gaviota State Park of the approximately 113.5-mile pipe termed "Segment CA-325." *See* Compl. ¶ 2.

The pipeline has been under the Park for nearly 40 years. *Id.* ¶ 7. Segment CA-325 was built in the 1980s following a comprehensive Environmental Impact Report and Environmental Impact Statement ("EIR/EIS"), including an assessment

of the long-term operation, necessary repairs, and ongoing maintenance of Segment CA-325. *Id.* ¶ 20.  Based in part on this assessment of the long-term operation of Segment CA-325, the EIR/EIS identified a right-of-way through Gaviota State Park as an environmentally superior route, and accordingly CDPR granted an easement for the construction, maintenance, and operation of Segment CA-325. *Id.* ¶¶ 21–22. Oil first flowed through the Gaviota Park segment in 1992. *Id.* ¶ 7.

In 2015, under different ownership, a spill occurred along a different segment of the pipeline system. *Id.* ¶ 3. Following the spill, the "then-owners of Segments CA-324 and CA-325, the United States, and various California agencies—including CDPR—entered into the Consent Decree to 'resolve[] the civil claims of the United States and the State Agencies' relating to the Refugio spill." *Id.* ¶ 24 (quoting Ex. B at 72). The Consent Decree provided "three options for compliance": replacement, restart, or abandonment. *Id.* ¶ 26. While the "replacement option" required that the pipeline owner "timely obtain . . . whatever *additional* rights are needed, including rights-of-way that may be needed from landowners," the "restart" option "did not include any provisions or requirements for further state-law environmental review, nor for further securing of easement rights from CDPR." *Id.* ¶¶ 27–28 (quoting Ex. B at 105).

Nine years after the spill, Sable purchased the SYPS and "contractually agreed to be bound by certain Consent Decree provisions relating to the pipeline." *Id.* ¶ 4. "At all times since Sable acquired the Santa Ynez Pipeline System, it has intended to resume petroleum transportation throughout the Santa Ynez Pipeline System," and "CDPR understood that this is Sable's purpose and has knowingly encouraged and authorized Sable to invest its resources[.]" *Id.* ¶ 38.

As part of the restart process, "Sable required continual access to Gaviota State Park for repair and maintenance of the pipeline" to "comply with the relevant Consent Decree provisions," which "CDPR knew and understood" was "based on [Sable's] reliance on the segment restart process agreed to by CDPR in the Consent

Decree." *Id.* ¶ 5. However, after encouraging Sable to "invest[] over $150 million in repairs and upgrades to the Santa Ynez Pipeline System, including Segment CA-325," *id.* ¶¶ 35–36, CDPR did an about-face and "refused to extend the longstanding easement," a refusal for which "CDPR has not offered any non-regulatory reasons," *id.* ¶¶ 41–42. "Instead, by requiring extensive additional environmental analysis and review, CDPR is effectively treating the easement as an entirely new project," which "[o]n information and belief"—and in light of California's subsequent actions in related cases—is "pretextual." *Id.* ¶¶ 42–43.

On December 17, 2025, PHMSA "determined that the Santa Ynez Pipeline System (including Segment CA-325) is an interstate pipeline 'subject to the regulatory oversight of PHMSA.'" *Id.* ¶ 31 (quoting Ex. C at 131 & n.8). PHMSA has subsequently approved Sable's restart plan and granted all regulatory approvals necessary to flow oil through Segment CA-325. *See id.* ¶¶ 32–24.

"On March 13, 2026, the Secretary of Energy issued the DPA Order, 'direct[ing]' Sable to 'immediately commence' services which will require flowing oil throughout the entirety of the Santa Ynez Pipeline System." *Id.* ¶ 37 (quoting ECF 1, Ex. A at 20). The DPA Order was issued pursuant to "Executive Order 14156," which found that "'our Nation's inadequate energy supply and infrastructure causes and makes worse . . . high energy prices'" and results in a "'diminished capacity to insulate [the United States] from hostile foreign actors.'" *Id.* ¶ 16 (quoting 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025)).

California, acting through its agency CDPR, seeks to prevent Sable from complying with this federal law, and improperly attempts to regulate pipeline safety, which is under the exclusive jurisdiction of PHMSA pursuant to the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*[1]   Defendant disputes this here, but in related

---

[1] The Pipeline Safety Act consolidates and recodifies two earlier pipeline safety statutes: the Natural Gas Pipeline Safety Act of 1968 (NGPSA) and the Hazardous Liquid Pipeline Safety Act of 1979 (HLPSA), without making substantive changes.

litigation, CDPR's sworn declarants have acknowledged that CDPR has attempted to use its easement rights to "oversee[] the management of Gaviota State Park in a manner consistent with public safety," and that its refusal of an easement is based on its concerns regarding "the safe operation of pipeline CA-325 within Gaviota State Park." Decl. of Dena Bellman at 5 ¶ 16, *Cal. Dep't. of Parks & Rec. v. Sable*, No. 2:26-cv-02946-SVW-SSCx, ECF 23-4 (Mar. 7, 2026). Further, CDPR asserts that it may continue to refuse to permit Sable's operations based on its belief "that safety problems with CA-325 at Gaviota State Park are at high risk of being neglected." *Id.* ¶ 17.

Sable brings this lawsuit to clarify its rights and responsibilities in light of the DPA Order, the collision of conflicting federal and state regulatory regimes, and California's unwillingness to work with Sable to reach a negotiated solution. Compl. ¶ 8 and Prayer for Relief.

## III.   LEGAL STANDARD

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint survives a motion to dismiss so long as it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Young v. NeoCortext, Inc.*, 690 F. Supp. 3d 1091, 1098 (C.D. Cal. 2023). The question is not whether Sable will ultimately prevail, but whether it has alleged facts that, accepted as true, state a plausible claim for declaratory relief. *See Iqbal*, 556 U.S. at 678.

---

Many cases relevant to interpreting the PSA were decided under provisions of the NGPSA and HLPSA that are substantively identical.

## IV. ARGUMENT

### A. Defendant Cannot Show That the Pipeline Safety Act Does Not Preempt State-Law Claims

Sable seeks declaratory relief that Defendant's efforts to prevent Sable from restarting the SYPS—by refusing to renew or extend the longstanding easement—are preempted by the Pipeline Safety Act. Sable alleges that Defendant is using his agency's control over the easement to impose conditions that function as de facto regulation of pipeline safety and to advance California regulatory objectives in an area preempted by Congress—actions that are expressly preempted by the PSA. *See* Compl. ¶¶ 6, 30-34, 38-43. "[W]hen Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (internal citation and quotation marks omitted).

Consistent with Sable's allegations in the Complaint, this Court has already found that State Parks' "concerns about its inability to address environmental and safety concerns undoubtedly refer to an inability to regulate the Pipeline's use." Order Denying Plaintiff's Mot. for Prelim. Inj. at 7, *Cal. Dep't. of Parks & Rec. v. Sable*, ECF 60 (May 28, 2026). These attempts to regulate the pipeline's use are preempted. Because the Complaint plausibly alleges preemption, dismissal at the pleading stage is improper.

### 1. Whether Defendant's agency is acting in its capacity as a landowner or as a safety regulator is a fact-intensive inquiry that cannot be resolved on a Rule 12(b)(6) motion.

Congress enacted the PSA to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1). Federal law thus establishes "a national hazardous liquid pipeline safety program with nationally uniform minimal standards and with

enforcement administered through a Federal–State partnership." 49 C.F.R. pt. 195, app. A. The PSA authorizes the Secretary of Transportation to prescribe "safety standards" governing "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." 49 U.S.C. § 60102(a)(2). Congress further directed that those standards "shall be . . . practicable" and "designed to meet the need for . . . protecting the environment." *Id.* § 60102(b).

The PSA expressly preempts all state and local regulation. "Federal preemption of the regulation of interstate pipeline safety in *any* . . . manner is manifest" under the PSA. *Olympic Pipe Line Co. v. City of Seattle,* 437 F.3d 872, 878 (9th Cir. 2006) (emphasis added); *see also ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) (federal pipeline safety law "leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards"). Courts have recognized that "nominally non-safety provisions are preempted by federal law if they nevertheless regulate safety." *Couser v. Shelby County*, 139 F.4th 664, 670 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 25-419, 2026 WL 79941 (U.S. Jan. 12, 2026).

The Complaint alleges that Defendant "seeks to regulate the Santa Ynez Pipeline System," including Line CA-325, by using the easement as leverage. Compl. ¶ 43; *see also id.* ¶ 6 ("CDPR now demands, as a condition of renewing the long-held easement, that Sable conduct extensive additional environmental testing and review and acquire new permits . . . ."), *id.* ¶ 39 ("CDPR now asserts that Sable may not flow oil unless it complies with additional environmental analysis and review . . . ."); *id.* ¶ 42 ("CDPR has not offered any non-regulatory reasons for refusing to renew or extend the long-held easement."); *id.* ¶ 43 (Defendant "seeks to regulate the Santa Ynez Pipeline System indirectly by refusing to renew the easement and instead conditioning its extension on compliance with directives . . .

inconsistent with PHMSA's exclusive jurisdiction."); *id.* ¶ 45 ("Defendant is seeking to regulate in an area reserved solely to the federal government under the federal Pipeline Safety Act . . . demanding compliance with its preferred state regulatory regime as a condition of clarifying the status of and/or renewing Sable's easement in Gaviota State Park.").

Taken as true, those allegations plausibly describe an effort to impose de facto safety standards—regardless of whether Defendant characterizes his agency as a landowner, and regardless of whether his agency is imposing these conditions by contract rather than by ordinance. "The Pipeline Safety Act is not concerned with *how* the state imposed or enforced safety standards on an interstate pipeline but rather *whether* it did." *Enbridge Energy, Ltd. P'ship v. Whitmer*, 813 F. Supp. 3d 777, 800 (W.D. Mich. Dec. 17, 2025). A state authority may not "us[e] its status as a party to a contract to regulate preempted fields." *Olympic Pipe Line Co. v. City of Seattle*, C03-2343L, 2003 WL 27392855, at *6 (W.D. Wash. Aug. 21, 2003). As alleged in the Complaint, Defendant's attempt to use his agency's position as a party to the easement to enforce additional safety standards on CA-325 is expressly preempted by the PSA.

Though his agency has admitted in related litigation that its refusal to grant an easement was based on pipeline-safety-related reasons, *see supra* at 7-8, Defendant now contends in his motion that his agency acts solely as a landowner enforcing proprietary rights, *see* Mot. at 12-13. This argument presents a fact-intensive inquiry which cannot be resolved at the pleading stage. Whether Defendant's challenged conduct is a vehicle for imposing safety-driven constraints on Sable's operation (as alleged in Sable's Complaint) or proprietary in nature (as asserted in Defendant's Motion) turns on the purpose and effect of the conditions Defendant demanded. On a Rule 12(b)(6) motion to dismiss, the Court must accept Sable's well-pleaded allegations and draw reasonable inferences in Sable's favor. *See Young*, 690 F. Supp. 3d at 1098.

Defendant argues that the PSA "does not compel" a state landowner to grant or renew an easement. Mot. at 13. This misstates Sable's claim:  Sable asserts that Defendant may not use his control over state land as leverage to impose conditions that effectively operate as pipeline-safety regulation. *See* Compl. ¶¶ 44–48. Sable's allegations state a claim for relief. The Ninth Circuit's analysis in *Olympic Pipe Line* is instructive here. *See* 437 F.3d at 874-75. The pipeline at issue was subject to a franchise agreement with the City of Seattle that allowed the operator to maintain and operate the pipeline within the city limits for a ten-year term. *See id.* at 875. Seattle declined to renew the Franchise Agreement "until Olympic complied with the City's list of pipeline safety demands." *Id.* at 874. After the operator refused to comply, the city attempted to shut down the pipeline. *Id.* The Ninth Circuit concluded that by requiring Olympic to comply with certain safety demands as a condition of renewing its Franchise Agreement, the City "acted pursuant to its general duty to protect the public health and safety—a duty grounded in the City's regulatory, police power—rather than in an attempt to protect its role in the real estate market." *Id.* at 881. Accordingly, the Court determined that the provisions of the Franchise Agreement that impose safety standards were preempted by the PSA. *See id.* at 879–82. The fact that the city sought to impose the safety conditions by contract, rather than by statute or ordinance, did not change the Court's preemption analysis.

Other courts have reached the same conclusion where governmental entities attempted to use property instruments to control pipeline safety. For example, in *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551 (D. Minn. 1987), a Minnesota municipality sought to restrain a pipeline operator from testing or restarting its pipeline based on safety conditions embedded in revocable licenses for county property, arguing that "as a property owner, [the County] is free to demand that its licensee abide by conditions it chooses to set." *Id.* at 568. The district court rejected that theory, reasoning that the County's attempt to prevent operation of the

pipeline through enforcing conditions on the pipeline's license was preempted by the PSA's predecessor statute and noting that:

> [h]azardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons. Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted. Ramsey County's property and contract-based claims for injunctive relief appear to be "so repugnant to the statute that the survival of such rights would in effect deprive [HLPSA] of its efficacy."

*Id.* at 569–70 (quoting *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 437 (1907)).

More recently, *Enbridge Energy* rejected an attempt by Michigan to shut down a pipeline by enforcing safety conditions contained in an easement. *See* 813 F. Supp. 3d at 777. The Court observed that "Michigan's 'primary motivation' for including these standards in the easement was to ensure [the challenged pipeline's] safety." *Id.* at 799-800. Accordingly, the "invocation of these easement conditions is a straightforward attempt by state authorities to regulate pipeline safety and 'continue in force' state law safety standards." *Id.* at 800. "As such, the easement conditions are exactly the kind of state-imposed safety standards that the Pipeline Safety Act intended to preempt." *Id.*

Defendant's argument repeats the same error. The question is not whether the PSA compels Defendant to grant or renew an easement.  Rather, the PSA prohibits Defendant from using his property rights to impose safety conditions and operational constraints that are preempted by the PSA. Sable plausibly alleges that Defendant is doing just that. *See, e.g.*, Compl. ¶¶ 6, 39, 42–43, 45. As this Court has already recognized, CDPR's actions are motivated by a desire to "regulate the Pipeline's use." Order Denying Plaintiff's Mot. for Prelim. Inj. at 7, *Cal. Dep't. of Parks & Rec. v. Sable*, ECF 60 (May 28, 2026). At minimum, Sable's allegations present a

factual dispute about purpose and effect that cannot be resolved on a Rule 12(b)(6) record. Accordingly, Defendant's motion should be denied.

> **2.      Whether Defendant's actions with respect to the easement constitute regulation is a factual dispute not resolvable on a motion to dismiss.**

Defendant next argues the Complaint "fails to identify a single pipeline safety standard that State Parks has imposed," and contends that his agency's request for "further environmental review" during easement negotiations is not "the adoption or enforcement of safety standards" under the PSA. Mot. at 8. But Defendant also concedes that his agency demanded "extensive environmental analysis and review" in connection with determining whether Line 325 could restart, *id.* at 15, and that CDPR's Right of Entry Permits expressly excluded "restarting Line 325," *id.* at 9. And, as noted above, in a related matter, Defendant's employee has conceded that State Parks exercised its easement rights in order to support its preferred pipeline regulator and secure its own vision of "pipeline safety." *See, e.g.*, RJN, Ex. 2, at 53, 55; Decl. of Dena Bellman ¶¶ 17, 19, *Cal. Dep't. of Parks & Rec. v. Sable*, ECF 23-4 (Mar. 7, 2026) ("I believe that safety problems with CA-325 at Gaviota State Park are at high risk of being neglected. . . . The reduced structural integrity of the land surrounding the Pipeline at the location photographed by Mr. Flora may create greater risk of Pipeline rupture."); Mem. ISO Mot. to Dismiss at 1, 14, *Cal. Dep't. of Parks & Rec. v. Sable*, ECF 23-1 (Mar. 7, 2026) ("State Parks cannot determine whether the portions of Gaviota State Park through which the Pipeline runs are safe to use."). Those concessions signal that Defendant was motivated by a desire to control how—and whether—the Pipeline may be operated and restarted. As alleged in the Complaint, such preconditions function as de facto safety standards.

Indeed, Defendant's conduct is precisely the type of state interference Congress intended the PSA to preempt. The PSA authorizes PHMSA to prescribe "safety standards" governing "the design, installation, inspection, emergency plans

and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." 49 U.S.C. § 60102(a)(2). Congress further directed that those standards be "designed to meet the need for . . . protecting the environment." *Id.* § 60102(b). Because "Congress expressly intended for the federal government's safety regulations to account for environmental protection," *Enbridge Energy*, 813 F. Supp. 3d at 794, Defendant cannot avoid preemption by relabeling safety-driven operational prerequisites as "environmental" review. If a local entity could evade the PSA merely by couching its regulations as non-safety—even when that assertion is pretextual—the preemption provision would be meaningless. *See, e.g.*, *Williams Pipe Line*, 651 F. Supp. at 569–70.

Olympic Pipe Line demonstrates that the Court is permitted to look beyond the characterization of a standard by local authorities to its intent and effect. 437 F.3d at 881 (proprietary/regulatory distinction turns on the action's practical purpose and effect); *see also Couser*, 139 F.4th at 670 ("[N]ominally non-safety provisions are preempted by federal law if they nevertheless regulate safety."). Accepting the Complaint's allegations as true and drawing reasonable inferences in Sable's favor, Sable has plausibly alleged that Defendant's conduct is preempted and dismissal is improper.

### 3.  Defendant cannot regulate the pipeline regardless of whether it is interstate or intrastate.

Finally, Defendant's assertion about whether the pipeline is interstate or intrastate is irrelevant. The PSA's express preemption provision governs *both* interstate and intrastate pipelines. *See* 49 U.S.C. § 60104(c). Regardless of whether Segment CA-325 is interstate or intrastate, Defendant lacks authority to impose or leverage safety-related conditions. For *interstate* pipelines, the PSA broadly prohibits any state or local authority from "adopt[ing] or continu[ing] in force safety standards for interstate pipeline facilities or transportation." *Id.* "This Congressional grant of exclusive federal regulatory authority precludes state decision-making in

this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards." *Couser*, 139 F.4th at 669. For *intrastate* pipeline facilities, "a state authority may regulate intrastate pipelines and impose safety requirements in addition to the federal standards only if 1) [the state authority] applies and is approved by the DOT through an annual certification process . . . ; and 2) [its] standards are compatible with the federal standards." *Olympic Pipe Line*, 437 F.3d at 878 (citing 49 U.S.C. §§ 60104(c), 60105). Alternatively, a state authority may obtain DOT authorization through a pipeline safety agreement under § 60106(a) or by designation as an agent under § 60117(c). *See id.* at 878-79. Regulation of pipeline safety by any other state entity is preempted. *Id.* at 878.

CDPR is not the certified or authorized California "state authority" for hazardous liquid pipeline safety under the PSA. Rather, Cal. Gov't. Code § 51010 assigns the Office of the State Fire Marshal ("OSFM") "exclusive safety regulatory and enforcement authority over intrastate carbon dioxide and hazardous liquid pipelines" and specifically authorizes OSFM to "act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979[.]" *Id.* Defendant therefore lacks any statutory basis to regulate pipeline safety (or to impose safety-driven conditions) whether Segment CA-325 is interstate or intrastate.

**B.    Defendant Cannot Show That the Defense Production Act Does Not Preempt State-Law Claims**

Defendant next raises three arguments attacking Sable's requested declaratory relief as it relates to the DPA. *See* Mot. at 17-22. As relevant to the DPA, Sable requests declaratory judgment on two grounds: 1) impossibility preemption prevents Defendant from foreclosing Sable's compliance with the DPA Order as federal law; and 2) the DPA's broad limitation-of-liability provision in 50 U.S.C. § 4557 serves as a complete defense to any state-law claim, whether in trespass or otherwise,

seeking to foreclose Sable's compliance with the DPA Order. *See* Compl. at Prayer for Relief. Again, Defendant fails to acknowledge or credit the well-pleaded allegations in Sable's complaint. None of Defendant's arguments can overcome Sable's well-pleaded facts.

### 1.    Defendant's Argument Against "Requisition" and "Anti-Commandeering" is a Strawman

Defendant's lead DPA argument attacks a strawman: that Sable (allegedly) asserts "that federal contractors may requisition property in order to comply with a DPA order" and that "the DPA entitles [Sable] to make use of the park." Mot. at 17-18. Defendant does not cite, let alone quote, Sable's Complaint for this point, because Sable does not make this claim. Instead, Sable pleads only that there is a conflict between state and federal law and that federal law controls under the Supremacy Clause, and seeks a judicial declaration to that effect. *See* Compl. ¶¶ 44-48.

The Complaint clearly alleges an ongoing conflict between Defendant's refusal to renew the easement and a current, binding federal order, which is all that is required to survive a motion to dismiss. *See* Fed R. Civ. P. 8(a). "Impossibility preemption" applies "where it is impossible for a private party to comply with both state and federal law[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) ("[W]hen Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." (citation and internal quotation marks omitted)). Here, Sable has alleged that it faces two directly contradictory demands: the DPA Order commanding Sable to flow oil and Defendant's "intransigence in clarifying the Gaviota State Park easement (or, as necessary, negotiating an extension of the easement)." Compl. ¶ 46. Sable must choose between compliance with federal law—risking the lawsuit Defendant has already compelled his agency to bring in the related case of *Cal. Dep't. of Parks and*

*Rec. v. Sable*, No. 2:26-cv-02946-SVW-SSC (C.D. Cal.)—and compliance with Defendant's demands—risking the DPA's civil and criminal penalties. *See* 50 U.S.C. § 4513. This irreconcilable conflict is the hallmark of impossibility preemption, *see Crosby*, 530 U.S. at 379–80, and Defendant is therefore "barred and estopped from" any attempt to "regulate, direct, oversee, inspect, control, or otherwise interfere with the operation, maintenance, construction, restart, staffing, or testing of Sable's pipeline," Compl. ¶¶ 47-48.

At no point does Sable plead that California has been directly ordered to assist it in complying with federal law in any way, and California's repetition of its well-worn requisition/anti-commandeering argument, *see* Sable's Opp. to California's Mot. for a Prelim. Inj. at 21, *California v. Wright*, No. 26-cv-03396-SVW-SSC, ECF 24-4 (C.D. Cal. May 11, 2026); Sable's Opp. to California's Mot. for a Prelim. Inj. at 29, *Cal. Dep't of Parks & Rec*, ECF 24, has no bearing on Sable's actually-pleaded preemption claim. As Sable has previously explained in those cases, the anti-commandeering doctrine only prohibits the federal government from "issu[ing] orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). The DPA Order imposes no obligations on any California state agency; it is directed to a private party—Sable—and allegedly conflicts with certain state law obligations California seeks to enforce. Sable seeks a judicial declaration regarding the availability of a federal defense against any attempt by Defendant to force Sable's noncompliance with federal law "through the coercive application of state property law." Compl. ¶ 47. That is preemption, and "commandeering does not occur when Congress validly preempts state law through the Supremacy Clause." *New York v. Dep't of Just.*, 343 F. Supp. 3d 213, 232 (S.D.N.Y. 2018).

### 2. Defendant Ignores the Modern Law of DPA Preemption and Reverses the Canons of Statutory Construction

Defendant next argues for his preferred narrow reading of the DPA's preemptive scope, relying exclusively on only two cases: *Hercules, Inc. v. United*

*States*, 24 F.3d 188 (Fed. Cir. 1994), and *United States v. Vertac Chemical Corp.*, 46 F.3d 803 (8th Cir. 1995).  But these cases are inapposite: Sable merely seeks declaratory relief regarding the DPA's *immunity* provision, while both *Hercules* and *Vertac* addressed primarily whether the United States was required to *indemnify* DPA contractors for liabilities arising from their manufacture of Agent Orange. *See Hercules*, 24 F.3d at 203; *Vertac*, 46 F.3d at 812.  Both *Hercules* and *Vertac* expressly left open the possibility that—although § 4557 did not require indemnification—it might nevertheless provide broad immunity. *See Hercules*, 24 F.3d at 203 n.15 (noting that § 4557 may "protect DPA contractors against . . . increased risk to employees or users" (internal quotation marks omitted)); *Vertac*, 46 F.3d at 812 n.11. The Supreme Court in *Hercules* likewise expressly declined the United States' request to interpret § 4557 as limited in the exact way that Defendant advance here.  *See Hercules, Inc. v. United States*, 516 U.S. 417, 430 & n.14 (1996).

Recent COVID-19-era case law further undermines Defendant's reliance on *Hercules* and *Vertac*, as these cases have made explicit what *Hercules* and *Vertac* implied—that the DPA's preemptive force extends, at least, to state-law tort actions. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022), *aff'd,* No. 22-10171, 2023 WL 2645553 (5th Cir. Mar. 27, 2023); *Reed v. Tyson Foods, Inc.*, No. 21-CV-01155-STA-JAY, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021). In *Johnson*, the court held that state-law tort claims were preempted by an order instructing meat processors to continue operations during the pandemic.[2] 580 F. Supp. 3d at 388–89 (citing Exec. Order No. 13917, 85 Fed. Reg. 26,313 (Apr. 28, 2020)). The court explained that the "application of those state-law standards would undermine the President's statutory authority" under the DPA, because "[o]nce the

---

[2] Despite California's assertion to the contrary in related litigation, *see* Cal. Plaintiff's Reply to Opp. to Mot. for Prelim. Inj., *California v. Wright*, No. 26-cv-03396-SVW-SSC, ECF 27 at 11-12 (C.D. Cal. May 18, 2026), the fact that the DPA Order in those cases had not yet issued has no bearing on these courts' analyses of the preemptive effect of DPA Orders generally.

President makes critical infrastructure determinations, 'state law is naturally preempted to the extent of any conflict with a federal statute,'" *id.* at 389 (quoting *Crosby*, 530 U.S. at 372), and conflict occurs whenever "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting *Hillman v. Maretta*, 569 U.S. 483, 490 (2013)).

*Reed* likewise "agree[d] . . . that it is 'simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state [law] that might, if enforced, blunt the consequences of discretionary Presidential action," 2021 WL 5107725, at *6 (quoting *Crosby*, 530 U.S. at 376), and "[b]ecause 'the purpose of the [DPA] cannot otherwise be accomplished' while allowing states to implement their own, potentially inconsistent policy decisions . . . , 'the state law must yield,'" *id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

Left without caselaw support, Defendant attempts to turn well-established canons of statutory construction on their head. Defendant argues that, because Congress "saw fit to include narrow preemptive language in one provision of the DPA"—§ 4558(j), which is not at issue in this case—the broadly-worded § 4557 must, likewise, actually be narrow. Mot. at 20. Defendant's own cited cases stand for the opposite proposition. "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *United States v. Youssef*, 547 F.3d 1090, 1094 (9th Cir. 2008) (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983)). Congress's "omission" of limiting language in one part of a statute "is evidence of Congress's expressed intent not to impose" that limitation, particularly when another part of the statute contains that limiting language. *Id.* As Defendant notes, § 4558(j) creates immunity "to any civil or criminal action brought under the antitrust laws[.]" 50 U.S.C. § 4558(j); *see* Mot. at 20. Section 4557, by contrast, applies to *"any act or failure to*

*act* resulting directly *or indirectly* from compliance with a rule, regulation, or order issued pursuant to this chapter[.]"  50 U.S.C. § 4557 (emphasis added). In other words, Section 4557 is broadly written and covers all acts and failures to act, direct and indirect, so long as necessitated by compliance with a DPA Order; it is not limited to contracts. Section 4557 should be interpreted in line with its plain text.

The legislative history confirms the plain-text reading.  Section 4557's predecessor provision in the Second War Powers Act only protected against liability for "default under any contract or order." 50 U.S.C. app. § 633(7). When Congress subsequently enacted the DPA, it used the much broader language of § 4557 ("*any act or failure to act*" (emphasis added)). Contemporary opinions of the Comptroller General—responsible for implementation of Korean War-era DPA contracts— recognized the importance of this change, noting that while "[t]he relief granted by the earlier provision was limited to cases of default 'under any contract or order,'" *Comptroller Gen. Warren to the Adm'r, Civ. Aeronautics Admin.*, 31 Comp. Gen. 408, 411 (Feb. 19, 1952), "the provisions of [§ 4557] deal with damages for any act or failure to act, whether under a Government or a private contract, **or even if unrelated to any contract**," *Comptroller Gen. Warren to the Sec'y of Com.*, 32 Comp. Gen. 497, 498 (May 8, 1953) (emphasis added).  Defendant fails to demonstrate that section 4557 does not provide Sable a defense as a matter of law, and his motion to dismiss should be denied.

### 3.    Defendant Cannot Overcome the Plain Language of Section 4557

Finally, Defendant knocks down one final argument that Sable has not pleaded: that interpreting § 4557 according to its plain text, statutory canons, legislative history, and in line with sister courts would give Sable carte blanche to "violate the laws with impunity." Mot. at 20-22. This "sky is falling" argument lacks merit: Sable seeks only a declaration that the DPA "bars any legal or equitable action by Defendant *seeking to prevent Sable from complying with the terms of the DPA*

*Order*[.]" Compl. ¶ 52 (emphasis added). This is a tailored defense that maps on to the language of the statute: Sable seeks a declaratory judgment that § 4557 immunizes it from "any act or failure to act resulting directly or indirectly from compliance with" the DPA Order. 50 U.S.C. § 4557; *see* DPA Order. As Sable has already explained in response to the identical argument in another of California's multitudinous filings, Sable has never "claimed that the DPA Order is—as California repeatedly and wrongly asserts—a universal trump card. The consequence of the DPA Order is to preempt State laws that contravene the actions directed by the DPA Order. Sable has argued the DPA provides a defense to certain specific state law claims; it has not argued that it is free to ignore all state laws that touch on any aspect of the SYPS." Sable's Opp. to California's Mot. for a Prelim. Inj. at 26, *California v. Wright*, ECF 24-4. Allowing Sable's claim to proceed does not require the Court to adopt a construction of the Defense Production Act that gives *carte blanche* to any and all actions any private party might take; it requires the Court only to declare Sable's rights and responsibilities vis-à-vis the DPA Order and California's specific state law claims.

## C.    The Parties' Competing Interpretations of the Consent Decree Cannot be Resolved on the Pleadings.

Finally, Defendant's half-hearted argument that the Consent Decree cannot estop his trespass claims mischaracterizes Sable's allegations and the relief sought. Indeed, Defendant *does not cite a single case or statute in this entire section*. That alone is reason enough to reject Defendant's argument. *See In re Basquez*, No. 6:18-BK-19790-WJ, 2020 WL 6929242, at *2 (Bankr. C.D. Cal. Nov. 16, 2020) ("Courts often deny motions when moving parties fail to provide developed legal reasoning or to cite sufficient case authority in support of motions.").

Sable does not contend that the Consent Decree contains "*all* the legal conditions that a pipeline operator would need to comply with." Mot. at 22. Rather, Sable contends that, having agreed to a specific restart procedure in the Consent

Decree, CDPR cannot now refuse to allow restart based on new, different, and previously undisclosed criteria. *See* Compl. ¶¶ 39–40, 47–48.

Sable pleads that the Consent Decree—to which CDPR is a party and under which it received a $2 million payment—sets out conditions that may be met to resume flow of oil through CA-325, and that CDPR's agreement to that specific restart scheme estops it from now adopting different, more onerous restart requirements as a prerequisite to the pipeline continuing to operate in Gaviota State Park. *See id*. ¶¶ 23–29, 39–41, 47–48. Sable pleads that the Consent Decree's "restart" option, unlike its "replacement" option, did not require new or renewed property rights, and that this distinction is meaningful, because CDPR consented to restart of the existing pipeline so long as the Consent Decree conditions were complied with. *Id*. ¶¶ 26–28. When CDPR entered the Consent Decree in 2020, the original 30-year easement had already expired (in 2016). *Id*. ¶ 28. Yet the Decree's restart pathway did not require the pipeline owner to obtain a new easement or—critically—give CDPR the right to prevent restart based on the lack of such an easement. *Id*.

Determining whether Defendant is estopped from acting based on CDPR's representations in the Consent Decree requires inquiry into the parties' states of mind when entering the Consent Decree, the nature of the Consent Decree's terms, and the reasonableness of Sable's reliance—none of which can be established at the pleading stage. *Luis v. Metro. Life Ins. Co.*, 142 F. Supp. 3d 873, 879 (N.D. Cal. 2015) (noting that estoppel arguments "compel the consideration of facts outside the complaint" which are generally "unsuitable topics for a motion under Rule 12"); *United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) (holding district court was precluded from resolving estoppel defense on motion to dismiss where factual disputes would "invade the province of the ultimate finder of fact").

Defendant's observation that the Consent Decree did not itself grant an easement, *see* Mot. at 23, is beside the point. Sable's claim is defensive: that CDPR

cannot use the lack of an easement to prevent restart or attempt to impose different restart conditions—whether labeled "environmental review," "land management," or "easement negotiations"—than those it agreed to in the Consent Decree. *See* Compl. ¶¶ 23–29, 39–41, 47–48.

Nor does the Consent Decree's general requirement that the pipeline operator comply with "applicable federal, state, and local laws," Mot. at 22 (quoting Consent Decree ¶ 78, ECF 1-2), preclude Sable's estoppel defense. The language Defendant quotes acknowledges that the Consent Decree *does* provide a defense to actions "as set forth herein." *Id.* Sable contends that clause, properly understood, to preserve non-preempted, generally applicable legal requirements, but not to authorize Defendant to renege on his agency's own agreed-to restart provisions—whether Defendant couches them as "property rights" or not. The interaction between the Consent Decree, the federal pipeline-safety regime, and Defendant's asserted easement-based prerequisites raises fact- and context-dependent issues that cannot be resolved on a motion to dismiss.

## V.    ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND

Even if this Court were inclined to dismiss the Complaint, it should do so with leave to amend in light of the Ninth Circuit's "extreme liberality" in allowing repleading. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment."). Sable's claims raise factual and legal questions that are, at minimum, subject to further development given the quickly evolving facts at issue in this case.

## VI.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, ECF 27, should be dismissed in its entirety.

Dated:  June 8, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Jessica Stebbins Bina*
   Jessica Stebbins Bina
   *jessica.stebbinsbina@lw.com*
   10250 Constellation Blvd., Suite 1100
   Los Angeles, CA 90067
   Telephone:  +1 424.653.5500
   Facsimile:   +1 424.653.5501

BABST CALLAND
   Nicholas McDaniel (*pro hac vice*)
   *nmcdaniel@babstcalland.com*
   505 Ninth St., NW, Suite 602
   Washington, DC 20004
   Telephone:  +1 202.853.3455
   Facsimile:   +1 202.853.3491

HOLLAND & KNIGHT LLP
   James W. Noe (*pro hac vice*)
   *jim.noe@hklaw.com*
   Ashley Akers (*pro hac vice*)
   *ashley.akers@hklaw.com*
   800 17th St., NW, Suite 1100
   Washington, DC 20006
   Telephone: +1 202.469.5525

*Attorneys for Plaintiffs Sable Offshore Corp. and Pacific Pipeline Company*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Sable Offshore Corp. and Pacific Pipeline Company, hereby certifies that this brief contains 6,871 words, which complies with the word limit for Local Rule 11-6.1, and is less than 25 pages, which complies with this Court's New Case Order, ECF 24 ¶ 3.A.

Dated: June 8, 2026                    /s/ *Jessica Stebbins Bina*

                                       Jessica Stebbins Bina