ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General
MATTHEW T. STRUHAR (SBN 293973)
*matthew.struhar@doj.ca.gov*
Deputy Attorneys General
  1300 I Street
  Sacramento CA 95814
  Tel: (916)210-7246
*Attorneys for Defendant*
*Armando Quintero, in his official capacity as*
*Director of the California Department of Parks and*
*Recreation*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **Sable Offshore Corp. and Pacific Pipeline Company,**<br><br>Plaintiffs,<br><br>v.<br><br>**Armando Quintero, in his official capacity as Director of the California Department of Parks and Recreation,**<br><br>Defendant. | Case No. 2:26-cv-02739-SVW-SSC<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S' COMPLAINT FOR DECLARATORY RELIEF**<br><br>**(Fed. R. Civ. P. 12(b)(6).)**<br><br>Date:          June 29, 2026<br>Time:          1:30 p.m.<br>Courtroom:  10A<br>Judge:        Hon. Stephen V. Wilson<br>Trial Date:   Not Set<br>Action Filed: March 13, 2026<br>Complaint Served: March 26, 2026 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.      Sable Has Not Shown That It Has Stated a Claim Under the Pipeline Safety Act ...................................................................................... 2

     A.      Sable Fails to Explain How State Parks Has Allegedly Imposed Pipeline Safety Regulations on the Pipeline in Violation of the PSA ................................................................. 3

     B.      Sable Has Not Alleged Sufficient Facts to Support a Plausible PSA Claim Under Its De Facto Regulation Theory ................................................................................................ 5

II.      Sable Fails to Show That Its DPA Claim Can Survive ....................... 7

     A.      The DPA Does Not Conflict with State Trespass Law .............. 7

     B.      The DPA Does Not Confer Sable with Blanket Immunity from State Tort Liability ................................................................. 8

III.      The Consent Decree Does Not Bar State Parks' Trespass Action ..... 10

CONCLUSION ........................................................................................................ 12

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) .................................................................................... 1, 3, 6

*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Reservation v. Enbridge Energy Co.*
   626 F.Supp.3d 1030 (W.D. Wis. 2022)........................................................ 3, 4, 5

*Cassinos v. Union Oil Co.*
   14 Cal.App.4th 1770 (1993).......................................................................... 11, 12

*Cheverez v. Plains All American Pipeline, LP*
   Case No. CV15-4113 PSG, 2016 WL 4771883 (C.D. Cal. Mar. 4, 2016) .............................................................................................................. 3

*Couser v. Shelby County, Iowa*
   139 F.4th 664 (8th Cir. 2025)............................................................................. 6

*Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*
   532 F.2d 957 (5th Cir. 1976)............................................................................. 9

*Enbridge Energy, Ltd. P'ship v. Whitmer*
   813 F.Supp.3d 777 (W.D. Mich. 2025)........................................................... 3, 4

*Firefighters Local Union No. 1784 v. Stotts*
   467 U.S. 561 (1984) ....................................................................................... 2, 10

*Hercules Inc. v. United States*
   24 F.3d 188 (Fed. Cir. 1994) ......................................................................... 8, 9

*Hercules, Inc. v. United States*
   516 U.S. 417 (1996) ........................................................................................... 9

*Olympic Pipe Line Co. v. City of Seattle*
   316 F.Supp.2d 900 (W.D. Wash. 2004)............................................................ 4

*Olympic Pipe Line Co. v. City of Seattle*
   437 F.3d 872 (9th Cir. 2006)........................................................................... 3, 4

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Portland Pipe Line Corp. v. City of S. Portland*
    288 F.Supp.3d 321 (D. Maine 2017)......................................................5

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*
    608 F.3d 200 (5th Cir. 2010)............................................................5, 6

*United States v. California*
    921 F.3d 865 (9th Cir. 2019)................................................................8

*United States v. Vertac Chem. Corp.*
    46 F.3d 803 (8th Cir. 1995)..................................................................8

*Wash. Gas Light Co. v. Prince George's Cnty. Council*
    711 F.3d 412 (4th Cir. 2013)........................................................2, 5, 6

*Williams Pipe Line Co. v. City of Mounds View*
    651 F.Supp. 551 (D. Minn. 1987) .........................................................4

STATUTES

49 U.S.C.
    § 60104(c)........................................................................................3
    § 60120(c)........................................................................................3
    § 60121(d)........................................................................................3

50 U.S.C.
    § 4511(a)........................................................................................7, 8
    § 4511(c)........................................................................................8, 9
    § 4511(c)(1), (2)(A)(i) .......................................................................9
    § 4511(c)(2)(A)(i) .............................................................................9

Defense Production Act (DPA)
    § 101 ...........................................................................................8, 9
    § 101(a)........................................................................................7, 9
    § 101(c)........................................................................................7, 9
    § 707 ...........................................................................................8, 9

67 Stat. 129 (1953) ...............................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

COURT RULES

Fed. R. Civ. P.
  8 ................................................................................................................1
  8(a)(2) ........................................................................................................1
  12(b)(6) ......................................................................................................6

**INTRODUCTION**

According to Plaintiffs Sable Offshore Corp. and the Pacific Pipeline Company ("Sable"), federal law entitles Sable to operate an oil pipeline on state property without the State's permission, full stop. The Court should not embrace this far-reaching understanding of federal preemption, which would effectively strip states of their authority to govern pipelines in any manner (see ECF 28 at 6 ["The PSA expressly preempts all state and local regulation."]), while placing states at risk of forfeiting their property rights. The Court should instead dismiss Sable's Complaint without leave to amend.

Sable provides no reason for why any of its claims should survive. Starting with Sable's Pipeline Safety Act ("PSA") claim, Sable argues that the Complaint includes plausible allegations that the California Department of Parks and Recreation ("State Parks") has impermissibly sought to regulate pipeline safety through its easement authority. ECF 28 at 6-11. But those arguments fail to establish preemption as a matter of law because they do not show that State Parks has imposed or enforced pipeline safety standards. And even if those arguments could support preemption, Sable has not shown that its factual allegations meet the demands of Rule 8 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Moving to the Defense Production Act ("DPA") claim, Sable asks this Court to adopt a strikingly broad reading of the preemptive scope of the DPA that would allow Sable to ride roughshod over state trespass law. No authority holds that the DPA allows private companies to commit trespass or requisition others' property. Even if it could, DPA immunity only covers the risk of *prioritizing* the performance of contracts or *allocating* materials that are essential to maintaining or expanding the production, refining, or transportation of energy sources. The DPA does not, however, confer the President with the authority to order the *transportation* of energy sources in places where such transportation is not permitted under state law,

1

and thus it does not immunize Sable from liability for its trespass. Sable ignores the plain text of the DPA that draws this distinction.

Finally, Sable argues that the Court cannot resolve competing interpretations of the Consent Decree on the pleadings. Not so. The estoppel effect of the Consent Decree depends solely on its express terms. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984). And on its face, the Consent Decree does not estop State Parks from enforcing its property rights. This claim thus fails, too.

For these reasons, Defendant Armando Quintero respectfully requests that the Court dismiss the Complaint without leave to amend.

## ARGUMENT

### I. SABLE HAS NOT SHOWN THAT IT HAS STATED A CLAIM UNDER THE PIPELINE SAFETY ACT

Sable describes its PSA claim as seeking "declaratory relief that Defendant's efforts to prevent Sable from restarting the SYPS—by refusing to renew or extend the longstanding easement—are preempted by the Pipeline Safety Act." ECF 28 at 6. According to Sable, State Parks is using its "control over the easement to impose conditions that function as de facto regulation of pipeline safety and to advance California regulatory objectives" in a manner preempted by the PSA. *Id*.

This argument fails to support a claim under the PSA for two reasons. First, as a matter of law, the conduct described by Sable does not constitute impermissible pipeline safety regulation. State and local agencies may make demands that affect pipelines, even out of safety concerns, so long as they are not imposing pipeline safety standards, which the PSA preempts. *See Wash. Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 421-22 (4th Cir. 2013). Sable provides this Court with no reason to broaden the preemptive scope of the PSA so as to require State Parks to provide Sable with an easement.

Second, this argument fails to support Sable's claim because it consists of threadbare legal contentions. To survive a motion to dismiss, a complaint cannot

simply recite the elements needed to prove liability. *Iqbal*, 556 U.S. at 679. The complaint must plead facts that, if proven, would *show* that the plaintiff is entitled to relief. *Id*. Conclusory allegations do not suffice. *Id*. at 678.

### A. Sable Fails to Explain How State Parks Has Allegedly Imposed Pipeline Safety Regulations on the Pipeline in Violation of the PSA

The PSA only prohibits the State from "adopt[ing] or continu[ing] in force safety standards…." 49 U.S.C. § 60104(c).[1] It does not require a sovereign entity or any property owner "to grant or renew an easement for a pipeline across its land simply because it has concerns about the safety of doing so." *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Reservation v. Enbridge Energy Co.*, 626 F.Supp.3d 1030, 1061 (W.D. Wis. 2022). Nothing in the PSA requires property owners to forego their property rights just because of the PSA's preemptive effect. *Id*.

Nor does the PSA preempt common law tort claims. *Id*. (citing 49 U.S.C. §§ 60120(c), 60121(d)). That includes claims to remedy injury to property interests. *See Cheverez v. Plains All American Pipeline, LP*, Case No. CV15-4113 PSG (JEMx), 2016 WL 4771883 at *5-6 (C.D. Cal. Mar. 4, 2016); *see also* 49 U.S.C. § 60120(c) ("This chapter does not affect the tort liability of any person."). Refusing to dedicate an interest in real property does not, in and of itself, constitute pipeline safety regulation. What Sable must show, and what Sable fails to show, is that State Parks is imposing or enforcing safety standards on Line CA-325. *See Enbridge Energy, Ltd. P'ship v. Whitmer*, 813 F.Supp.3d 777, 800 (W.D. Mich. 2025).

The authorities provided by Sable do not compel a different result. *Olympic Pipe Line*, for instance, involved specific pipeline safety regulations that Seattle sought to enforce against the pipeline operator in question. *See Olympic Pipe Line*

---

[1] The State is currently litigating the interstate status of Line CA-325 for purposes of the PSA, but Defendant agrees with Sable that State Parks is not a state authority under the PSA and thus cannot impose pipeline safety regulations on Line CA-325 anyway. Thus, for this case, the interstate status of Line CA-325 is irrelevant.

3

*Co. v. City of Seattle*, 437 F.3d 872, 874 (9th Cir. 2006).[2] As Sable phrases it: "the Court determined that the provisions of the Franchise Agreement that impose safety standards were preempted by the PSA." ECF 28 at 9. Sable points to no similar provisions at issue here.

Similarly, *Whitmer* focused on whether the state "*imposed or enforced safety standards….*" *Whitmer*, 813 F.Supp.3d at 800 (italics added). There, Michigan issued a shutdown order for the express purpose of avoiding the risk of an oil spill, which is a core concern of pipeline safety regulation. *Id*. at 798-99. Furthermore, the easement conditions in *Whitmer* were, in substance, safety standards. *Id*. at 799. And, similar to *Whitmer* and *Olympic Pipe Line*, *Williams Pipe Line* involved a municipal government seeking to enforce safety conditions in its revocable licenses in its county property. *Williams Pipe Line Co. v. City of Mounds View*, 651 F.Supp. 551, 568 (D. Minn. 1987).

Notably, the operator in *Whitmer* actually had an easement. *Whitmer*, 813 F.Supp.3d at 784. Without an easement or equivalent authorization, an operator has no freestanding right under the PSA to transfer oil through sovereign lands or private property. *See Bad River Band*, 626 F.Supp.3d at 1061.

Unlike the pipeline operators in *Olympic Pipeline*, *Whitmer*, and *Williams Pipe Line*, Sable has not identified *any* safety regulations embodied in *any* source— be it statutory, regulatory, or contractual—that State Parks has sought to enforce against Sable. None appear in the Complaint. And none appear in the Opposition. That makes these authorities critically distinguishable from this case.

---

[2] Notably, the district court in *Olympic Pipe Line* denied the pipeline operator's request for declaratory relief that any termination or denial of a franchise agreement was preempted under the dormant commerce clause. *Olympic Pipe Line Co. v. City of Seattle*, 316 F.Supp.2d 900, 908 (W.D. Wash. 2004). "Such termination or denial on the basis of Olympics' refusal to comply with Seattle's safety demands would be impermissible." *Id*. at 907 n.8. *But* "Seattle may be permitted to terminate or deny the franchise for other reasons," although that issue was not before the district court. *Id*.

Instead of identifying actual pipeline safety standards that State Parks has enforced or imposed, Sable argues that State Parks has imposed *de facto* safety standards on Line CA-325. ECF 28 at 11. According to Sable, safety concerns have impermissibly motivated State Parks' negotiations over its easement. *Id*.

That is not a viable basis for finding PSA preemption. The weight of authority teaches that state and local agencies may act out of concern for pipeline safety, so long as they are not enforcing or imposing pipeline safety standards. *See, e.g.*, *Wash. Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 420 (4th Cir. 2013); *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010); *Portland Pipe Line Corp. v. City of S. Portland*, 288 F.Supp.3d 321, 430 (D. Maine 2017).

Indeed, in *Washington Gas Light*, the Fourth Circuit rejected an argument that the challenged land use policies constitute de facto safety regulations—or, as the operator framed them, "safety regulations in disguise." *See, e.g.*, *Wash. Gas Light*, 711 F.3d at 421. The Fourth Circuit did so while assuming that safety concerns may have played a role in promulgating those land use policies. *Id*. at 422. That did not suffice to find PSA preemption because the policies in question were primarily land use regulations. *Id*.

The PSA may prohibit State Parks from imposing and enforcing pipeline safety standards, but it does not require State Parks to grant an easement to Sable. *See Bad River Band*, 626 F.Supp.3d at 1061. Sable's PSA claim thus fails as a matter of law, and this Court should dismiss the PSA claim without leave to amend.

**B.    Sable Has Not Alleged Sufficient Facts to Support a Plausible PSA Claim Under Its De Facto Regulation Theory**

Even if the PSA prohibited de facto regulation of pipeline safety, Sable altogether fails to allege a plausible claim for relief on this theory. To show that State Parks engaged in de facto pipeline safety regulation, Sable would need to demonstrate, with concrete facts, that State Parks' alleged safety concerns were

more than "merely incidental to the overall purpose" of State Parks' alleged acts affecting pipeline safety.[3] *See Wash. Gas Light*, 711 F.3d at 421-22. That would require showing that State Parks is regulating pipeline safety first and foremost, and not in the furtherance of its non-safety objectives. *See id*. at 422.

The Complaint falls short because it relies on conclusory allegations. *See Iqbal*, 556 U.S. at 678. Here, Sable's material allegations boil down to one fact, which is that State Parks has insisted on environmental review before agreeing to grant Sable a new easement. ECF 1, ¶¶ 39, 41-42. From there, Sable asserts, without factual substantiation, that State Parks' insistence on further environmental review constitutes a pretext for regulating pipeline safety. *Id*., ¶ 43. By merely reciting an element of its theory of liability, Sable has failed to demonstrate that its claim has sufficient facial plausibility to survive a Rule 12(b)(6) motion. *See Iqbal*, 556 U.S. at 678.

Sable must plead facts that, if proven, would show that State Parks' alleged acts had the purpose and effect of regulating pipeline safety. As State Parks explained, environmental review can disclose and assess impacts wholly unrelated to pipeline safety while allowing State Parks to avoid or mitigate those non-safety impacts. *See* ECF 27-1 at 9-11. Nothing in the Complaint supports a plausible inference that State Parks' demands in the course of negotiating an easement had the purpose and effect of imposing or enforcing pipeline safety standards. Because Sable has not pled facts showing that State Parks' alleged actions have that purpose and effect, this Court cannot infer that State Parks is liable. *Iqbal*, 556 U.S. at 663.

---

[3] Although ostensibly non-safety regulations can be found preempted if they regulate pipeline safety (see *Couser v. Shelby County, Iowa*, 139 F.4th 664, 670 (8th Cir. 2025)), incidental regulation of pipeline safety is permissible so long as the effect is not direct or substantial. *Grand Prairie*, 608 F.3d at 212 (holding that if a "requirement is not a safety standard in letter, purpose, or effect, it may remain in force").

For that reason, if the Court is inclined to allow Sable to proceed on this de facto regulation theory, it should still grant this motion and only provide Sable with leave to amend on the condition that it pleads sufficient facts to this effect.

## II.    SABLE FAILS TO SHOW THAT ITS DPA CLAIM CAN SURVIVE

The DPA neither requires nor authorizes Sable to transfer oil through the Park, and its immunity provision does not insulate Sable from liability for its flagrant trespass. For these reasons, the Court should dismiss Sable's DPA claim without leave to amend.

### A.    The DPA Does Not Conflict with State Trespass Law

Sable accuses Defendant of attacking a strawman by pointing out that the DPA does not confer the President or private properties subject to DPA orders with the power to requisition property. ECF 28 at 14. Instead, Sable attempts to frame its DPA claim as a straightforward preemption argument. *Id*. ("Sable pleads only that there is a conflict between state and federal law and that federal law controls under the Supremacy Clause and seeks a judicial declaration to that effect.").

But this claim posits that Sable's obligations under the DPA conflict with state trespass law. And no conflict exists because the DPA does not allow Sable to requisition the Park. *See* ECF 27-1 at 11-12. Congress revoked the President's requisition authority in 1953. P.L. 83-95, 67 Stat. 129. By extension, private parties subject to DPA orders also cannot requisition others' property. That means the DPA does not authorize or require Sable to compel State Parks to dedicate a property interest in the Park so that Sable can transfer oil.

In trying to argue that these laws are in conflict, Sable makes no reference to the text of the DPA. Section 101(a) of the DPA empowers the President to direct private parties to prioritize the performance of government contracts necessary to serve the national defense over other civilian contracts. 50 U.S.C. § 4511(a). Section 101(c) empowers the President to require the allocation and prioritization concerning "materials, equipment, and services in order to maximize domestic

energy supplies….” 50 U.S.C. § 4511(c). Both provisions concern *prioritization* and *allocation* of contracts and materials, which involve satisfying certain uses above others. *See id*. § 4511(a), (c); *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996) (noting that section 101 is titled “Priority in contracts and orders”).

Neither of these provisions authorize, let alone require, parties subject to DPA orders to impair property interests. If Congress or the President required the State to provide facilities or dedicate an interest in property, it would run afoul of the U.S. Supreme Court’s anticommandeering doctrine. *See United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019). Sable’s only argument here is that the Wright Order is not directed to State Parks. That is true. But that point misunderstands State Parks’ argument, which is that the DPA and the Wright Order do not and cannot compel California to assist Sable in its participation in a federal program. *See id*.

**B.     The DPA Does Not Confer Sable with Blanket Immunity from State Tort Liability**

On immunity under section 707 of the DPA, Sable argues that “COVID-19-era case law … made explicit … that the DPA’s preemptive force extends, at least, to state-law tort actions.” ECF 28 at 16. But the district court decisions Sable relies on do not adequately account for the weight of federal appellate authority.

The weight of federal appellate authority supports a narrower reading of section 707. *See Hercules*, 24 F.3d at 203; *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 811-812 (8th Cir. 1995). *Hercules* held, unambiguously, that the protection provided under section 707 only covered “liability arising as a consequence of such re-prioritization.” *Hercules*, 24.F.3d at 204. That was because the scope of section 707’s immunity is limited to the scope of the risk created from compliance with section 101. *Id*. at 203. And *Hercules* held that the scope of that risk was analogous to the common law defense of impossibility in breach of

contract actions. *Id*. (citing *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 997 (5th Cir. 1976)).

Contrary to Sable's argument, *Hercules*'s holding is not limited to its discussion of indemnification.[4] The case makes clear that "the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA." *Id*. And section 101 only allows the President to issue orders to prioritize performing certain contracts and to allocate certain materials. *See* 50 U.S.C. § 4511(c).

Notably, section 101 does not authorize the President to compel the *transportation* of energy sources in places where those activities are not otherwise permitted under state or local law. Indeed, section 101(c) treats energy exploration, production, refining, and transportation differently from the allocation and prioritization of contracts concerning "materials, equipment, and services" for those activities. 50 U.S.C. § 4511(c)(1), (2)(A)(i). Under section 101(c), the President may compel the allocation of "materials … essential to maintain or expand exploration, production, refining, [or] transportation[.]" *Id*. § 4511(c)(2)(A)(i). But the statute does not expressly confer the President with the authority to order the transportation of energy resources in places where such transportation is not permitted. Tellingly, the Wright Order couches its directions in the language of *prioritization* and *allocation*. *See* ECF 1-1 at 3.

Because section 101 does not authorize the President to compel the transportation of energy sources, section 707 does not shield contractors from tort liability stemming from those transportation services. *See Hercules*, 24 F.3d at 203. Sable's preemption and immunity arguments accordingly lack legal merit, and its DPA claim thus fails as a matter of law.

---

[4] Sable notes that the U.S. Supreme Court declined to adopt a narrow reading of section 707. But Sable ignores some crucial context, which is that the U.S. Supreme Court found that section 707 had no bearing on the issue before it. *See Hercules, Inc. v. United States*, 516 U.S. 417, 430 n.14.

### III.    THE CONSENT DECREE DOES NOT BAR STATE PARKS' TRESPASS ACTION

Finally, Sable argues that the Court cannot resolve competing interpretations of the Consent Decree on the pleadings. But interpreting a consent decree is a legal function, and in performing that function, this Court is limited to the four corners of the Consent Decree. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984). For that reason, this Court may only look to the express terms of the Consent Decree to determine whether it has an estoppel effect.

On its express terms, the Consent Decree cannot be construed to limit State Parks' right to obtain injunctive relief to cure prospective violations of state law. Consent Decree, ¶ 74 ("This Consent Decree shall not limit the rights of … the State Agencies … to obtain injunctive relief … under … state laws.").[5] And State Parks, in entering the Consent Decree, did not concede that Sable's predecessor's compliance with the Consent Decree would result in compliance "with any other provisions of federal, state, or local laws, regulations, or permits." *Id*., ¶ 76. These points alone foreclose Sable from pursuing its estoppel theory as a matter of law.

The Court should also reject the argument that State Parks is estopped from insisting that Sable obtain an easement to restart pipeline operations, because the Consent Decree's "restart" option (unlike the "replacement" option) did not require the pipeline owner to obtain a new or renewed property right (i.e., an easement), or give State Parks the right to prevent restart based on the lack of such a property right. ECF 28 at 20. The Consent Decree requires Sable to comply with the conditions precedent in the Consent Decree, including Appendix D, "and applicable law" before restarting. Consent Decree, App. B, ECF 1-2 at 106. In other words, the Consent Decree establishes necessary but insufficient conditions to allow Sable to flow oil through the Park, which Sables appears to concede. *See* ECF 28 at 20-21.

---

[5] The Consent Decree is attached as Exhibit B to the Complaint. *See* ECF 1-2.

To restart, Sable must also comply with applicable law, and that requires Sable to obtain State Parks' authorization to transport oil through the Park. *See Cassinos v. Union Oil Co.*, 14 Cal.App.4th 1770, 1778 (1993) ("[C]ausing subsurface migration of fluids into a mineral estate without consent constitutes a trespass.").

To accept Sable's argument—which is that an easement is not required to restart operations—would then entitle Sable to restart the transportation of oil across the Park or others' lands without authorization. This argument makes no sense, and it could not have been contemplated by the Consent Decree.[6] In fact, that the previous pipeline owner operated the pipeline pursuant to a 30-year easement issued by State Parks further supports the argument that such a property right is required for restart even if not explicitly referenced in the Consent Decree.

The Court should also reject any suggestion by Sable that, by receiving a $2 million payment under the Consent Decree (see ECF 28 at 20), State Parks cannot demand additional payment from Sable through an easement. The payment that State Parks received under the Consent Decree was for past natural resource damages resulting from the 2015 Refugio Oil Spill (Consent Decree, ¶ 12.b) and is entirely unrelated to State Parks' right to demand payment for Sable's use of state property.

Finally, the Consent Decree specifically requires that restart proceed in accordance with "applicable law" (Consent Decree, ¶ 76, App. B), which necessarily includes state property laws. See also *id*., ¶ 78 (requiring Sable's predecessor to maintain compliance with all applicable state laws). Sable cannot comply with state property law by entering onto state property without a valid property right (in this case, an easement), as doing so would constitute trespass. *See Cassinos*, 14 Cal.App.4th at 1778.

---

[6] Sable undermines this argument by conceding that State Parks is entitled to seek the fair market value of Sable's use of the Park, which appears to be an acknowledgment that Sable is trespassing. ECF 28 at 2.

11

In summary, the express terms of the Consent Decree foreclose Sable's estoppel defense for three reasons. First, the Consent Decree does not estop State Parks from pursuing injunctive relief to enforce its property rights. Consent Decree, ¶ 74. Second, the Consent Decree provides the necessary, but not necessarily the sufficient, conditions that Sable's predecessor had to satisfy before it could restart the pipelines. *Id*. And third, Sable's predecessor remained "responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein." *Id*., ¶ 78. The Court should ignore Sable's request to look beyond the four corners of the Consent Decree and dismiss this claim without leave to amend.

## CONCLUSION

Defendant respectfully requests that the Court grant this motion without leave to amend.

Dated: June 15, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL
Supervising Deputy Attorney General

*/s/ Matthew T. Struhar*
MATTHEW T. STRUHAR
Deputy Attorney General
*Attorneys for Defendant Armando Quintero*

SA2026301402
USDC Central (2 Party).docx

12

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Armando Quintero, certifies that this brief contains 3,917 words, which complies with the word limit of L.R. 11-6.1.

Dated:  June 15, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California


*/s/ Matthew T. Struhar*
MATTHEW T. STRUHAR
Deputy Attorney General
*Attorneys for Defendant Armando Quintero*

13